|  |  |
|---|---|
| ANDREW MOBUS,<br><br>　　　　　　　Plaintiff,<br><br>v.<br><br>BARD COLLEGE, PETER LAIPSON, and<br>SUSAN LYON<br><br>　　　　　　　Defendants. | CIVIL ACTION NO. 17- |

## COMPLAINT

Plaintiff Andrew Mobus ("Andrew" or "Plaintiff"), through his undersigned attorneys, hereby asserts the following as his Complaint against Defendants Bard College, Peter Laipson and Susan Lyon:

## NATURE OF THE ACTION

1.　　In this action, Plaintiff seeks declaratory relief and monetary damages arising out of a series of wrongful acts committed by Defendants to the extreme detriment of Plaintiff while he was a student at Simon's Rock, which is an unincorporated division of Bard College.[1]　These wrongful acts constitute a violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 et seq., ("Title IX") and the rules, regulations, guidance, and advice promulgated thereunder.　That conduct also constitutes a breach of the contract that existed between Plaintiff and Bard pursuant to Bard's Student Handbook,[2] as well as the basis for the various tort claims asserted below.

---

[1] Because Simon's Rock is not a juridical entity separate and apart from Bard, the terms "Simon's Rock," "Bard" and the "College" are used interchangeably herein to refer to the same academic institution.

[2] References to the "Student Handbook" are to the Simon's Rock Student Handbook of 2013-2014, which was in effect during the time period relevant to the subject matter of this Complaint.

2.      As the culmination of Defendants' unlawful conduct, Plaintiff was expelled from Simon's Rock.  This occurred after and as the result of a complaint made to Simon's Rock by a former girlfriend of Plaintiff ("JG"), and a subsequent investigation, hearing, determination and appeal by Simon's Rock, each phase of which was motivated by gender bias, showing a callous disregard for and a breach of Plaintiff's statutory and common law rights.

3.      The conduct described below was consistent with the gender bias that Bard administrators admitted directly to Plaintiff.  Robert Graves, Dean of Campus Life at Simon's Rock, told Plaintiff that with respect to sexual misconduct proceedings, the "pendulum" had swung to the point that Bard was more interested in demonstrating a concern for the safety of female students than in ensuring that male students accused of sexual misconduct were treated fairly.  A similar admission was made to Andrew by Valerie Fanarjian, from the Department of Student Affairs, who warned him and other incoming male students to "be careful" because "heterosexual males" would be punished for engaging in the same conduct that would be of no consequence if engaged in by "females," further confirming the College's bias against its male students in favor of its female students.

4.      Bard's admitted gender bias may be attributed to, but certainly may not be justified by, the then-prevalent governmental threats of fiscal retaliation against colleges that did not effectively combat sexual misconduct on campus.  Well before May 2014, the month in which Bard initiated the JG investigation against Plaintiff, both the public media and Bard's own student body were accusing Bard and other colleges of failing to take seriously complaints made by female students against male students.  Such criticism was heightened that month by the United States Department of Education's release of its first public disclosure of colleges with

open Title IX "sexual violence investigations."[3]  Although Bard was not yet under investigation

by the government, the threat to Bard was imminent: that same month, May 2014, it was reported

that Bard College ranked second in New York State in the number of forcible sexual offenses

reported for the prior three-year period.[4]

5.      Not surprisingly, the student body at Bard inserted itself into the process:  in

2014, a new group called "Bardians Against Destructive Decisions," which was funded by Bard,

was formed to raise awareness of sexual misconduct incidents at the College.[5]

6.      It was against this backdrop that Defendant Lyon first persuaded JG to file a

complaint against Andrew, and then, as Deputy Title IX Coordinator[6] for the matter, personally

presided over an uninformed and poorly trained sexual misconduct Committee that conducted a

gender-biased and fundamentally unfair process with the goal of finding in favor of the female

complainant.  Following is a summary of the relevant facts that form the subject matter of

Plaintiff's claims in this action:

a.      At the end of April 2014, JG met with her Academic Advisor, Rebecca Fiske, to

discuss her poor academic performance and the risks she faced of losing her scholarship. Upon

information and belief, during that meeting, JG painted an extremely unflattering picture of

Plaintiff, describing him as abusive and suggesting that as the reason for her academic

problems.  JG told Fiske that she was thinking of ending the relationship, and Fiske encouraged

---

[3] Washington Post, May 1, 2014, "55 Colleges under Title IX Probe for Handling of Sexual Violence and Harassment Claims," by Nick Anderson. https://www.washingtonpost.com/local/education/federal-government-releases-list-of-55-colleges-universities-under-title-ix-investigations-over-handling-of-sexual-violence/2014/05/01/e0a74810-d13b-11e3-937f-d3026234b51c_story.html

[4] Poughkeepsie Journal, "Gillibrand:  Give Colleges Incentive to Report Sexual Abuse", May 30, 2014, byline Brian Tumulty. http://www.poughkeepsiejournal.com/story/news/local/2014/05/29/campus-sex-assault-gillibrand/9746437/

[5]  Bard Free Press, "Colleges Takes on Sexual Assault", September, 2014, by Johanna Costigan. https://issuu.com/bardfreepress/docs/2014september

[6] "Title IX Coordinator" refers to the person with responsibility for safeguarding the College's federal funding by ensuring compliance with Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 *et seq.,* and the rules, regulations, guidance and advice promulgated thereunder.

her to do so. A few days later, on May 2, JG abruptly ended her 10-week relationship with Plaintiff.

b.  Upon information and belief, Fiske recounted the conversation she had had with JG to Defendant Lyon, who was at that time a member of a Committee investigating a student's complaint that Plaintiff had touched her improperly (the "LF Complaint"). For no discernible reason other than hearing that JG claimed to have relationship problems with Plaintiff, Defendant Lyon instructed JG to appear before the Committee hearing the LF Complaint (the "LF Committee") on May 16. JG knew nothing about the LF Complaint and had not even begun to date Plaintiff until after that alleged incident occurred.  Moreover, Lyon knew that the LF Committee was soon to dismiss the LF Complaint (it did so only a few days later) because it was unsupportable by the credible evidence.  Although no transcript or notes of that meeting exist, the LF Committee's questioning of JG resulted in her asserting, for the first time, that Plaintiff had raped her on February 28, which was 2 ½ months earlier.

c.  At no time subsequent to the alleged incident of February 28, 2014 did JG report the incident to the police or seek medical assistance, nor did she report it to Simon's Rock, nor, upon information and belief, to friends or family members.  In fact, JG had not even accused Plaintiff of raping her during the conversation with Rebecca Fiske two weeks earlier. That long and unbroken silence is understandable, since the same night of the alleged incident, Plaintiff and JG spent the night together in JG's dormitory room, they exchanged warm and loving text messages the following day, and they continued to enjoy an intimate emotional and sexual relationship until JG terminated it on May 2, after speaking with Fiske.

d.      Upon learning about the "rape" allegation, the Dean of Campus Life, Robert

Graves, issued instructions that Plaintiff must leave the campus that day and not return, if at all,

until further notice.[7]

e.      A formal complaint letter was issued on May 23, 2014 (the "JG Complaint")

which, perhaps not so coincidentally, was the day after the LF Committee on which Defendant

Lyon served was compelled to dismiss all charges against Plaintiff for lack of evidence.

f.      A Committee was appointed to oversee the investigation and hearing of the JG

Complaint (the "JG Committee").  The original JG Committee was comprised of two women

and one man. On the eve of the Hearing, however, the male member of the JG Committee was

replaced by a self-styled radical feminist who had previously refused to act as Plaintiff's school-

sponsored advocate in connection with the LF investigation on the ground that she could not be

neutral.

g.      The three faculty members who served on the JG Committee had little or no

training with respect to Title IX investigations and hearings. Their ignorance of even the most

fundamental notions of fairness became evident during the course of their deposition testimony

given in connection with Plaintiff's separate defamation action against JG.[8] For example:

i.  Sometime during the summer of 2014, JG prepared a detailed three-page,

single-spaced, typed memorandum about the alleged rape and other aspects of

her relationship with Andrew.  This was several months after her May 16

meeting with the LF Committee when she first accused Andrew of raping her,

and at least five or sixth months after the alleged incident on February 28.  This

---

[7] That directive was ostensibly issued pursuant to an unwritten "policy" requiring the banishment from campus of any student who was simultaneously the subject of two sexual misconduct complaints.  However, Plaintiff was not permitted to return to the Simon's Rock campus after May 22, when the LF Complaint was dismissed.  Before closing that case, however, Defendant Lyon set in motion the gender-biased proceeding that forms the subject matter of this action.

[8] *Andrew Joseph Mobus v. Jane Doe,* Case No. 03C15005319, pending in the Circuit Court for Baltimore County (the "Maryland Defamation Action").

detailed memorandum (the "JG Allegations") was given to the JG Committee but not to Andrew. The JG Committee relied on the JG Allegations during the Hearing.

    ii. One of the three JG Committee Members admitted under oath not only that Plaintiff had <u>not</u> been given a copy of the JG Allegations, but that it would have been <u>against school policy</u> to provide Plaintiff with that information about the charges against him.

    iii. The other two JG Committee Members, as well as Defendant Lyon, the Deputy Title IX Coordinator — whose function included supervising the JG Committee's work to ensure compliance with applicable Title IX rules and regulations and the Student Handbook — testified that they "could not remember" whether Plaintiff had ever been given a copy of the JG Allegations.

    iv. Another JG Committee Member admitted that in deciding the JG matter, the JG Committee did not engage in any presumption that Plaintiff was innocent of the charges, and she testified that she did not even understand the question of whether JG had the burden of proving that Plaintiff had engaged in misconduct or whether Plaintiff had the burden of proving that he did not engage in misconduct.

    v. Another JG Committee Member testified that a student accused of wrongdoing has no right to call any witnesses who may have knowledge of relevant facts, and that the JG Committee could just decline to do so.

h. Although a Title IX Coordinator is neither a member of the Committee nor permitted to influence its determination, Defendant Lyon essentially hijacked the process. The JG Committee drafted two successive letters setting forth its findings and its recommendation, but Defendant Lyon rejected both letters as unsatisfactory, and then convened a meeting with

the JG Committee. There is some testimony that Defendant Lyon merely acted as the scrivener for the JG Committee at that meeting, but the written record tells a different story. The factual findings contained in the JG Committee's two letters, setting forth their own factual findings after weighing of the evidence, find no expression in the letter written by Lyon (the "Lyon Outcome Letter"), which essentially repeated verbatim the factual assertions made in the JG Allegations.

i.      But most significantly, the two letters prepared by the JG Committee had recommended suspension, not expulsion. The Lyon Outcome Letter stated that the JG Committee had recommended expulsion.

j.      The Lyon Outcome Letter also stated that the Dean of Campus Affairs, Robert Graves, had accepted its findings and recommendations, but there is no written evidence that Dean Graves was ever asked to, or did in fact, approve the "Lyon Outcome Letter" or accept the recommendation of expulsion. During her deposition, Defendant Lyon admitted that she had no specific recollection of having discussed the matter with Dean Graves, but she said believes she did so.

k.      Plaintiff appealed the decision, but the appeal process was similarly flawed. There is no evidence that Defendant Peter Laipson, who as Provost had responsibility for hearing and deciding Plaintiff's appeal, was ever made aware of any of the gross improprieties described above — including the fact that the Lyon Outcome Letter had been preceded by two versions of an outcome letter prepared by the JG Committee itself that contained markedly different findings of fact and the recommendation for a far more benign sanction. Indeed, Plaintiff himself did not become aware of those facts until well after his expulsion when he received some of the documents that he had requested from Bard pursuant to The Family Educational

and Privacy Rights Act (20 U.S.C. 1232g) (the "FERPA Documents").[9] Defendant Laipson's appeal decision was likewise improper because it applied a standard of review (requiring Plaintiff to establish that a different result would have been "compelled" in the absence of the errors below) that was far more stringent than prescribed by Bard's Student Handbook (that the JG Committee's errors "substantially affected the outcome" of the JG Committee's decision).

l.      But perhaps the best evidence that the appeal process was a sham is that Defendant Lyon wrote an email to Simon's Rock's Enrollment Committee on August 22 advising it that "Andrew Mobus will not be returning to Simon's Rock." That was the same date as Defendant Lyon's bogus "Outcome Letter" — and before the appeal process had even begun.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over Plaintiff's federal claims under 28 U.S.C. §§ 1331 and 1343. This Court has supplemental jurisdiction over Plaintiff's related state common-law claims pursuant to 28 U.S.C. § 1367.

8.      This Court has personal jurisdiction over all Defendants under Mass. Gen. Laws ch. 223A §§ 2, 3(a), and 3(c), because each is domiciled, regularly does business, engages in other persistent courses of conduct, or has committed tortious and other acts giving rise to the claims stated herein in this Commonwealth.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because Defendants reside in this District, and a substantial part of the events and omissions giving rise to

---

[9] The FERPA production still appears to be incomplete, as it did not include many of the documents that were required by the Department of Education to be created and maintained in connection with the Investigation, Hearing and Appeal of the proceeding at issue in this action. Some of those withheld documents were disclosed in response to a subpoena *duces tecum* issued in connection with the Maryland Action. Among the previously withheld, and highly revealing, documents were notes taken during the Hearing by members of the JG Committee who sat in judgment of Plaintiff. Inexplicably and improperly, those Committee notes had not been produced in response to Plaintiff's FERPA request.

Plaintiff's claims occurred here. Venue is proper in this division pursuant to Local Rule 40.1(D)(2) because, on information and belief, Defendant Peter Laipson resides in Middlesex County.

**PARTIES**

10. Plaintiff, Andrew Mobus, is a resident of the State of New York. During most of the relevant time period, Plaintiff was a full-time student at Bard College at Simon's Rock.

11. Defendant Bard College is a corporation organized under the laws of New York, which is registered to do business in the Commonwealth of Massachusetts as a foreign corporation. Bard College is a not-for-profit private educational institution acting with the approval of the Commonwealth of Massachusetts, operating the Simon's Rock campus at a location in Great Barrington, Massachusetts. The President of Bard College, Leon Botstein, is also the Chief Executive Officer of Bard College at Simon's Rock.

12. Defendant Lyon was, during times material to the Complaint, Associate Dean of Academic Affairs, Deputy Title IX Coordinator, and *de facto* Title IX Coordinator with respect to the JG matter. Lyon is, upon information and belief, a resident and citizen of the Commonwealth of Massachusetts. She is sued in her individual capacity to the extent that she acted outside the scope of her authority in committing the unlawful acts described herein. To the extent that she acted within the scope of her authority, she was as acting as an authorized agent of Bard College.

13. Defendant Laipson was, during times material to the Complaint, Provost of Bard College. He is, upon information and belief, a resident of the Town of Arlington and citizen of the Commonwealth of Massachusetts. He is sued in his individual capacity to the extent that he acted outside the scope of his authority in committing the wrongful acts described herein. To the extent that he acted within the scope of his authority, he was acting as an authorized agent of Bard College.

<u>**STATEMENT OF FACTS**</u>

**I. Background**

14.     Bard's Simon's Rock division holds itself out as an "Early College" for intellectually gifted high school students, many of whom deal with some degree of emotional or social challenge.

15.     Plaintiff Andrew Mobus matriculated at Simon's Rock in January 2014 after having completed 11th grade at his prior school.

16.     Andrew has a history of emotional issues that were fully disclosed to Defendant Bard during his application for admission to the Simon's Rock campus.  Initially, in the second grade, Andrew was diagnosed with ADHD.  By ninth grade, Andrew began to experience anxiety attacks, which became so severe that his pediatric neurologist prescribed anxiety medication.

17.     In the fall of 2013, Andrew and his father met with the Admissions Committee at Bard for the Simon's Rock campus.  As part of the admissions process, they fully disclosed Andrew's academic, psychological, emotional, and social history in great detail.  Andrew and his parents sought — and received — assurances that Simon's Rock was equipped not only to educate, but also to nurture and take care of Andrew, and to address his particular emotional issues.  The Admissions Officers affirmatively encouraged them to choose Bard for Andrew, assuring them, both verbally and by referring to the school's website, that Simon's Rock would provide Andrew an intellectually challenging, as well as a safe, nurturing, and supportive, environment.

18.     What followed Andrew's arrival at Simon's Rock bore little if any resemblance to those assurances.  Instead, Andrew found himself thrust into an unstructured and unsupervised environment, where Resident Directors turned a blind eye to rampant drug and alcohol abuse occurring openly in the dormitories they were supposed to supervise; students drank until they

dropped, with girls and boys vomiting their alcohol in the open; LSD, barbiturates, speed, and MDMA (commonly referred to as "Ecstasy") were readily available and openly and notoriously used (one alumni blogger described Simon's Rock as a "Drug Mecca"); sexual activity of every conceivable nature was rampant; and many students engaged in "cutting" and other acts of self-harm that the College did nothing to monitor or try to prevent.

19.     Andrew was ill-equipped to handle the challenges that life at Simon's Rock presented. Prior to his arrival there, he had had a sexual relationship with only one girlfriend; he had little experience with alcohol; and he had no experience at all with hallucinogens or other hard drugs.

## II. The Flawed JG Committee Investigation and Hearing

20.     Beginning in or about the middle of February 2014, and continuing until May 2, 2014, Andrew and JG had an intimate personal and sexual relationship.

21.     In or about the end of April 2014, JG had a meeting with her academic advisor, Rebecca Fiske, during which they discussed JG's poor academic performance and the risk she faced of losing her scholarship and having to leave Simon's Rock. Upon information and belief, JG suggested to Fiske that her relationship with Andrew might be adversely affecting her academic performance, and painted an unflattering picture of Andrew.

22.     Upon information and belief, Fiske subsequently recounted the conversation she had with JG to the Deputy Title IX Coordinator, Defendant Lyon, who was at that time a member of a LF Committee overseeing the LF Complaint, another investigation against Andrew that Lyon knew would soon be dismissed as unsupportable. JG had no direct knowledge about the LF matter. In fact, JG did not meet Andrew until after the alleged incident in which Andrew had rejected LF's advances, which was the precipitating cause of the bogus LF complaint. Nonetheless, Defendant Lyon arranged a meeting with JG on May 16 pretextually in furtherance of the work of the LF Committee. Upon information and belief, during that meeting, JG repeated

to Defendant Lyon the story she had told to Fiske and stated for the first time that Andrew had raped her. JG testified in the Maryland Defamation Action that it was during her conversation with Fiske that she first came to "realize" that Andrew had raped her on February 28, 2014, two months earlier. Nonetheless, JG never reported the incident to the school until her conversation with the LF Committee on May 16. Nor, as noted above, had JG reported the alleged incident to the police or sought medical assistance at the time, or indeed ever.

23.     Within hours of JG's meeting with Defendant Lyon and the LF Committee, Andrew was summoned to the office of Robert Graves, Dean of Campus Life, and told that he must leave campus immediately because he had been advised that a claim of sexual misconduct would shortly be filed against him.[10]

24.     One week later, on May 23, 2014, Bard sent the JG Complaint to Andrew. The JG Complaint contained general allegations of sexual and emotional misconduct on the part of Andrew, but did not identify February 28 or any other date on which a particular instance of misconduct had occurred, nor did it state that JG had alleged that Andrew had raped her.

25.     At the suggestion of the Title IX Coordinator, later in the summer JG wrote the JG Allegations: a long and highly detailed statement based on her memory of the events of February 28, as well as other highly selective recollections about her relationship with Andrew between its inception in mid-February and May 2, when she terminated it. It was in this document that JG accused Andrew of having raped her, and identified February 28 as the date on which that rape had allegedly occurred.

26.     This document was given to the JG Committee, but not to Andrew, despite the fact that it would obviously be essential for Andrew to have it in order to prepare for the Hearing, and despite the fact that he had specifically asked the JG Committee to provide him

---

[10]   The pretextual nature of that directive is discussed in note 7, *supra.*

with any relevant evidence they had.  In fact, the first time Andrew saw the JG Allegations was long after the Hearing, after his unsuccessful appeal and after his expulsion from Simon's Rock. Andrew did not see this critically important charging document, on which the JG Committee heavily relied in its deliberations and decision, and which formed the backbone of the Lyon Outcome Letter, until it was finally produced to him in response to a FERPA request.

27.       After weeks of silence[11] Defendant Lyon set a Hearing date for August 14 with only six days' notice to Andrew. Andrew asked for a brief adjournment, not only because he needed more time to prepare his oral and written defense, but also because his mother's younger sister was very close to death. Defendant Lyon denied the request, despite the fact that, upon information and belief, she knew that one of the JG Committee Members, Francisca Oyogoa, would be out of the country on vacation on August 14, and could only participate by Skype, but was returning to the States the following day, August 15.  The Hearing proceeded on August 14, with Andrew's father sitting outside the hearing room, but being denied the opportunity even to sit with his son to provide moral support.  Andrew's aunt died the following day.  Defendant Lyon's conduct in this regard made a mockery of Bard's pledge that it would always treat the accused in any investigation with "respect and sensitivity" (Student Handbook, page 80).  In fact, as set for the below, the entire Investigative and Hearing Stages were tainted by gender bias; stages in which grossly unequal treatment was afforded the parties.

---

[11]   After Andrew was banished from the campus, he asked the Title IX Coordinator, then Marty Checchi, to direct further communications about the JG matter to his father. Having heard nothing from the school for several months, Andrew's father sent an email to Ms. Checchi to inquire about the status, only to find that she was no longer the Title IX Coordinator, or indeed any longer employed by Simon's Rock. Mr. Mobus followed up with an inquiry to Dean Graves, which apparently never found its way to Defendant Lyon, the Deputy Title IX Coordinator who had taken responsibility for the JG matter. For her part, Defendant Lyon testified that she had repeatedly tried to get in touch with Andrew, but was unable to do so.  Inexplicably, however, she never attempted to contact Andrew through his family, despite the fact that Simon's Rock certainly had all the contact information.

## A. The Investigative Stage was Tainted by Gender Bias

### 1. *Bard Failed to Appoint a Neutral Title IX Coordinator*

28.     In the Student Handbook, Bard commits to following the United States Department of Education rules and regulations.[12]

29.     Title IX rules and regulations can be found, in among other things, a "Dear Colleague Letter" from the United States Department of Education dated April 4, 2011 (the "Dear Colleague Letter").[13]  In the Dear Colleague Letter, the Office of Civil Rights ("OCR") stated that the Title IX Coordinator's role should be "independent to avoid any potential conflicts of interest," and that a school "should be careful to avoid designating an employee whose other job responsibilities may create a conflict of interest [such as] designating a disciplinary board member . . . [or] a dean of students."  Contrary to this prohibition, Defendant Lyon simultaneously occupied the roles of Assistant Dean of Academic Affairs, LF Committee member adjudging the LF Complaint, and Deputy Title IX Coordinator during the Spring Semester 2014, when the relevant events transpired.

### 2. *Bard Failed to Appoint a Neutral Committee*

30.     At the commencement of the JG investigation, Bard notified Andrew that two women and one man had been selected to serve on the JG Committee.  However, on the eve of the August 14 Hearing, Andrew was notified that the male JG Committee member had been injured and that he would be replaced by Francisca Oyogoa, a female professor of women's studies who regarded herself and who was regarded by others as a radical feminist and women's rights activist.  This eleventh-hour substitution was improper for several reasons.  Ms. Oyogoa had previously declined Andrew's request that she serve as his Advocate in the LF matter, admitting that she could not be neutral in a matter involving allegations of sexual misconduct

---

[12]  The Student Handbook represents to the students that "College policy is consistent with . . . federal statutes and regulations including . . . Title IX."  Student Handbook, page 8.

[13] http://www2.ed.gov/print/about/offices/list/ocr/letters/colleague-201104.html

against Andrew.  On that basis alone, she was required by Bard's own rules to recuse herself from serving on the JG Committee.  Moreover, Ms. Oyogoa was not even available to attend the Hearing in person, but could only watch from her laptop via video conference call from her vacation in Cabo, Mexico.

### 3. *Bard Failed to Provide Andrew with a Neutral Advocate*

31.     The Student Handbook provides that both the complainant and the accused party have the right to an advocate to assist in the Hearing procedure.  (Student Handbook, page 77). Remarkably, however, the Advocate Defendant Lyon recommended for Andrew was the Complainant's Resident Advisor.  Andrew understandably declined his help.  Because no alternative Advocate was recommended, Andrew prepared for and participated in the Hearing and subsequent appeal with no Advocate assistance.

### 4. *Bard Refused to Provide Andrew With the Same Privileges and Assistance that it Afforded JG During the Investigative Stage*

32.     Upon information and belief, Ms. Fiske, JG's advisor, assisted JG with her testimony before the Hearing. Andrew was not provided any pre-Hearing assistance, support, or advice.

33.     In fact, before the Hearing, the only document Bard provided to Andrew to prepare his testimony was the JG Complaint, while JG of course had full access to all the facts set forth in the JG Allegations she had written. In preparing his written statement in defense, Andrew stated that the allegations in the JG Complaint were too vague to respond to, and asked for more specificity, so he could properly respond to them.  Despite his request, and despite the obvious importance of the detailed accusatory allegations contained in the JG Allegations, that document was not provided to him.  In fact, one member of the JG Committee has testified under oath that it would have been against school policy to do so.

### B. The Hearing was Tainted by Gender Bias

#### 1. JG was Permitted to Have a Support Person In Attendance while She Testified; Andrew's Request for Support was Denied

34.     At the Hearing, JG was afforded the support of her academic advisor, Ms. Fiske, who attended the Hearing while JG offered her testimony via a video conference call.

35.     Andrew was denied the right to have a support person in attendance while he testified.  Andrew had made a specific request to have his father accompany him into the Hearing room for support; his father was sitting outside the Hearing room during the Hearing, but Andrew's request was denied.

#### 2. JG was Permitted to Have a Character Witness Testify as to her "Honesty"; Andrew was Not Permitted to Do Likewise

36.     Bard allowed JG to present a character witness on her behalf at the Hearing.  That witness was Rebecca Fiske, whose conversation — according to the JG Allegations — enabled JG to "realize" that she had been "raped," a characterization of the event that JG readily admitted had not even occurred to her before her conversation with Fiske, more than two months after the alleged incident.  Upon information and belief, Fiske not only acted as a character reference, but also expressed her own personal opinion that JG was telling the truth.  Contemporaneously prepared handwritten Committee notes suggest that Fiske's testimony in this regard formed the basis for at least one of the JG Committee Members to credit JG's testimony over Andrew's.

37.     Andrew's father sought to testify at the Hearing to attest to Andrew's character and express his belief that Andrew was incapable of the conduct ascribed to him in the JG Complaint, but Bard denied the request. In fact, he was not even allowed to sit silently beside his son to provide moral support during the Hearing.

### 3. The JG Committee Did Not Engage in A Presumption That Andrew Was Innocent of The Charges or Place the Burden on JG To Prove the Truth of Her Allegations.

38.     One member of the JG Committee has specifically admitted in sworn deposition testimony that the JG Committee did not afford Andrew the benefit of a presumption of innocence, and stated that she did not even know whether JG or Andrew had the burden of proof.

### 4. Andrew Was Not Provided Notice of the Charges Against Him

39.     At the beginning of the Hearing, Andrew started to address the allegations set forth in the JG Complaint. However, the JG Committee was referring to the highly detailed JG Allegations, which, unbeknownst to Andrew prior to the Hearing, stated that Andrew had raped JG six months earlier, on February 28, 2014

40.     As a result of the refusal of Bard to notify Andrew of the charges against him, the Hearing was *not* conducted on charges in the JG Complaint — charges to which Andrew had had an opportunity to prepare a defense. Instead, the JG Committee conducted the Hearing on the basis of the JG Allegations that Bard had not previously disclosed to him, and which the JG Committee refused to disclose to him even at the Hearing. Andrew was thus denied the opportunity even to <u>know</u>, much less refute, deny, or even explain his version of the facts with respect to the JG Allegations that the JG Committee considered and which were ultimately used as the basis for the findings and recommendation contained in the bogus Lyon Outcome Letter.

### 5. Bard Refused to Allow Andrew to Present Fact Witnesses

41.     Andrew was informed that he could not have any witnesses testify at the Hearing on his behalf. There were several witnesses whose testimony would have been relevant to the facts at issue. There were, for example, witnesses who could have provided significant testimony regarding the continuing affection and closeness between Andrew and JG for the two-month time period after the alleged incident. In addition, a Resident Advisor had seen JG and Andrew together on the night of the alleged incident and could have testified that JG did not

appear to be intoxicated or in any way even remotely incapable of giving her consent to what she later called rape.

### 6. Bard Failed to Conduct a Hearing that Enabled the JG Committee to Competently Assess the Credibility of Witnesses

42.     The allegations JG had made against Andrew were extremely serious and, if they had been true, JG would have been entitled to have them treated with the utmost diligence, sensitivity, and careful consideration.  That same degree of diligence, sensitivity, and careful consideration was owed to Andrew because the outcome of the Hearing could have a profound and adverse impact on his future, academically, professionally, and personally.

43.     Initially Andrew was asked to submit his entire defense via a video conference call.  Andrew declined, stating in writing that: "I think it is important that I be in the room when I am speaking with the committee.  The process is very important to me and for my future. I find Skype very unnatural and awkward."  Andrew's reasonable and sensible request that credibility be assessed "in person" was ignored when it came to JG, whose testimony was received not in person, but by video conference call. Further impairing the JG Committee's search for the truth in a matter that depended so entirely on the credibility of the parties, JG Committee Member Oyogoa also participated through a via video conferencing feed. Thus, all three JG Committee members were ostensibly judging JG's credibility by Skype and JG Committee member Oyogoa was supposedly making the credibility determination through two Skype hook-ups, JG's and Oyogoa's own remote hook-up from her vacation in Cabo. The denial of Andrew's request that the JG Committee treat the issue of credibility of witnesses with neutrality and seriousness contributed to the unfairness of the Hearing and the entire process.

### 7. Bard Failed to Afford Andrew the Right to Question the Testimony of Both JG and her Character Witness, Fiske, Either by Cross-Examination or Submission of Written Questions

44.     The FERPA Documents reveal that Ms. Fiske, JG's academic advisor, testified for one-half hour on JG's behalf.  Andrew was not allowed to be present during that testimony, nor was he informed of the content of that testimony.

45.     This event was significant because Andrew reasonably believed that JG had fabricated the story of Andrew's alleged sexual misconduct when speaking to Fiske as an excuse for JG's academic predicament:  that semester, she was failing her courses and was in danger of losing her scholarship.  Andrew was not informed that Fiske had provided support testimony for JG.  Thus, Andrew was denied the opportunity to question Fiske or JG about these facts, leaving the JG Committee unaware of evidence that bore directly on the question of JG's credibility.

46.     Andrew was also not permitted to ask JG any questions – either directly or by having the JG Committee ask them — regarding JG's version of events that she consumed "most" of the bottle of wine they shared, or to ask her to confirm that they spent the rest of the night cuddled together after the alleged "rape," and that they exchanged tender love note texts the following day or that they continued to have an intimate sexual relationship for more than two months thereafter. In fact, Andrew was denied the opportunity to question JG directly or through the JG Committee with respect to <u>any</u> of the statement contained in the JG Allegations, <u>because he had not been given a copy of that essential charging document</u>.

### III. The JG Committee Outcome Letter Was Improperly Hijacked by Title IX Coordinator Defendant Lyon to Achieve Desired Result

47.     Upon information and belief, Defendant Lyon was dissatisfied that the LF Complaint against Andrew had to be dismissed as unsupportable.  She was, upon information and belief, well aware of the pressure that was being placed on academic institutions such as Bard to demonstrate greater concern for females who were the victims of sexual misconduct.

48.     After the LF matter was concluded, and Andrew was exonerated of the charge against him, Defendant Lyon saw to it that she was selected as the Deputy Title IX Coordinator in charge of the JG matter.  Her precise role in the LF Hearing is unknown as no transcript of that proceeding has been produced.  In any event, after the Hearing, the JG Committee sent a letter to Lyon, dated August 15, 2014, setting forth its findings and its recommendation of suspension.  Defendant Lyon rejected that letter and provided the JG Committee with guidance as to what a revised letter should contain.

49.     The JG Committee then submitted a second letter to Defendant Lyon, also dated August 15, containing a more detailed recitation of the evidence and its findings based on that evidence, and once again recommending suspension, not expulsion.

50.     Defendant Lyon rejected that letter as well, and convened a meeting with the JG Committee.  By the end of that meeting, Defendant Lyon had prepared her own outcome letter, dated August 22, 2014 (the "Lyon Outcome Letter"), replacing much of the equivocal and benign language in the two JG Committee letters with verbatim passages from the JG Allegations.

51.     Most significantly, Defendant Lyon also changed the JG Committee's recommendation from suspension to expulsion.

52.     Although the decision of a JG Committee should be signed by the Committee itself, Defendant Lyon signed the August 22 letter.  Lyon represented in that letter that it expressed the findings and the recommendation of the JG Committee, and she also represented that it had been approved by Dean Graves, as required by the Student Handbook.  There is no evidence that Dean Graves was ever made aware of, much less accepted, the findings or recommendation contained in the bogus Lyon Outcome Letter.

## IV. Defendant Laipson's Improper and Deceptive Appeal Decision

53.     Andrew in good faith pursued his right to appeal the decision to Defendant Provost Laipson, unaware that Defendant Lyon had hijacked the JG Committee's work and that the JG Committee had twice recommended suspension, rather than expulsion. From documents made available pursuant to the FERPA request, it appears that there was no "record" for the Provost to review, as Bard maintained absolutely no records of the JG witness interviews, Investigation, or Hearing other than a few handwritten notes created during the JG Committee Hearing — none of which were, upon information and belief, submitted to Provost Laipson.

54.     The Appeal Decision was thus based on a virtually non-existent record and without the benefit of knowing that the two outcome letters written by the JG Committee itself were quite different from, and for more benign than, the bogus Lyon Outcome Letter. But even beyond that, the Appeal Decision signed by Defendant Laipson contained a number of false statements, including but not limited to the statements: (a) that Andrew had been informed of the nature of the allegations against him when, in fact, he had still not seen the JG Allegations that formed the basis for the case against him; and (b) that Andrew and the Complainant had had the same opportunity to call witnesses to testify, which, as described more fully above, was manifestly inaccurate. Andrew had specifically been advised that he could not call any fact or character witnesses, and he was unaware that Rebecca Fiske had appeared as a witness on behalf of JG.

55.     In addition to these and other clear factual errors, the Appeal Decision was also the product of at least two critical legal errors. *First,* Defendant Laipson specifically admitted that "when considering an appeal, I do not second-guess the Committee's judgment." There could be no clearer statement confirming that the appellate process was just a "rubber stamp" formality, and not any appeal at all.

56.     The *second* error was Defendant Laipson's use of a standard of appellate review that was materially different from the standard prescribed in the Student Handbook. In the Appeal Decision, Defendant Laipson that in order to reverse the JG Committee's decision, Andrew was required to establish that a different result would have been "compelled" in the absence of the errors below. However, the standard of review prescribed by the Student Handbook is that Andrew's burden on appeal was only to establish that the JG Committee's errors "substantially affected the outcome" of the JG Committee's decision.

57.     But perhaps the best evidence that the appeal process was a sham is that Defendant Lyon wrote an email to Simon's Rock's Enrollment Committee on August 22 advising it that "Andrew Mobus will not be returning to Simon's Rock." That was the same date as Defendant Lyon's bogus "Outcome Letter" — and before the appeal process had even begun.

58.     As the direct, inevitable and intended result of these many derelictions, both deliberate and negligent, evidencing Bard's gender bias and utter disregard not just for the most fundamental notions of fairness, but also the standards set by federal law and the requirements of Bard's own applicable written grievance procedures, Andrew was expelled from Bard.

### FIRST CLAIM
### (Violation of Title IX — Erroneous Outcome)
### Against Defendant Bard

59.     Plaintiff repeats and realleges the allegations set forth above as fully and completely as if set forth herein at length.

60.     Title IX of the Education Amendments of 1972 (20 U.S.C. §§ 1681-1688) provides that schools receiving federal funds must not discriminate on the basis of sex in the school's "education program or activity." 20 U.S.C. §1681 (a), 1687.

61.     Defendant Bard College is a recipient of federal funds and, as a condition for receiving such funds, has agreed to operate all its programs and activities in compliance with Title IX and the Department of Education's Title IX regulations. Specifically, the Student

Handbook commits to following the federal statutes and regulations of Title IX. Handbook, page 8.

62. As part of its agreement with the federal government not to discriminate on the basis of sex, the College has agreed to comply with the regulation set forth in 34 C.F.R. part 106.8(b) which requires that schools "adopt and publish grievance procedures providing for the prompt and equitable resolution of student . . . complaints alleging any action which would be prohibited by [Title IX or its regulations]."

63. Schools can ensure that they do not discriminate on the basis of sex in handling grievance procedures by following federal guidelines promulgated by the OCR.

64. The Office of Civil Rights ("OCR") issued a guide in 2001 entitled, "Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties" (the "2001 Guidance").[14] The 2001 Guidance regulations were promulgated pursuant to notice and comment rulemaking, and have the force and effect of law. These regulations set forth the standards a school should use to respond to sexual harassment and the measures it should take to ensure compliance with applicable rules and regulations. Federal guidelines also include a "Dear Colleague" letter issued by the OCR in April 2011, again stating minimum standards required by Title IX for grievance procedures at schools as well as a document entitled "Questions and Answers of Title IX and Sexual Violence" prepared by the OCR dated April 29, 2014.[15]

65. The 2001 Guidance states that in order to comply with 34 C.F.R. part 106.8 (page 20) a school's grievance procedures be "prompt and equitable" and any investigation of a complaint must:

---

[14] https://www2.ed.gov/offices/OCR/archives/pdf/shguide.pdf

[15] http://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf

a. Apply the written grievance procedures to complaints alleging sexual harassment;

b. Be adequate, reliable and impartial; and

c. Provide the opportunity for both sides to present witnesses and other evidence.

66. The Dear Colleague Letter states that the requirement for an "adequate, reliable and impartial investigation of complaints, including the opportunity to present witnesses and other evidence" is "*critical* to achieve compliance with Title IX," and it also requires that such procedures be "thorough." Dear Colleague Letter, pages 5, 9 (emphasis added).

67. The 2001 Guidance states that a school should accord due process to both the complainant and the accused in a grievance procedure. 2001 Guidance, page 22.

68. The 2001 Guidance also requires schools to provide "adequate training" to individuals conducting grievance procedures. 2001 Guidance, page 21.

69. The Dear Colleague letter clarified the 2001 Guidance by stating these additional standards for schools in conducting grievance procedures:

a. The parties to a grievance procedure must be kept informed as to the identity and contact information of the school's Title IX coordinator.

b. The complainant and the accused student must "have an equal opportunity to present relevant witnesses and other evidence."

c. The complainant and the accused student must "be afforded similar and timely access to any information that will be used at the hearing."

d. Schools "must maintain documentation of all proceedings, which may include written findings of fact, transcripts or audio recordings."

e. Schools should provide an appeals process.

f. "[T]he fact-finder and decision-maker should have adequate training or knowledge regarding sexual violence."

Dear Colleague Letter, pages 11-12.

70. A school that is subject to Title IX regulations, but which discriminates against a student based on gender is liable for monetary damages and equitable relief in a private action. Such illegal discrimination occurs where the school, motivated by gender bias, arrives at an erroneous outcome based on a flawed sexual misconduct proceeding.

## I. Evidence that the School was Motivated by Gender Bias throughout the Proceedings

71. Evidence of gender bias in the JG Complaint proceedings is found in statements made by Bard officials, and in the JG Investigation, in the Hearing on the JG Complaint, in the outcome of the JG Complaint, and in the Appeal of the JG Complaint, all as described in detail above.

72. That evidence includes but is not limited to the following admissions by Bard officials:

   a. At the beginning of the spring semester 2014, Valerie Fanarjian, the Director of Activities, Student Affairs, called a meeting exclusively for the newly-admitted male students and explained that the school was a "safe haven for gays and transgenders" but that "straight males" were in a much more disfavored position. She stated that the school will punish a heterosexual male for acts committed and language used with a female where those very same acts and language of one female to another female would not be punished. She told the boys that "things two girls say to each other or do with each other" could get a male student into serious trouble if he were to act in the very same way.

   b. Dean Robert Graves admitted to Andrew during a meeting that, with respect to misconduct complaints, "the pendulum" had "swung" from making sure the process is fair to men towards making "females feel safe;" that is, away from ensuring that the process was fair to men to favoring the position of women.

25

Francisca Oyogoa, who participated in the Hearing via a video conference call, is self-styled radical feminist and activist for women's causes, as well as for racial equality. The outside door of her office is covered with news articles, opinion pieces, poetry and prose, reflecting her strong support for, among other causes, an extremely activist approach to women's rights. Defendant Lyon's last-minute substitution of Professor Oyogoa for the only male member of the JG Committee — despite the fact that she was not on the list of potential JG Committee members and despite the fact that she had earlier admitted in the context of the LF Investigation that she could not be neutral towards Andrew — shows the gender bias that permeated the Hearing.

73. That the outcome of the JG proceedings was motivated by gender bias was demonstrated before during the Investigation phase in the following manner:

    a.   The failure to appoint a neutral advocate for Andrew, instead appointing JG's Resident Adviser, when, upon information and belief, JG had the benefit of her Academic Adviser, Rebecca Fiske, who not only acted as a neutral Advocate, but appeared as a character reference for JG and improperly expressed her own personal that JG was telling the truth.

    b.   The last-minute replacement of the one male on the JG Committee with Francisca Oyogoa, who had admitted to be biased against Andrew but had no articulated bias against JG, and who was a self-styled radical feminist.

    c.   The appointment of Defendant Lyon as the Deputy Title IX Coordinator with responsibility for the JG investigation and hearing, despite her patent bias against Andrew, as evidenced by her contriving to elicit negative comments from JG under the pretext that interviewing JG was relevant to the LF investigation, even

though JG had no relevant knowledge at all and Lyon knew that Andrew's exoneration of the LF charges was imminent.

74.     That the outcome of the JG proceedings was motivated by gender bias during the Investigation phase of the JG proceedings was also evidenced by the JG Committee's utter indifference to a balanced review of facts necessary to determine, without predilection, the truth of the JG Allegations, for example:

a.   The JG Committee failed to investigate, collect, or review any hard evidence regarding the couple's relationship, such as text messages and emails between the parties, or text messages and emails from either party to third parties, preferring to accept the uncorroborated statements of the female complainant.

b.   The JG Committee failed to interview, investigate, or contact, any witnesses that could testify as to Andrew's character.  Favoring the female, however, the JG Committee arranged for Ms. Fiske, JG's advisor, to testify as a character witness on JG's behalf and to support JG during the presentation of her testimony.

c.   The JG Committee failed to interview, investigate, or contact, any witnesses that could testify as to the nature of the relationship between Andrew and JG in the many weeks that followed the alleged incident.  This failure was slanted in JG's favor, because there was no review of available testimony that she had greatly enjoyed Andrew's company in the immediate days, and then many weeks after the incident, and there was no review of available testimony that she had indicated to third parties, after the alleged incident, upon information and belief, that she was happy with her sexual relations with Andrew.

d.   The JG Committee failed to interview, investigate, or contact the eyewitness who, upon information and belief, would have testified that he saw JG on the night in question after she had consumed a portion of the one bottle of wine drunk that

evening, and that she was not incapacitated to any visible degree. Instead, the JG Committee accepted her equivocal testimony that she was "sorta drunk, and even that equivocal testimony was changed in the Lyon Outcome Letter to state flatly that she was "drunk."

75.     That the outcome of the JG proceedings was motivated by gender bias was demonstrated by the unequal treatment of the parties at the Hearing as evidenced by the following:

a.  Andrew was not provided with notice of the detailed charges contained in the JG Allegations.

b.  The JG Committee failed to provide Andrew with a presumption of innocence, and did not place the burden of proof on the female, JG.

c.  Bard refused to allow Andrew to present testimony of any witnesses at the Hearing, whereas JG was permitted to present a witness.

d.  Andrew was not permitted to have an advisor present during his testimony, whereas JG was permitted to have an advisor present during her testimony.

e.  Andrew's request that the JG Committee make a meaningful assessment of the credibility of the witnesses through live testimony was denied. JG's twenty-minute testimony via a video conferencing call was ultimately accepted in all respects. Andrew's credibility was assessed, if at all, by one committee member via a separate video conferencing feed, despite the fact that she was returning from vacation the next day.

f.  The JG Committee did not consider available testimony that JG had made no complaints about Andrew to any third parties for the duration of their relationship.

g.  The JG Committee did not consider available evidence that JG and Andrew exchanged loving text messages the day after the alleged incident, and after they

had spent the night together in JG's dorm room immediately after that alleged rape.

h. The JG Committee did not consider available testimony on the parties' continuing intimate relationship for two months after the alleged incident.

i. The JG Committee did not review photographs showing, upon information and belief, JG's consent to the photos being taken and her enjoyment of the parties' sex play.

76. That the outcome of the JG proceedings was motivated by gender bias after the Hearing on the JG Complaint is evidenced by Defendant Lyon's utter disregard for the JG Committee findings, substituting the factual assertions contained in the JG Allegations for the JG Committee's own findings; imposing the penalty of expulsion instead of the JG Committee's twice-repeated recommendation of suspension; and denying Andrew the right to have the Dean review the JG Committee's own findings and recommendation of suspension rather than expulsion; all of the foregoing for the purpose of reaching a result favorable to the female complainant, JG, regardless of the facts.

77. That the outcome of the JG proceedings was motivated by gender bias after the Lyon Outcome Letter was issued is evidenced by the actions of Defendant Laipson, who denied Andrew the right to any true appeal, who misrepresented what had actually occurred during the investigation and Hearing, and who denied Andrew the right to the proper standard of appellate review, all for the purpose of providing a positive result for the female complainant, JG, in disregard of the facts.

78. Bard was also motivated by gender bias because the school did nothing to ameliorate the inherent conflict of interest surrounding the handling of sexual-misconduct cases: if the school finds against a female complainant, it risks losing its federal funding. This threat is significant: OCR investigations threatening loss of funding for a school's handling of sexual

misconduct cases rose from 55 schools in May 2014 to 95 schools in January 2015.[16]  This inherent conflict was substantially exacerbated at Bard because Defendant Lyon both: (a) controlled the JG Investigation and outcome from the first interview with JG through to the final decision; and (b) was a Title IX Coordinator with responsibility for protecting Bard's eligibility to continue receiving federal funds.

79.    Bard subsequently acknowledged that this conflict of interest results in gender bias in favor of female complainants — as a means of protecting its federal funding — by later delegating the investigation of all sexual-misconduct claims to an "Independent Investigator" who "is a trained professional hired by the College to fully investigate allegations of sexual misconduct, determine whether or not violations of the Code have occurred and recommend appropriate sanctions to the Title IX Coordinator."  Bard Student Handbook, 2014-2015, page 92.[17]  In this way, the school's Title IX Coordinator, who is in charge of ensuring that the College maintains its right to federal funding by showing protection of female students, is no longer in charge of the conflicting obligation to be fair to accused male students.  *See,* Student Handbook 2014-2015, page 92.

## II.    Evidence that the Proceedings Were Materially Flawed and Led to an Erroneous Outcome

80.    Evidence that proceedings on the JG Complaint were materially flawed, resulting in an erroneous outcome includes the fact that Bard expelled Andrew after the JG Committee, hearing the limited evidence, found that temporary suspension was the proper outcome and that in the proceedings, Bard ignored even the most basic notions of fair play set forth in both the OCR guidelines and the Student Handbook.

---

[16] *See* http://thinkprogress.org/health/2015/01/13/3610865/title-ix-investigations

[17] This reference is to the Student Handbook 2014-2105, applicable to the year after Plaintiff left Bard; it differs from the Student Handbook 2013-2014, which is referenced elsewhere in this Complaint, and which was the handbook applicable during the spring semester of 2014.

## 1. Bard's Failure to Comply with OCR Guidelines

81.     Bard failed to follow the federal standard that "Due Process of the Accused" includes the fundamental right of an accused to be apprised of the charges that have been asserted against him.  2001 Guidance, page 22.  As stated above, the JG Committee did not afford Andrew the presumption of innocence, or place the burden on JG to prove the truth of her allegations.  Beyond that, Andrew was not even apprised of the specific claims against him, either before or even during the Hearing.  Most significantly, he was never given the opportunity to review the JG Allegations that the JG Committee used to make their Investigation and ultimate findings: he did not have notice that non-consensual sex was alleged to have occurred on one night in February, near the beginning of his ten-week relationship with JG; he did not have notice that the alleged non-consent was based on an assertion of incapacity by reason of intoxication; he did not have notice that there were photographs that JG complained she had not consented to (photos that Andrew had already erased at JG's request prior to the Hearing); and he did not have notice that JG complained that he threatened to put photographs of her on the internet.  In effect, he was ambushed at the Hearing.

82.     Bard failed to follow the federal standard that, "*Grievance proceedings must be 'adequate, reliable and impartial,'*" which includes the requirements that both parties "*have an equal opportunity to present relevant witnesses and other testimony*" and that the proceedings be "*thorough*."  2001 Guidance, page 20; Dear Colleague Letter, pages 5, 9.  Bard failed to adhere to these standards as described above in the indicia of gender bias.

83.     Bard failed to follow the federal standard that, "*[A]ny real or perceived conflicts of interest between the fact-finder or decision-maker and the parties should be disclosed.*"  Dear Colleague Letter, page 12.  Defendant Bard College failed to comply with this guideline in that Defendant Lyon should not have appointed Oyogoa to the JG Committee, Oyogoa should have recused herself from sitting on the JG Committee, and Defendant Lyon should not have acted as

the Title IX Coordinator for these proceedings because she had a conflict having served on the LF Committee, having interviewed JG during that Investigation, and having delivered an academic warning to Andrew as the Associate Dean of Academics.

84. Bard failed to follow the federal standard that, *"The complainant and the alleged perpetrator must be afforded similar and timely access to any information that will be used at the hearing."* Dear Colleague Letter, page 11. Defendant Bard College failed to comply with this guideline in that while the female party, JG, was afforded timely access to all information used at the Hearing, Andrew, the male party, was not permitted access to the JG Allegations, which was used by the JG Committee at the Hearing. Timely access in this case also required Bard to notify Plaintiff in May that photographs on his phone were at issue.

85. Bard failed to follow the federal standard that, *"Schools must maintain records of all proceedings, which may include written findings of facts, transcripts, or audio recordings."* Dear Colleague Letter, page 12. Defendant Bard College failed to comply with this guideline in that it failed to maintain proper documentation of the Investigation, Hearing, committee deliberations, or Appeal in connection with the JG Complaint.

86. Bard failed to adhere to the federal standard that, *"All persons involved in implementing a recipient's grievance procedures (e.g. Title IX coordinators, investigator, and adjudicators) must have training or experience in handling complaints of sexual harassment and sexual violence, and in the recipient's grievance procedures."* Dear Colleague Letter, page 12. The training of the JG Committee Members was woefully deficient in that the members: (a) did not know the very basic right of Andrew to see the JG Allegations, which set forth the accusations as to which he needed to mount a defense, and indeed at least one JG Committee Member believed that Bard's rules actually prohibited the JG Committee from sharing those allegations with Andrew; (b) did not understand or did not care that they were required to give him notice of the specific charges against him; (c) did not know that Andrew was entitled to a

presumption of innocence, and that JG had the burden of proving the truth of her allegations; (d) did not know or did not care that they were not allowed to interview a character witness for JG alone, while denying that benefit to Andrew; (e) did not know or did not care that they were required to keep a record of the proceedings; (f) did not know or did not care that a perceived conflict of interest on the part of Ms. Oyogoa was not permissible; and (g) did not know or did not care that Andrew was not permitted to have any witnesses testify on his behalf; (h) did not know or did not care that they were required to provide counselling to Andrew before the Hearing.

87.     Bard failed to adhere to the federal standard that, *"OCR also recommends that schools provide an appeals process."* Dear Colleague Letter, page 12. Defendant Bard College failed to comply with this guideline in that the Appeal conducted by Defendant Provost Laipson was effectively no appeal at all, and he applied an appellate standard of review that was more rigorous that permitted by Bard's own Rules.

88.     Bard failed to adhere to the federal standard that, *"The Title IX regulations require a recipient to notify all students and employees of the name or title and contact information of the person designated to coordinate the recipient's compliance with Title IX . . . The Title IX coordinator or designee should be available to meet with students as needed."* Dear Colleague Letter, page 7. Defendant Bard College failed to comply with this guideline in that the College designated Defendant Lyon as Title IX Coordinator while Andrew's case was pending and failed to inform him of the change, despite a specific request from the family as to the identity of Ms. Checchi's replacement.

89.     Bard failed to adhere to the federal standard that, Title IX Coordinators *"should not have other job responsibilities that may create a conflict of interest . . . [such as] Dean of Students and any employee who serves on the judicial/hearing board."* OCR Questions and Answers of Title IX and Sexual Violence dated April 29, 2104. Defendant Lyon was Deputy

Title IX Coordinator for the College during the JG Investigation and Hearing; was Associate Dean of Academics issuing an academic warning to Plaintiff; while serving on the LF Committee had showed patent bias against Andrew; and who then improperly hijacked the JG Committee determination process. Defendant Lyon's "many hats" showed a flagrant disregard for federal standards for fair proceedings.

### 2. Bard's Failure to Comply with Its Own Internal Procedures

90.     Bard's Student Manual incorporates by reference all the foregoing protections mandated by Title IX, all of which were ignored as described above. Additional evidence that the proceeding was flawed and lead to an erroneous outcome includes Bard's substantial failures to comply with its own published grievance procedures. The following procedures are quoted below verbatim from pages 80-81 of the Student Handbook. Bard breached each of these obligations in the manner described at length above, and as summarized immediately below:

- *"The right to be treated with respect and sensitivity by College officials."* Although many of the actions described above that were taken by Bard representatives make a mockery of this promise, one stands out in particular: Defendant Lyon refused to adjourn the August 14 Hearing date despite the facts that: (a) Andrew had received only six days' notice of the Hearing date; (b) his mother's younger sister was on her deathbed, and proceeding with the Hearing on the scheduled date necessarily meant that Andrew and his parents would have to prepare his defense amidst the grief and emotional devastation they were all experiencing; (c) Andrew's father would have to abandon his wife, Andrew's mother, if he wished to support his anxiety-ridden son and (d) there was manifestly no need for such urgency since: (i) the matter had already been languishing for more than three months after the JG Complaint was filed, (ii) one of the JG Committee Members was on vacation and would only be able to

participate — and make credibility determinations — via a video conference call and (iii) Oyogoa was returning from vacation the day after the Hearing at which time, presumably, Bard could have complied with Andrew's request for live testimony at the Hearing. Other examples of Bard's breach of this particular contractual undertaking include Bard's insistence that Plaintiff leave campus immediately on May 16, without prior warning, Bard's refusal to accommodate Plaintiff's anxiety issues through counseling and advice prior to and during both the LF Complaint proceedings and the JG Complaint proceedings, as well as the myriad examples set forth above.

- *"The right to be advised of and have access to all medical, counseling, legal and support resources available, both on-campus and in the community."* Breach of this obligation is evident from Bard's utter disregard for Andrew's medical condition — which it knew or should have known based on disclosures made during the Admissions process — its grossly insensitive denial of a request for adjournment of the Hearing, its cavalier disregard for the most fundamental principles of fairness during the Hearing, as well as other conduct described more fully above.

- *"The right to be fully informed of the nature of the alleged violations, and of the policies, procedures and rules regarding investigation and adjudication of a complaint of sexual misconduct including possible sanctions."* The many respects in which this contractual undertaking was breached are discussed above. They include, but are not limited to: (a) requiring Andrew to defend himself against charges that were not set forth in the JG Complaint, by refusing to provide him with a copy of the JG Allegations; (b) refusing to permit Andrew to present relevant and highly probative evidence; and (c) forcing Andrew to participate in

an adjudicatory proceeding that was conducted by untrained and uninformed committee members, all of whom appear to have had inadequate training, or none at all, regarding the laws, rules, regulations, and protocols relating to the handling of sexual misconduct complaints, supervised by a severely conflicted Title IX Coordinator, none of whom respected the rights afforded to an accused as provided for in the Student Handbook.

- *"The right to have a fundamentally fair hearing that is consistent with the procedures described in this policy."* For all the reasons discussed above, both individually and certainly in combination, the Hearing and appeal process to which Andrew was subjected was neither fundamentally fair nor consistent with Bard's own stated policies and procedures.

- *"The right to choose an advocate for assistance throughout the investigation process."* As discussed above, Andrew was not advised of the identity of his Advocate until the eve of the Hearing, and the person who had been selected was clearly inappropriate, as he was the complainant's Resident Director.

- *"The right to present information, evidence and/or witnesses to the investigators."* The factual allegations discussed at length above demonstrate a remarkable insensitivity to this fundamental right both by the JG Committee under the guidance of the Defendant Lyon and by Defendant Laipson who handled the Appeal.

- *"The right to be kept informed of the progress of the investigation."* As described above, through no fault of his own, Andrew and his parents were not advised of the Hearing date until six days before it was scheduled to occur.

- *"The right to appeal the findings of, or sanctions resulting from, a complaint or investigation, in accordance with the appeals policy."* As demonstrated above,

the person charged with responsibility for ensuring compliance with the appeal policy, Defendant Laipson, did not adjudicate Plaintiff's Appeal in accordance with the College's appeal policy in that he failed to employ the "substantially affected" standard for reversal. This fundamental misuse of a higher burden placed on Plaintiff in his Appeal clearly infected the entirety of the Appeal Decision. In effect, Defendant Laipson simply rubber-stamped the deeply flawed and fundamentally unfair Lyon Outcome Letter prepared by Defendant Lyon.

91. As a result of the unlawful actions of Defendant Bard College in violation of Title IX of the Education Amendments of 1972, in arriving at an erroneous outcome, based on a flawed proceeding, and motivated by gender bias, Andrew has suffered and will continue to suffer injury and damages in an amount not yet capable of precise ascertainment, but believed to be in excess of $10 million.

92. By reason of the foregoing, Andrew is also entitled to at least the following equitable relief: (i) the findings of the JG Committee, the findings of the Lyon Outcome Letter, and the Appeal Decision should be nullified; (ii) Plaintiff's disciplinary record should be expunged in its entirety; and (iii) the record of Plaintiff's expulsion from Bard should be removed from his education file.

### SECOND CLAIM
### (Breach of Contract)
### Against Defendant Bard

93. Plaintiff repeats and realleges the allegations set forth above as fully and completely as if set forth herein at length.

94. In or about January 2014, Bard College entered into a contract with Plaintiff, the terms and conditions of which are set forth in, among other places, the Student Handbook, the laws, rules, regulations, and other documents that are incorporated therein by reference, statements made in the Bard College and Simon's Rock websites and other promotional

materials and, not least, the assurances provided to Andrew and his parents that induced Andrew to accept admission to Bard College at Simon's Rock.

95. In the Student Handbook, Defendant Bard College obligated itself to comply with the grievance procedures set forth therein and to comply with all Title IX rules and regulations: at page 8 the College represented to its students, "College policy is consistent with . . . Federal Statutes and regulation, including but not limited to . . . Title IX of the Education Amendments of 1972." Student Handbook, page 8.

96. Pursuant to its contract with Plaintiff, Bard was obligated at all times to ensure that its faculty, staff, employees, representatives, and agents would be aware of, and act in accordance with, the standards and procedures set forth in or referred to in the Student Handbook, and that all such individuals had received the training necessary to enable them to do so.

97. Pursuant to its contract with Plaintiff, Bard was obligated at all times to ensure that its faculty, staff, employees, representatives, and agents would be aware of, and act in accordance with, the standards and procedures set forth in or referred to in the Student Handbook, including the representation therein that the College would adhere to all Title IX regulations in conducting a sexual misconduct Hearing.

98. In addition to its obligation to follow the standards and procedures set forth in or referred to in the Student Handbook, Bard had a separate and additional obligation to provide basic fairness in conducting the LF Complaint proceedings, the JG Complaint proceedings, and the Appeal of the Lyon Outcome Letter.

99. Defendant Bard College breached its contract with Plaintiff by failing to adhere to its own procedures, by failing to adhere to Title IX rules and regulations, by acting arbitrarily and capriciously in expelling Plaintiff, and by breaching its obligation to provide basic fairness, all as set forth in Claim One, above.

100.     The failure on the part of Defendant Bard College to follow its own Hearing protocols and to follow Title IX regulations contravenes basic fairness, and violates the covenant of good faith and fair dealing inherent in every contract.

101.     Plaintiff has fully and faithfully discharged his own obligations owed to Bard under the contract.

102.     As a result of the breaches of contract by Bard, Plaintiff has suffered and will continue to suffer injury and damages in an amount not yet capable of precise ascertainment, but believed to be in excess of $10 million.  These damages include but are not limited to reimbursement of all tuition, room and board charges, and fees for the spring term 2014, amounting to not less than $30,000.

### THIRD CLAIM
### (Promissory Estoppel)
### Against Defendant Bard

103.     Plaintiff repeats and realleges the allegations set forth above as fully and completely as if set forth herein at length.

104.     As described above, the sexual misconduct procedures set forth in the Student Handbook constitute promises and representations that Defendant Bard intended future students to rely upon.  In reasonable reliance on those promises, as well as the assurances orally given to him and his parents during the admissions process, Plaintiff accepted the College's offer of admission and incurred the costs of tuition, fees, and related expenses based on the express and implied promises of the College in the Student Handbook, including the promise that the College would abide by all Title IX rules and regulations, its promise to provide due process and follow certain procedures as set forth in the Handbook, and the implied promise of fundamental fairness and good faith.

105.     Plaintiff reasonably relied on these express and implied promises.

106.     In the event that it is determined that a contract did not exist between Plaintiff and Defendant Bard, enforcement of Defendant Bard's express and implied promises is required to avoid an injustice to Plaintiff.

107.     As a direct and foreseeable result of the College's failure to honor its promises and representations, Plaintiff has sustained, and will continue to sustain, substantial injury, damage, and loss, including, but not limited to mental anguish, severe emotional distress, injury to reputation, past and future economic loss, and loss of educational and career opportunities, in an amount not yet capable of precise ascertainment, but believed to be in excess of $10 million.

**FOURTH CLAIM**
**(Negligent Infliction of Emotional Distress)**
**Against All Defendants**

108.     Plaintiff repeats and realleges the allegations set forth above as fully and completely as if set forth herein at length.

109.     In addition to, and separate and apart from, Bard's contractual obligations outlined above, the Defendants owed Plaintiff a duty to conduct all aspects of the Investigation, Hearing, and Appeal of the proceedings with respect to the JG Complaint in a non-negligent and reasonable manner and with due care.

110.     Defendants' conduct as described above fell below the applicable standard of care, was negligent, and involved numerous breaches of the duty Defendants owed to Plaintiff.

111.     A reasonable person would have suffered emotional and mental distress under the same circumstances.

112.     Defendants' breaches of the duty of care did actually and proximately cause Plaintiff emotional and mental distress, lack of sleep, and aggravated anxiety, as well as other substantial injury, damage, and loss.

113.    As a result of Defendants' breaches of the applicable duty of care, Andrew has suffered and will continue to suffer injury and damages in an amount not yet capable of precise ascertainment, but believed to be in excess of $10 million.

**FIFTH CLAIM**
**(Intentional Infliction of Emotional Distress)**
<u>**Against All Defendants**</u>

114.    Plaintiff repeats and realleges the allegations set forth above as fully and completely as if set forth herein at length.

115.    The Defendants conducted the Investigation, Hearing, and Appeal of the JG Complaint in a manner that was extreme and outrageous, beyond all possible bounds of decency, and was utterly intolerable in a civilized society.

116.    In conducting the Investigation, Hearing, and Appeal of the JG Complaint, Defendants acted with reckless and callous indifference to Plaintiff's rights, and either intended to inflict emotional distress on Plaintiff, or recklessly disregarded and knew or should have known that emotional distress was likely to result from such conduct. Plaintiff's emotional distress was severe and of a nature no reasonable person could be expected to endure.

117.    Defendants' conduct, whether intentional or reckless, did actually and proximately cause Plaintiff emotional and mental distress, lack of sleep, and aggravated anxiety, as well as other substantial injury, damage, and loss.

118.    As a direct and proximate result of the Defendants' intentional or reckless conduct, Plaintiff has suffered and will continue to suffer injury and damages in an amount not yet capable of precise ascertainment, but believed to be in excess of $10 million.

119.    As a consequence of Defendants' willful and outrageous conduct, Plaintiff is entitled to punitive damages against all Defendants in an amount to be determined at trial.

## SIXTH CLAIM
### (Tortious Interference with Contract)
### Against Defendants Lyon and Laipson

120.    Plaintiff repeats and realleges the allegations set forth above as fully and completely as if set forth herein at length.

121.    Defendants Lyon and Laipson were aware of the contractual relationship between Plaintiff and Bard as set out above, which encompassed the obligations of each under the Student Handbook.

122.    Defendants Lyon and Laipson, without any legal justification, intentionally and maliciously interfered with Plaintiff's contractual relationship with Bard as set out above, including by failing to ensure that the Plaintiff received a fair, unbiased, and non-discriminatory investigative and disciplinary process.  As a result of the conduct of the individual defendants, Bard severed its relationship with Plaintiff by expelling him from the College.

123.    As a result of the wrongful conduct of Defendants Lyon and Laipson, not otherwise privileged, Plaintiff has suffered and will continue to suffer injury and damages in an amount not yet capable of precise ascertainment, but believed to be in excess of $10 million.

## SEVENTH CLAIM
### (Breach of Duty of Good Faith and Fair Dealing)
### Against Defendant Bard

124.    Plaintiff repeats and realleges the allegations set forth above as fully and completely as if set forth herein at length.

125.    Defendant Bard had a duty to ensure that Plaintiff's disciplinary process was conducted in good faith and with fair dealing.

126.    Defendant Bard breached this duty of good faith and fair dealing with regard to the LF Complaint proceedings, the JG Complaint proceedings, and the Appeal of the Lyon Outcome Letter.

127.    Defendant Bard's breaches of the duty of good faith and fair dealing did actually and proximately cause Plaintiff emotional and mental distress, lack of sleep, and aggravated anxiety, as well as other substantial injury, damage, and loss.

128.    As a result of Defendant Bard's breaches of the applicable duty of good faith and fair dealing, Plaintiff has suffered and will continue to suffer injury and damages in an amount not yet capable of precise ascertainment, but believed to be in excess of $10 million.

**EIGHTH CLAIM**
**(Negligence — Disciplinary Proceeding)**
**<u>Against All Defendants</u>**

129.    Plaintiff repeats and realleges the allegations set forth above as fully and completely as if set forth herein at length.

130.    Having put into place a student disciplinary process, including the sexual misconduct procedures in the Student Handbook, Defendant Bard owed a duty of care to Plaintiff to conduct that process in a non-negligent manner and with due care.  Defendants Lyon and Laipson directed and implemented that process, and in so doing owed the same duty of care to Plaintiff.

131.    The conduct of Defendants fell below the applicable standard of care and amounted to breaches of the duty of care.

132.    Defendants' breaches of the duty of care did actually and proximately cause Plaintiff emotional and mental distress, lack of sleep, and aggravated anxiety, as well as other substantial injury, damage, and loss.

133.    As a result of Defendants' breaches of the applicable duty of care, Plaintiff has suffered and will continue to suffer injury and damages in an amount not yet capable of precise ascertainment, but believed to be in excess of $10 million.

### NINTH CLAIM
### (Declaratory Judgment)
### <u>Against Defendant Bard</u>

134.     Plaintiff repeats and realleges the allegations set forth above as fully and completely as if set forth herein at length.

135.     Plaintiff's educational opportunities and future career have both been severely damaged.  Without appropriate redress, the unfair outcome of the Hearing will continue to cause irreversible damages to Plaintiff's educational career and future employment prospects for the remainder of his lifetime.

136.     As a result of the foregoing, there exists a justiciable controversy between the parties with respect to the outcome, permanency, and future handling of Andrew's student record at Bard.

137.     By reason of the foregoing, Plaintiff requests a declaration that, to the extent permitted by applicable law: (i) the findings of the JG Committee, the findings of the Lyon Outcome Letter, and the Appeal Decision should be nullified; (ii) Plaintiff's disciplinary record should be expunged in its entirety; and (iii) the record of Plaintiff's expulsion from Bard should be removed from his education file.

**WHEREFORE,** Plaintiff demands judgment as follows:

A.      Compensatory damages against all Defendants, jointly and severally, in an amount to be determined at trial, but believed to be in excess of $10 million.

B.      Punitive damages against all Defendants in an amount to be determined by a jury.

C.      A Declaration that (i) the outcome and findings made by the JG Committee, the findings in the Lyon Outcome Letter, and the Appeal Decision should be nullified, (ii) Plaintiff's disciplinary record should be expunged in its entirety, and (iii) the record of Plaintiff's expulsion from Bard should be removed from his education file.

D.    Interest and costs including reasonable attorneys' fees incurred in connection with the prosecution of this action; and

E.    Such other, further, and different relief as to the Court may seem just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY**

ANDREW MOBUS,

By His Attorneys,

PARTRIDGE SNOW & HAHN LLP

Dated:   June 1, 2017

/s/ Martin P. Desmery
Martin P. Desmery (BBO #550133)
Partridge Snow & Hahn LLP
30 Federal Street, 7th Floor
Boston, MA  02110
(617) 292-7900
(617) 292-7910 FAX
mdesmery@psh.com

-and-

Robert D. Piliero
Lisa A. Frey
PILIERO & ASSOCIATES PLLC
444 Madison Avenue, Fourth Floor
New York, NY 10022
Tel.:   646.854.1273
piliero@pilierolaw.com
lfrey@pilierolaw.com
*(pro hac vice pending)*

3066627.1/14599-2