UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


ANDREW MOBUS,                    )
                                 )
          Plaintiff,             )
                                 )    Civil Action
v.                               )    No. 17-11011-GAO
                                 )
BARD COLLEGE, et al.,            )
                                 )
          Defendants.            )
                                 )


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
SENIOR UNITED STATES DISTRICT JUDGE


STATUS CONFERENCE


John J. Moakley United States Courthouse
Courtroom No. 22
One Courthouse Way
Boston, Massachusetts  02210
Monday, January 29, 2018
2:29 p.m.


Marcia G. Patrisso, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 7209
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

```
 1   APPEARANCES:

 2        PARTRIDGE, SNOW & HAHN, LLP
          By: Martin P. Desmery, Esq.
 3        30 Federal Street
          Boston, Massachusetts  02109
 4        - and -
          PILIERO & ASSOCIATES, PLLC
 5        By: Robert D. Piliero, Esq.
          444 Madison Avenue
 6        Fourth Floor
          New York, New York  10022
 7        On Behalf of the Plaintiff

 8        HIRSCH ROBERTS WEINSTEIN LLP
          By: Scott A. Roberts, Esq.
 9            Tobias W. Crawford, Esq.
          24 Federal Street
10        12th Floor
          Boston, Massachusetts  02110
11        On Behalf of the Defendant

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        P R O C E E D I N G S

 2              THE CLERK:  Next up for a status conference, Mobus v.

 3  Bard College, 17-11011.  Would counsel identify yourselves for

 4  the record, please.

 5              MR. DESMERY:  Good afternoon, your Honor.  Martin

 6  Desmery on behalf of the plaintiff, Andrew Mobus.

 7              MR. PILIERO:  Good afternoon, your Honor.  Robert

 8  Piliero also on behalf of the plaintiff, Andrew Mobus.  I'm

 9  admitted pro hac vice here, and I thank you for that, Judge.

10              MR. ROBERTS:  Good afternoon, Judge O'Toole.  Scott

11  Roberts for the defendant.

12              MR. CRAWFORD:  And Toby Crawford also for the

13  defendant.

14              THE COURT:  Okay.  Thank you.

15              This is, I guess, a status conference, right?

16              MR. DESMERY:  Yes, your Honor.

17              THE COURT:  So tell me what the status is.  So I'm

18  aware of the recent motion to compel and opposition.  I don't

19  want to get into the substance of that today because I haven't

20  digested it enough.  I think what we will do is set a hearing

21  on that at some point in the relatively near future so we can

22  resolve that.

23              MR. PILIERO:  We would ask your Honor if we could have

24  permission to file a reply on that.  And if your Honor would

25  give us two weeks to do that, we'd appreciate it.
```

1          THE COURT:  Okay.  It's a little along the long side

2     but I'll give it to you.

3          MR. PILIERO:  Thank you.

4          THE COURT:  Okay.  Do you want to then address what --

5     more generally what the status of the case is.

6          MR. PILIERO:  Yeah.  I think things are going along

7     well except for the discovery, which is where we are.  There

8     are issues with respect to some third-party subpoenas that need

9     to be worked out.  There is our motion to compel.  I believe

00:02 10   that defendant's counsel has indicated they intend to make a

11    motion to compel with respect to our discovery production.  But

12    other than that, I think we're proceeding at pace.

13         THE COURT:  Discovery is open until June sometime, I

14    think, right?

15         MR. PILIERO:  That's correct, your Honor.  Yes.

16         MR. ROBERTS:  I don't disagree with Mr. Piliero with

17    respect to discovery but I do think that that's where all the

18    problems are currently.  Just as a précis, your Honor, we've

19    been put in the position where we've served five third parties,

00:02 20   including Mr. Mobus's father, his mother.  The one to his

21    father produced 173 pages.  We were told that with respect to

22    the search that he had performed, he would only search on his

23    work files, something called "Andrew," nothing else in terms of

24    applying our search parameters.  He's refused to search Gmail.

25         Mrs. Malanoski took four months to produce 19 pages to

```
 1        us, has also declined to produce her Gmail, and told us, "Well,

 2        I don't have access to my work email."  So we subpoenaed the

 3        work email where she sits on the board of directors.

 4        Initially, we were told there was a problem with the service on

 5        that even though the service was accepted, then we were told it

 6        would be very difficult to respond without search parameters.

 7        We provided search parameters.  Then we were told on Friday,

 8        "We're not doing anything by way of search unless you tell us

 9        you're picking up 100 percent of the tab."
00:03 10              I don't think that's an appropriate way to respond to

11        a Rule 45 subpoena.  I would very much like to work that out,

12        but thus far we've really encountered a number of hurdles.

13        We've received in production lie detector tests that Mr. Mobus

14        took with respect to one of the proceedings that he was

15        involved in at Bard College --

16              THE COURT:  Which one?

17              MR. PILIERO:  The LF proceeding for which he was found

18        not responsive.  Not surprisingly, we get those, but we get an

19        objection on the other one.  We're led to believe he didn't do
00:04 20        so well on that.  When we didn't get those, we then served a

21        subpoena upon the third-party examiner wanting to know, "Hey,

22        tell us what he told you about what he did that day."  All of

23        these are fair game for discovery.  We're told, "No, those are

24        privileged.  You've got enough."

25              We filed a subpoena to the Putney School.  We get an
```

```
 1    infirm motion to quash filed here.  We're put to the cost of

 2    opposing that.  We then move to compel up in Vermont, get local

 3    counsel there, are put to the cost of doing that.  Then after

 4    we do all that the subpoena -- the objections to the subpoena

 5    are withdrawn.

 6            So, your Honor, I agree that the problems have been in

 7    the discovery process right now, but I really think that what

 8    I've laid out for you right now indicate some real problems

 9    with respect to how discovery has been handled on the other
```

00:05 10    side.  And there are a number of ways we can approach this.  On

```
11    the third-party subpoena to -- or the requests for the lie

12    detecter results, we had to go down to Washington, D.C., to see

13    them, we went up to Vermont, we're going to New York for the

14    one for Mrs. Mobus's -- or excuse me -- Ms. Malonoski's

15    employer, but the reality is that there's now a number of

16    hurdles that we need to get over, and we think we'll get over

17    all of them, but it is becoming time-consuming at this point.

18    I mean, to serve a subpoena on Ms. Malanoski on August 2nd and

19    then on November 30th to get 19 pages and be told, "Hmm, she
```

00:05 20    doesn't have access to what she had at work," tends to slow the

```
21    process down.

22            So I am a little bit concerned about the June 1st

23    deadline for discovery.  If we had all of the documents right

24    now, we'd be able to dive right into depositions.  And I don't

25    think there will be that many.  But I think there are a number
```

```
 1   of issues --

 2            THE COURT:  You don't think there will be that many

 3   what, depositions or documents?

 4            MR. ROBERTS:  No, depositions.

 5            THE COURT:  Okay.

 6            MR. ROBERTS:  So I am concerned about that in terms

 7   what it means with respect to the status moving forward.

 8            MR. PILIERO:  The big picture that is painted I'd like

 9   to respond to a little bit, your Honor.  As far as the

10   parents', subpoenas to the parents, Ms. Malanoski -- Marilyn

11   Malanoski is the mother.  She was not very, very much involved

12   in the to's and fro's with respect to what went on.  She

13   searched the emails that she has -- the email account she has.

14            She used to work for a company.  She was the head of

15   investment banking for a company called Morgan Joseph.  They're

16   in windup, and they've been in windup since 2015, I think,

17   which means she does not have access to their emails.  It's not

18   made up.  They have served a subpoena on Morgan Joseph.  The

19   subpoena was exceedingly broad.  It basically asked them for

20   everything under the sun.  I don't have it in front of me.  I

21   wish I did.  And we talked about that.  And I asked for search

22   terms and they did give search terms and I have agreed to the

23   search terms.

24            I'm told by Morgan Joseph that the task of doing that

25   literally because they don't have a server anymore -- they have
```

1    the data stored elsewhere -- it takes about 24 hours a pop for

2    each year in order to load it, and then they've got to do the

3    searches.  And there is some 25, 30 search terms, which we

4    haven't objected to.

5           As far as the payment for it, it's not a lot of money.

6    It's just on principle.  The third party really doesn't care to

7    pay for it.  It's only -- I think it's less than $2500.  It's

8    not very much.  But we are proceeding at pace on that.  And we

9    have responded and updated that as often as we could.

00:07 10          As far as the subpoena to Mr. Mobus, that too, as far

11   as I understand, everything was given.  If people have -- know

12   what kinds of -- which email accounts they use for which

13   purpose -- for example, Mr. Mobus has got a business.  He's a

14   turnaround guy.  And so his business he knows he doesn't use

15   for his personal stuff.  So the idea of searching through that

16   just seems to be a waste of time.

17          As far as the third-party subpoena to the polygrapher,

18   I don't know how Mr. Roberts was led to believe what the result

19   was of a second polygraph that we have never even established

00:08 20   was taken, but that suits the theory of the case, I guess.  My

21   understanding is that polygraph evidence is not admissible at

22   trial, and it is so clearly not admissible at trial that asking

23   for it in discovery is not appropriate either.  That's my

24   understanding.

25          Putney:  He's right.  We initially objected to the

1    subpoena to Putney which is very, very broad.  Putney is a

2    school that Andrew Mobus went to right before he went to

3    Simon's Rock.  Very, very broad subpoena asking for every

4    aspect of his life there.  We objected to it.  They then

5    proceeded, and then we saw that what they were doing was they

6    were looking at shadows.

7         They submitted an affidavit by Sue Lyon at Simon's

8    Rock to support their inquiry -- their broad-based inquiry to

9    Putney that said, "I heard from one student that another

00:09 10   student told that student that Andrew had a problem at Putney."

11   That was the predicate.  We saw that and I spoke to Mr. Mobus

12   and I said, "Do you know what?  The best way to let people see

13   there's nothing there is to turn the light on," so we withdrew

14   our objection.  We're being castigated for that.

15        We have been trying very hard under very difficult

16   circumstances to cooperate, Judge.  And when we get to the

17   motion to compel, which I know is not going to be today, you

18   will see that the opposite side of that coin may be different.

19   Thank you.

00:10 20        MR. ROBERTS:  I do want to respond briefly.  With

21   respect to The Putney School in terms of chasing shadows, we

22   laid out the theory in our motion to compel to The Putney

23   School and that caused Mr. Desmery to inform me right away that

24   they were withdrawing their objection.  Far from shooting at

25   shadows, what those documents -- and the small production we've

1    received from Putney thus to date -- indicates that what

2    Mr. Mobus represented coming into Simon's Rock, particularly

3    about his ability to continue on at Putney, was not true.  It

4    also revealed that what he had said under oath in the trial in

5    Maryland, his reason for departure were purely academic, was

6    not true.  So this is not chasing shadows.  Your Honor, there

7    is a legitimate reason we are looking for this.  And this is

8    discovery and that's what we are pursuing.

9            As for the polygrapher, Mr. Piliero's assertion that

00:11 10    the results of a polygraph exam may not be admissible in

11    evidence?  I'm not going to dispute him on that point.  But as

12    I informed both Mr. Piliero and Mr. Desmery, the law is clear,

13    and I provided them federal court citations out of Pennsylvania

14    indicating, but that doesn't mean discovery regarding a

15    polygraph result and communications with a polygrapher are

16    irrelevant.  For example, let's assume that Mr. Mobus told the

17    polygrapher, "Yup, I did it.  I did sexually assault her."  Or

18    he registered false on that and there was a follow-up on that.

19    That's documents that we certainly are entitled to get in

00:11 20    discovery but we've been told that they're privileged, yet no

21    privilege log from the polygrapher and no privilege log from

22    Mr. Mobus indicating that those documents are privileged.

23            So as for the subpoena to Morgan Joseph, I guess if

24    it's a modest amount and they're now saying they're doing this

25    on principle, essentially what I'm hearing from Mr. Piliero is

|    |    |
|----|----|
| 1 | for $2500 we've got a company that at least at the end of 2016 |
| 2 | had $1.5 million that it was reporting to the SEC that has done |
| 3 | million-dollar deals, according to its website, on which |
| 4 | Mrs. Mobus sits on the board of directors, but they want to |
| 5 | hang us out for $2500 on principle.  As I said, had we just |
| 6 | been told, "Listen, do you want to share the costs?  Or "Here's |
| 7 | the third-party vendor that we'll use neutrally to try to |
| 8 | figure out what's over there..." |
| 9 |       Right now all I know is that Mr. Piliero's side of the |
| 00:12 10 | table is controlling MJTA, so we think they're still interested |
| 11 | in this.  He selected a forensic person I don't know, and I'm |
| 12 | being told that there are costs to run, as he said, reasonably |
| 13 | narrowed searches that take far longer, according to his IT |
| 14 | person, than ours has suggested it would take.  At the end of |
| 15 | the day if it means splitting the cost of that to get the |
| 16 | documents and actually having the search run, I'm certainly |
| 17 | willing to consider that; what I found problematic was the |
| 18 | declaration on Friday of, "Unless you pay, we're not doing it. |
| 19 | We're not even conducting the search." |
| 00:13 20 |       So those have been problematic, your Honor.  And as I |
| 21 | said, it's creating the hurdles, and we'll just keep going over |
| 22 | them. |
| 23 |       MR. PILIERO:  Briefly, Judge. |
| 24 |       THE COURT:  No, we're not going to resolve any of this |
| 25 | today. |

```
 1              MR. PILIERO:  Okay.

 2              THE COURT:  So one thing -- I haven't spent much time,

 3     frankly, getting familiar with the case, but one thing I can't

 4     figure out is what the dispute is over Bard versus Simon's Rock

 5     and what it means to be a unit of Bard.

 6              Let me start with -- I guess the defendant is Bard.

 7              MR. ROBERTS:  Sure.  Simon's Rock is a separately

 8     accredited institution.  It is recognized by the Department of

 9     Education as a separately accredited institution.  It has and

00:14 10     is the only school Andrew Mobus ever applied to or went to.  It

11     has its own distinct policy and procedures.  It has an entirely

12     different Title IX process.  Literally two entirely different

13     systems.  The entire --

14              THE COURT:  Apart from the legalities, tell me in the

15     real world why students go to one and not the other.  And I

16     don't even know what they do.

17              MR. ROBERTS:  Oh, they're very different schools.

18     Bard College and Simon's Rock is what's called -- and it's the

19     first time I've heard of it -- a "young college."  It pitches

00:15 20     itself to high school students who have reached sophomore year,

21     and at that point those who are particularly capable or able to

22     handle the college environment apply, and in two years -- what

23     would have been their two final years of high school -- they

24     get an associate's degree, or they can continue to stay on for

25     a full four years and get a bachelor's degree.  So they're
```

1   pitched, if you will, to entirely different audiences and they

2   are run entirely separately.  Yes, you have the Provost

3   reporting to the president of Bard college, but there's no

4   overlap of processes in this case whatsoever.

5          THE COURT:  You haven't, I guess, disputed that the

6   proper defendant is Bard College?

7          MR. ROBERTS:  I've said before that I thought that the

8   proper defendant here was Bard College and Simon's Rock.  I

9   said that years ago to Mr. --

00:15 10        THE COURT:  I mean, they're not distinct legal

11  entities; they're one legal entity.  Is that right?

12         MR. ROBERTS:  Your Honor, I don't ever want to mislead

13  a court when I'm asked a question so I do not know, as he has

14  repeatedly said, that they're the same juridical entity.  I do

15  not know.

16         MR. PILIERO:  They are.  There's only one -- it's his

17  client.  I'm sure that he could find out pretty easily.

18         The issue is -- first of all, it's very, very clear

19  there's a lot of overlap in the governance of Bard College and

00:16 20  Simon's Rock.  The president of Bard College is Leon Botstein.

21  He's also the CEO of Simon's Rock.  Bard College of Simon's

22  Rock.  The brochure says that Simon's Rock is run under the

23  supervision of the board of trustees of Bard College.

24         But even that's not the point.  The point is this:

25  The point is that the gravamen of our case is that there was

1    sexual -- that there was gender discrimination against my

2    client under Title IX, and the reason for that was that Bard

3    College was under pressure, as were a lot of colleges from the

4    Office of Civil Rights' Department of Education.  Under the

5    threat of losing their funding, they needed to be sure that

6    they were doing what the OCR at that time thought was

7    appropriate.

8              In May of 2014, which is when the complaint was issued

9    against my client, the OCR published a report which showed that

00:17 10   Bard College was the second largest in the state of New York

11   with sexual misconduct complaints over the prior three years.

12   Bard College was scrambling.  They wanted to make sure that

13   they didn't get in trouble.

14             To me the idea that Bard College, Leon Botstein's Bard

15   College, Leo Botstein over at Simon's Rock, is not saying,

16   "Let's just all of us be sure that we're dotting all the I's

17   and crossing the T's."  It's beyond -- all we want is

18   correspondence between Bard College and the OCR.  We're not

19   looking for student files.  He invokes a decision by one of

00:18 20   your colleagues on this court.  We're not looking for those

21   things, we're not looking for other cases.  We've got enough to

22   look at.  I want to see what was going on between Bard College,

23   Simon's Rock and OCR.

24             MR. ROBERTS:  Your Honor, if you would like me to

25   continue to argue, I'd be happy to do that.

```
 1              THE COURT:  No, I don't.

 2              MR. ROBERTS:  Okay.

 3              THE COURT:  I just wanted to be -- among other things,

 4    I wanted to be sure we weren't getting into the problem of

 5    having the wrong defendant, that's all.  I guess we don't

 6    necessarily.

 7              Okay.  I think so, hearing the discussion, but are

 8    there going to be more discovery motions in the near future?  I

 9    can predict the long term.

00:19 10              MR. ROBERTS:  At this stage of the game that is

11    predicted unless these are resolved.

12              THE COURT:  So...

13              MR. ROBERTS:  I don't know that they'll be in front of

14    you, your Honor.  They may be in Connecticut, they may be --

15              THE COURT:  Right.  But there are some presently

16    existing controversies that could be the subject of discovery

17    motions.

18              MR. ROBERTS:  Correct.

19              THE COURT:  Okay.  Why don't we set a deadline for

00:19 20    bringing those motions or not, and then we can hear all the

21    discovery matters together rather than having a series of

22    discovery hearings.

23              MR. ROBERTS:  That will be fine, your Honor.  The

24    other thing I would --

25              THE COURT:  What would be an appropriate time limit
```

|   |   |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 00:20 | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| | 15 |
| | 16 |
| | 17 |
| | 18 |
| | 19 |
| 00:20 | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |
| | 25 |

for file or not?  A couple of weeks?  A month?

MR. ROBERTS:  Yeah, at least -- because we've not received what we expected to receive from The Putney School yet with the number of extensions.  I think that 30 days would probably be a good idea.  And, your Honor, we've also referenced that we do intend to move to amend, to add an affirmative defense as well as a possible counterclaim for fraud.  I know that there has been some concern about whether or not there's a good reason to do that after September 30th, which was originally the date for filing those, but the information that we've learned was learned after September 30th.  I would again like to see what is in the Putney production.  So, your Honor, I would commit to trying to get a motion then in to the Court as well within 30 days provided that --

THE COURT:  Well, I only want to address discovery at this point.

MR. ROBERTS:  All right.  That's fine.

MR. PILIERO:  Defendant -- I have an objection. Defendant's document production to us is not complete so I don't know whether or not there would be a motion.  There are things they said they would produce.  I haven't seen them and so I have to reserve on that as well.  So if I can find out when they will complete their document production, then we can set a deadline after that for --

```
 1              THE COURT:  Well, I think I want to set a deadline

 2    right now.  So February 28th, which is about a month -- this is

 3    the 29th of January -- for service of discovery motions, and

 4    then we'll at some point have an organized hearing on

 5    outstanding discovery, okay?

 6              MR. PILIERO:  We had talked earlier about putting off

 7    the -- do you want to put the existing motion to compel against

 8    them on the same timetable?

 9              THE COURT:  Yes.

00:21 10        MR. PILIERO:  So put that back too.

11              THE COURT:  That's filed.  You're going to file a

12    response?

13              MR. PILIERO:  I'll file a response in two weeks and

14    then we'll --

15              THE COURT:  But it will be a part of what may be

16    multiple motions unless you're able to come to some agreements.

17              MR. ROBERTS:  From your lips to God's ears.

18              MR. PILIERO:  Your Honor, I'm just sitting here

19    listening to motions -- argument, really, on motions that

00:21 20   haven't been filed yet, but one of the things that Mr. Roberts

21    said, he mentioned a discovery deadline and that it may be

22    difficult to complete discovery within the existing deadline

23    depending on how these motions shake out.

24              My only question to you is:  Would this be the

25    appropriate time to seek leave to amend that schedule or should
```

```
 1   we do that later on down the road after --

 2             THE COURT:  No.

 3             MR. PILIERO:  Gotcha.  Thank you.

 4             THE COURT:  Okay.  Thank you.

 5             MR. ROBERTS:  Thank you.

 6             MR. PILIERO:  Thank you, your Honor.

 7             (The proceedings adjourned at 2:51 p.m.)

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    C E R T I F I C A T E

2

3          I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

4     the United States District Court, do hereby certify that the

5     foregoing transcript constitutes, to the best of my skill and

6     ability, a true and accurate transcription of my stenotype

7     notes taken in the matter of Civil Action No. 17-11011-GAO,

8     Andrew Mobus v. Bard College, et al.

9

10    /s/ Marcia G. Patrisso
      MARCIA G. PATRISSO, RMR, CRR
11    Official Court Reporter

12
      Date:  2/2/18
13

14

15

16

17

18

19

20

21

22

23

24

25
```