```
 1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
 2

 3   ANDREW MOBUS,                  )
                    Plaintiff      )
 4                                  )
     vs.                            )    C.A. No. 1:17-cv-11011-GAO
 5                                  )
     BARD COLLEGE, ET AL.           )
 6                  Defendants.     )

 7


 8
              BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
 9                  UNITED STATES DISTRICT JUDGE
                         MOTION HEARING
10


11


12


13             John Joseph Moakley United States Courthouse
                          Courtroom No. 22
14                        One Courthouse Way
                       Boston, Massachusetts 02210
15

16                           May 7, 2018
                             2:30 p.m.
17


18


19


20


21              Kathleen Mullen Silva, RPR, CRR
                       Official Court Reporter
22        John Joseph Moakley United States Courthouse
                  One Courthouse Way, Room 5205
23                 Boston, Massachusetts 02210
                  E-mail: kathysilva@verizon.com
24


25
```

```
 1   APPEARANCES:

 2
     PILIERO & ASSOCIATES, PLLC
 3           Lisa A. Frey, Esq.
             Robert Donald Piliero, Esq.
 4           444 Madison Avenue, 4th Floor
             New York, New York 10022
 5           646.854.1273
             frey@pilierolaw.com; piliero@pilierolaw.com
 6           and
     ROBINS CAPLAN LLP
 7           Lauren J. Copppola, Esq.
             800 Boylston Street, Suite 2500
 8           Boston, Massachusetts 02199
             617.267.2300.
 9           and
     PARTRIDGE SNOW & HAHN LLP
10           Martin P. Desmery, Esq.
             30 Federal Street
11           Boston, Massachusetts 02109
             617.292.7910
12           mdesmery@psh.com
             for Plaintiff
13

14
     HIRSCH ROBERTS WEINSTEIN LLP
15           Scott A. Roberts, Esq.
             Tobias W. Crawford, Esq.
16           24 Federal Street, 12th Floor
             Boston, Massachusetts 02110
17           617.348.4300
             sroberts@hrwlawyers.com; tcrawford@hrwlawyers.com
18           for Defendants

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2              THE CLERK:  Court is in session.  Be seated for a
 3    motion hearing in the case of Andrew Mobus versus Bard College,
 4    et al., 17-CV-11011.
 5         Would counsel identify yourselves for the record.
 6              MR. PILIERO:  Robert Piliero for the plaintiff.
 7              MS. COPPOLA:  Lauren Coppola for the plaintiff, Your
 8    Honor.
 9              MS. FREY:  Lisa Frey for the plaintiff, Your Honor.
10              MR. DESMERY:  Martin Desmery for the plaintiff.
11              MR. ROBERTS:  Scott Roberts for Bard College, Your
12    Honor.
13              MR. CRAWFORD:  Toby Crawford for Bard College as well.
14              THE COURT:  Okay.  So we have some discovery motions
15    principally.
16         But before we get to those, let me hear you on your
17    theory of the case; that is, where you think you are with your
18    theory of the case, and then I'll hear from the defense.
19              MR. PILIERO:  Sure.  Just to briefly summarize, and
20    Your Honor probably already knows, so forgive me if I'm telling
21    you something you already know.
22         The case is a Title IX case.  We're saying that our
23    guy was expelled from Simon's Rock, which is a high school.
24    They call it early college.  It was 11th grade.  He was
25    expelled based on a finding of sexual misconduct.
```

1          We have asserted claims under Title IX saying that

2     that was motivated -- a couple things -- that the proceeding

3     was a kangaroo court, that it really was not fundamentally fair

4     at all.  Just one little thing to let you know about that is,

5     there's a four-page single-spaced statement of the

6     complainant's claims against my client.  He was not given that

7     before the hearing.  So we think that's one indication.

8     There's lots of others.

9          We think that the reason why Bard College rushed to

10    judgment on this was because the Department of Education Office

11    of Civil Rights was putting a lot of heat on colleges with

12    respect to the need to be rigorous in their enforcement of

13    sexual misconduct, in preventing sexual misconduct and

14    adjudicating it when it happens.

15         So we think that was the motivating factor, a threat

16    from the Department of Justice at the time -- Department of

17    Education at the time was that you lose your funding if you

18    don't do the right job.  There's evidence in the record that

19    we've seen where the Title IX coordinator specifically said

20    that, that, We've got to be careful with these cases not to

21    lose funding.

22         So we think a couple of things happened.  We think

23    that that as a backdrop, we believe that the committee that

24    heard this case knew before it ever got there to the hearing,

25    which way it was going to come out, and the documentary

1    evidence suggests that that's exactly what happened.

2         We also believe that the Title IX coordinator, who had

3    sat on the committee -- there was an earlier case against my

4    client for which he was exonerated.  They found that there was

5    no preponderance of the evidence to prove the claims.

6    Nonetheless in that outcome letter to my client it said that

7    she was upset, which we thought was gratuitous.  One of the

8    things you're going to hear in this argument, Judge, is they

9    won't give me a copy of the outcome letter they sent to that

10   complainant.

11        Going forward what we believe we can prove is that the

12   way in which the hearing was conducted, the investigation was

13   conducted, just didn't come close to being fundamentally fair,

14   and we think we have a lot of evidence on that.

15        The issues that we're talking about today, and the

16   reasons for our motion have to do with the gender bias issue.

17   We want to get information with respect to Bard College's

18   communications with the Department of Education Office of Civil

19   Rights.  That's one of the issues.  And I'll get into the

20   argument whenever you want me to, but just let me tee it up for

21   you.

22        Another issue is the academic record of JG, the

23   complaining witness in the case that forms the basis for this

24   case, and that's important because there's lots of evidence to

25   establish that she was failing out of school.  She had a ten-

1    week intimate relationship with my client.  Didn't say a boo

2    about there being any problem.  The issue that came up was a

3    claim of unconsented to anal intercourse that happened day one

4    essentially.  Never brought it up for ten weeks.  And there's

5    very good evidence that says she was failing out of school and

6    she was going to lose her financial aid, and that that provided

7    a motive for this.

8          The committee looked at none of that, looked at

9    absolutely none of that.  There's lots of other things they

10   didn't look at either but I don't know if you want to hear the

11   whole case right now.

12         THE COURT:  I just want to get what your theory is.

13         MR. ROBERTS:  Okay.

14         THE COURT:  What would make them have to look at it or

15   be free not to look at it?

16         MR. PILIERO:  They say in their student handbook that

17   they guarantee everybody a fundamentally fair hearing.  A

18   fundamentally fair hearing I believe is impossible if you don't

19   tell the respondent what he's accused of having done.  I don't

20   know how you defend a case where you don't know, except in very

21   general terms.  They wrote a May 23 letter which ticked off

22   things, but it said nothing to the level of detail that he was

23   questioned about during the hearing.

24         THE COURT:  Do you rely on something prescriptive from

25   the -- whatever the documents might be, the university handbook

1  or whatever, or broader notions of fundamental things?  That's

2  what I'm trying to get at.

3          MR. PILIERO:  It's in the student handbook.  It says

4  we'll give you a fundamentally fair hearing.

5          THE COURT:  So if they hadn't said that, they wouldn't

6  have had to do it?

7          MR. PILIERO:  I think they still have to do it, quite

8  frankly, but to the extent that we get into issues about due

9  process required of a private institution, et cetera, we don't

10  have to get there.

11          THE COURT:  That's what I'm getting at.

12          MR. PILIERO:  I understand that, but what I'm saying

13  is we don't really have to get there.  That's why we have

14  breach of contract claims here.

15          THE COURT:  To the extent -- I don't know whether I

16  have in my record that is in the docket the relevant handbook,

17  but if I don't, I should.

18          MR. PILIERO:  Okay.

19          THE COURT:  So I can compare what you're saying

20  against the language in the handbook.

21          MR. PILIERO:  Okay.  I'm not sure if I have it right

22  with me right now.

23          THE COURT:  It might already be in the record.  If so,

24  maybe you can point to where it is.  If not, then perhaps

25  supply it.  I mean, it sounds like it's going to have a central

1   role -- the interpretation of it is going to have a --

2        MR. PILIERO:  It's not interpreted.  It says

3   "fundamentally fair."  I'm quoting "fundamentally fair."

4        THE COURT:  Is that all it says?

5        MR. ROBERTS:  Well, no, that's not what it says.

6        MR. PILIERO:  Do you have it?

7        MR. ROBERTS:  You can finish the whole sentence in

8   which "fundamentally" was --

9        MR. PILIERO:  I don't have it here, Judge.

10       MR. ROBERTS:  I don't have it with me, but...

11       MR. PILIERO:  I don't have it here, Judge.  If anybody

12  has it I'd love to see it.  I think it's on page 85.  I just

13  remember it.  There's a whole list of rights that the accused

14  has.  Okay?  One of the rights is a fundamentally fair hearing.

15  But we'll get that to you for sure.

16       So that's on that one.  So yes, we think that there

17  was an affirmative obligation to treat him fairly.  We

18  understand the difference between a private and a public

19  institution.  We do believe, however, that this really crossed

20  the line by not giving him notice of what he's supposed to

21  defend himself for.

22       There's also an indication that the committee met a

23  week before the hearing and decided he was guilty and would be

24  expelled.  That was a week -- not a week.  Three weeks before

25  the hearing.  So there's evidence which I think would shock the

1    conscience of the court about how this kid was treated.

2          So that's on that issue.

3          On the issue of fairness, I do think that it is

4    relevant for a fact finder to inquire as to motive.  There were

5    situations where my client asked the panel to get certain

6    pieces of evidence, and they declined to do so.

7          They -- the evidence seems very clear that the Title

8    IX coordinator, Susan Lyon, who had been on the committee in

9    the first case that exonerated my client, she then became Title

10   IX coordinator in the second case, and she wasn't going to let

11   him go again.  And there's lots of evidence that we believe

12   leads to that conclusion.

13         I can talk about other issues on the motion or not.

14         THE COURT:  Okay.  Why don't we start with your

15   motion.  There's cross motions.  We'll start with the

16   plaintiff.

17         MR. PILIERO:  Okay.  Excuse me one second, Judge.

18         Here it is.  It's quoted in -- on page 35 of the

19   complaint from the handbook.  It says, "The right to be fully

20   informed of the nature of the alleged violations, and of the

21   policies, procedures and rules regarding investigation and

22   adjudication of a complaint of sexual misconduct including

23   possible sanctions."  That's a direct -- that's the total

24   quote.

25         It also says, quote, "The right to a fundamentally

1    fair hearing that is consistent with the procedures described

2    in this policy."

3         MR. ROBERTS:  Thank you.  That's the part I was

4    talking about.

5         MR. PILIERO:  Okay.  And we can give you a copy -- we

6    will give you a copy, Judge.

7         THE COURT:  Okay.

8         MR. PILIERO:  But to go directly to the issues:  The

9    first issue is the defendant, Bard College, refuses to produce

10   discovery.  They make a distinction between Bard College at

11   Simon's Rock and Bard College the overall college, which is in

12   Annandale, where the headquarters is.  There is no dispute that

13   they are one and the same unit, that Simon's Rock is a unit of

14   Bard College.  There's no dispute that the president of Bard

15   College is also the chief executive enter of Simon's Rock.

16   There's no dispute that the board of trustees of Bard College

17   is in charge of running the show at Simon's Rock.

18        The position that defendant is taking is this all

19   happened at Simon's Rock.  That's the only place that matters.

20   We believe that discovery is essential from the defendant, not

21   only because it's the defendant, but because what we're talking

22   about here is the concern that we believe Bard College has

23   exhibited about satisfying the Office of Civil Rights under

24   fear of losing its funding.  The timing is very important.  We

25   know, for example, that what happened was, in March of 2014 the

1   Department of Education Office of Civil Rights for the first

2   time said it was going to start publishing a list of schools

3   that it thought was not in compliance.

4          Also in March of 2014, there was a study which was

5   published that Bard College was the second worst in the state

6   in dealing with sexual misconduct.  It is no surprise that it

7   was in March that the first investigation was launched against

8   my client.  It is no surprise under those circumstances that on

9   May 22, when the first investigation was dismissed for lack of

10  evidence, that the very next day a brand-new investigation was

11  brought against my client.

12         That's the one that we're talking about here, but we

13  believe they're interrelated.  And that's why I'll just jump

14  ahead for a second.  We are quite concerned about the refusal

15  of defendant to provide us a copy of the outcome letter that

16  was sent to the first complainant, who had lost her case.

17         We would like to see whether or not there's anything

18  in that letter which suggests, in words or substance, But don't

19  worry, we'll get him on the next one, because the next one was

20  brought the next day.

21         So what we're saying is we want to see what Bard

22  College, Annandale, the headquarters was doing with the

23  Department of Education, because I think it's naive to think

24  that if they were getting some heat from the OCR that that

25  wouldn't pass down to Simon's Rock, and that Simon's Rock would

1   not be in the same position of having to watch out for the OCR.

2   And, in fact, there is an email sent by the Title IX

3   coordinator in July of 2014 before the hearing which says,

4   Given that our federal funding without which we could not exist

5   is tied to these important cases, we need to move quickly.

6           It doesn't prove bias.  It shows an awareness.  What

7   we want to do is we want to see how much heat they were getting

8   at that time.

9           So the first issue is we would like full discovery

10  from Bard College at least with respect to document request

11  number 26, which is what we're talking about in terms of

12  communications between Bard College and the defendant and OCR.

13  We're not asking for things from anyone who was not a party.

14  It's a party.

15          The second one I think we may have worked out.  It's

16  about subpoenas to employees that are represented by counsel.

17  We've been going around for quite a while trying to get some

18  dates, but I think we're going to work that out.

19          The third one is the outcome letter in the LF matter,

20  the first investigation, as I mentioned to you why we think

21  that's terribly important to see and, quite frankly, we can't

22  see why that wouldn't be produced.  The argument we're being

23  told is it's protected by FERPA.  Of course, FERPA doesn't

24  block you from discovery.  What it says is do you want to ask

25  the person do they mind giving it up.  They have refused to ask

1    the person does she mind giving it up.

2           Secondly, it's odd that the outcome letter to her is

3    deemed to be protected by FERPA but they produced the outcome

4    letter that they sent to JG, the woman in the second

5    investigation.  That one they had no FERPA problem with, or

6    they did ask and get permission to do it.  I don't know which

7    it is, but it seems very strange that the case he won we can't

8    see what they told the complainant.

9           Again, it bears emphasis, they tossed that case on May

10   22, and they started this one on May 23.  And what had

11   happened, by the way, is that JG, the woman who's in the second

12   investigation, they called her to testify in the first case.

13   She had broken up with Andrew on May 2 after a ten-week

14   relationship.  That was at about -- well, she told her academic

15   advisor, who she was talking to about flunking out, that it was

16   because of Andrew.  It was first time she said that Andrew had

17   a bad relationship with her after ten weeks.

18          So Sue Lyon, who's on the committee for the first

19   case, invites, directs, JG to give testimony at the first

20   hearing, not because she had any knowledge, because she didn't.

21   She had absolutely no knowledge.  It was really about, so what

22   do you think of Andrew?  Well, this is a girl that broke up

23   with her boyfriend.  What do you think she said?  And it was

24   very ugly.

25          Based on that he was kicked out of campus that same

1    day.  Based on that statement that this JG made to the

2    committee in the LF case, he was required to leave campus that

3    day.  They said it was because there were two investigations

4    that were ongoing against him, but then they dismissed one of

5    them.  They didn't let him come back.  So that's LF.

6         The other thing we want is, as I mentioned, the

7    investigation should have included, and we want to look at JG's

8    motivation for coming out after ten weeks and saying that my

9    guy did what she says he did and hold that up against her

10   academic record.

11        We learned in deposition testimony from JG in the

12   Maryland case, you may be aware of, we had sued for defamation

13   in that, we learned that she started out the semester with four

14   classes, by February had dropped two and then was failing the

15   other two; and she was on financial aid.  So she was toast.

16   And she needed something.

17        Fast forward -- as a result of this, she originally

18   was given an academic dismissal for failure to keep up.  They

19   then switched it to a voluntary withdrawal.  So this was a

20   favored student.  This was a favored gender, in our view.

21        So why am I saying this, because we want her academic

22   records.  We want to be able to show what I said, which right

23   now is in terms of oral testimony, but I'd like to see her

24   grades.  I'd like to see her records, her transcript.  That's

25   that.

1            The last one is the hearing in our case was 2013/'14

2    handbook, it was under the 2013/'14 handbook.  The hearing was

3    in the investigations, and the hearing was in the spring of

4    2014.  The following year there was a total revamping, total

5    revamping of the way in which sexual misconduct cases are

6    investigated and how hearings are conducted.

7            We have gotten copies of the subsequent iterations of

8    the 2014/'15 and subsequent years, but we have been denied

9    notes.  What we would like to see is what kind of conversations

10   were going on as to why they made these changes.  One thing

11   they did was they got rid of the idea of having three faculty

12   members handle the hearing.  They got a private investigator --

13   not a private investigator -- they got a separate investigator

14   to do it.  That's what happened the following year.  Does that

15   mean anything?  I don't know if it means anything, but let's

16   see what it means.  I'd like to see if there were memos that

17   says, We can't let this happen again, the way this was handled.

18           It sounded like a closing.  I'm sorry about that,

19   Judge.

20           THE COURT:  As to that motion.

21           MR. ROBERTS:  I'll try to make it not sound like a

22   closing.

23           I take it you don't want to hear my theory of the case

24   or anything like that.  I'm happy to jump in.

25           THE COURT:  Go ahead.

```
 1              MR. ROBERTS:   There's been a suggestion made by

 2     Mr. Piliero -- not just a suggestion, but a very clear

 3     statement to Your Honor that we haven't produced documents from

 4     Bard College, and that we haven't conducted a search of Bard

 5     College.  That's simply not true.  What we did was we started

 6     our search in the place where Mr. Piliero even concedes it

 7     should have begun, the only institution that Andrew Mobus ever

 8     attended, Bard College at Simon's Rock.  It is there that his

 9     disciplinary proceedings went forward.  It is under the

10     policies of Simon's Rock that were applied.  It is before

11     Simon's Rock personnel and Simon's Rock's Title IX office that

12     everything was handled.

13              I'll leave aside the absurdity of suggesting that

14     there was a bias that miraculously appeared out of nowhere in

15     the second proceeding but somehow wasn't present in the first

16     one.  According to Mr. Piliero he's found not responsible, and

17     then within a day the same people say, Let's find him

18     responsible and suddenly become aware of issues of gender bias.

19     I'll leave that.  I'll focus again on the issue of this alleged

20     geographical restriction.  That is not what occurred.

21              As I said, we started our process at Simon's Rock at

22     the request of Mr. Piliero and his colleagues.  We expanded it

23     to Bard College.  Now, we did this even though when we looked

24     at the records at Simon's Rock we found no communications

25     between anyone at Simon's Rock and Bard College about this
```

1  matter, not a one.  Nonetheless we went to Bard College.  We

2  went to their student affairs office.  We went to their Title

3  IX office and we had them run searches on anything they could

4  find regarding Andrew Mobus, and the answer was they found

5  nothing.

6           May I approach, Your Honor?

7           THE COURT:  All right.

8           MR. ROBERTS:  We're obliged to conduct a reasonable

9  search.  We conducted a more than reasonable search.  What I've

10 presented you, Your Honor, is exactly where we looked, who we

11 looked at, what we conducted, and in the letters that are

12 attached to this are appended the search protocols that we

13 used.  So any suggestion that somehow we won't look at Bard

14 College's records or we've just not done a good enough job is

15 truly a misrepresentation of what the defendants have done

16 here.

17           Now, with respect to the particular documents at issue

18 here, the first one that Mr. Piliero says that he wants to get

19 are the communications between Bard College and the Office of

20 Civil Rights under the theory that because of the issuance of

21 the dear colleague letter in 2011 every single institution must

22 have been aware of issues of gender bias and this somehow

23 colored everything that happened at Simon's Rock.  That theory

24 has not been accepted by courts with that sweeping generality.

25           More importantly here, Bard College is recognized by

1    the Office of Civil Rights as a separate recipient of federal

2    funds.  It is monitored by the New York office of the Office of

3    Civil Rights.  Simon's Rock, a separate recipient of federal

4    funds, a separately accredited institution, is monitored by the

5    Massachusetts Office of Civil Rights.

6            If I can, Your Honor, I'd like to show you a letter

7    reflecting the Office of Civil Rights' recognition of the

8    distinction between the two entities.

9            This is a letter involving an initial investigation

10   that OCR was going to open regarding a complaint of misconduct.

11   Initially it was opened by the New York Office of Civil Rights

12   because the allegations purported to be made, as Mr. Piliero

13   has done against Bard College, this letter says back from the

14   Office of Civil Rights, Hey, in the course of our

15   investigation, we've discovered that what happened here

16   actually occurred at Bard College at Simon's Rock.  So we, New

17   York office, which we recognize as a separate recipient of

18   federal funds.  As a result, we, New York office of OCR, are

19   closing our investigation.  And this matter is being

20   transferred over to the Office of Civil Rights in Boston, which

21   is the one that oversees Simon's Rock.  So the notion that we

22   come in and here and tell you that these are treated by the OCR

23   as separate entities is for a simple reason.  It's true.

24           Bard College, also, Your Honor, even if you want to

25   accept his argument that somehow communications with OCR and

1    Bard College must have colored or flavored what went on at

2    Simon's Rock, there is no basis for that.  We have told

3    Mr. Piliero and obtained information from Bard College and

4    provided it to them that the very first communication that Bard

5    College had with OCR regarding concerns about the handling of

6    sexual misconduct cases occurred in December of 2015, nearly a

7    year and a half after Andrew Mobus was expelled from Bard

8    College at Simon's Rock.

9            The documents that he cited to you, he mentions, when

10   OCR published its list of those institutions that were under

11   investigation, he left off the fact that Bard College isn't on

12   it.

13           With respect to the other document he referenced where

14   he said something along the lines of they're second worst in

15   dealing with sexual assault, that's a Clery report, Your Honor.

16   That's something that every college puts a report out on the

17   criminal activity on campus.  It has nothing to do with the

18   handling of sexual misconduct cases.  It has to do solely with

19   the reporting of crime.  That's it.

20           Now, as a matter of -- I've explained factually why

21   this is an irrelevant request and an overbroad request, but

22   it's also this court -- actually, it was actually Justice Boal

23   -- Judge Boal who's recognized it -- in a case involving a

24   student at Harvard College who sued Harvard College for

25   violating Title IX.  She said, I want to get all communications

1   between Harvard Law School, which is, as Your Honor knows, a

2   stone's throw from Harvard College.  I want to see all their

3   communications from Harvard College.  And Judge Boal said no.

4   The issue in this case is whether Harvard College complied with

5   its policies.  It's phrased where the only issue is whether

6   Harvard complied with its policies in effect at the relevant

7   time, and it denied a request for all these communications

8   between Harvard Law School and OCR.  So here we have

9   communications by an institution he never attended that OCR

10  recognizes as a separate recipient of federal funds regarding

11  communications that occurred after -- long after this kid was

12  expelled from Simon's Rock.  It would be harder to describe a

13  more irrelevant document than what I just described.

14          With respect to the issues of documents in the

15  possession of former employees of Simon's Rock, I agree with

16  Mr. Piliero, I think that is something we'll be able to work

17  out.  Certainly we couldn't have been compelled to go get stuff

18  from former employees, but nonetheless as you'll see from

19  information that I put in front of you, we tried mightily to do

20  that.

21          The LF outcome letter.  I want to be clear because

22  there's a number of representations made in the briefing

23  regarding the LF proceeding that are not accurate.  They

24  contend that the only thing that we've been willing to provide

25  -- the only thing -- is some notations of JG's testimony.  That

1    is not true.  We have provided all of the documentation that we

2    have regarding the LF proceeding, including scheduling emails,

3    notes of witness interviews, correspondence between Mobus and

4    Bob Graves, who was in charge of handling this at Simon's Rock

5    at the time, correspondence even between LF and her advisor.

6    All of that was not subject to any privacy protection under

7    FERPA.

8            Mr. Piliero didn't address FERPA other than utter the

9    word.  But it is a federal statute that affords privacy

10   protections to students at colleges.  He says, well, what we

11   should have done is just asked LF if we could turn over the

12   outcome letter, which no one disputes is part of her

13   educational record.  That is not how it works, Your Honor.

14           How it works is that they have to show -- they bear

15   the heavy -- a heavy burden under the case law and a

16   significant burden to show a genuine need for the outcome

17   letter.

18           Now, Mr. Piliero's created a very credible out of

19   whole cloth recitation of what that letter must say.  It says,

20   according to him, Don't worry, we'll get him.  Let's be clear.

21   He pulled that right out of the air.  But that speculation on

22   his part is not a showing of genuine need.  He wants to tromp

23   all over LF's privacy rights and JG's while at the same time --

24   I can't help but notice, and I've argued to the court -- he

25   embraced those same privacy protections with great vigor in

1    Maryland, contending that no one should be allowed to look

2    through his educational records for stuff that might smear him.

3    Well, he looks to do the exactly the same, especially with

4    respect to JG.  But that outcome letter, which is the only

5    thing we've said we can't provide -- you have the notes of the

6    hearing.  You have all the documents that went forward with

7    respect to the hearing.  You have the notes of JG's testimony.

8    The outcome letter we can't provide.  Oh, and by the way, you

9    know the outcome.  You trumpet the outcome at every turn.  You

10   were found not responsible.  We know.  So that's the one

11   document we can't give unless there's -- unless there's -- and

12   there's nothing here that shows that he's provided anything to

13   the court that would trump that privacy interest that, as I

14   said, he so mightily touted in Maryland.

15          Regarding JG's academic records, I have to say that it

16   is this argument that should give Your Honor great pause

17   because distilled to its essence, this is Mr. Piliero's

18   argument:  Any time a young woman or young man comes forward

19   with a claim of sexual assault and there is a resulting

20   litigation, I can get whatever I want from the academic record.

21   I'm going to -- because maybe it will show some motivation of

22   bias.  Maybe it will show that somehow she accused someone of

23   rape because she dropped courses.

24          Mr. Piliero sidesteps the issue that perhaps

25   performance issues could have been generated because according

1    to her she was raped by his client.  He leaves that aside.  The

2    reality is this:  We have produced to him from the academic

3    records with the permission of JG's counsel everything in those

4    academic records concerning the LF proceeding, concerning her

5    proceeding and concerning Andrew Mobus, including the outcome

6    letter.  And the reason we have done so is because we have

7    permission to do so.

8            We do not have permission from the counsel for JG to

9    produce those records, and we don't even think it's

10   appropriate -- although we have asked, we don't think it was

11   appropriate to ask because those are simply not relevant.  He's

12   made no showing here that he is, again, the significance,

13   haven't shown a genuine need, none of that.  He just

14   speculates, well, maybe it will show some motivation of bias.

15           So Your Honor, we have a good reason for not giving

16   those records.  And I have to say, again, in a situation where

17   Mr. Mobus put his privacy rights on like a shield down in

18   Maryland, it really is a little inconsistent, just a touch

19   hypocritical, for him to suggest they should be swept away with

20   respect to JG.

21           Regarding the handbooks.  Mr. Piliero and I agree

22   there is but one handbook that matters in this matter, the

23   2013-2014 handbook.  That's it.  Nonetheless, they insisted

24   that we produce all the handbooks from then until now.  We

25   have.  They wanted to know what the changes were.  We said they

1    are self-evident.  They want to know, well, why, what were the

2    reasons for these changes?  Again, Your Honor, that has nothing

3    to do with this case.  Yes, you can see from the procedure that

4    the school went from a three-panel model, a hearing panel model

5    to a single investigator model.  The interesting thing is if

6    you talk to Judge Sorokin he would say we had it right before

7    with the three-panel model as opposed to the single

8    investigator model, which I believe Judge Sorokin in the

9    Brandeis case vested -- Judge Saylor, excuse me -- Judge Saylor

10   said basically vested judge, jury and executioner authority in

11   one person.

12          So this idea of why there were changes, there were

13   changes.  There they are.  The question, only question is

14   whether we comported with the policy that was in effect at the

15   time.  And with respect to the issue of fundamental fairness,

16   we can go right back to the Schaer versus Brandeis decision,

17   Your Honor, which says exactly what fundamental fairness is.

18   It is notification of the charge and an opportunity to be

19   heard.  Period.

20          Andrew Mobus got both those.  He likes to pretend he

21   didn't have every single specific before he walked into the

22   hearing room or the investigative conferences, but he certainly

23   was provided the information that the policy said he should and

24   then in the midst of those investigations and the conferences

25   he had, it was crystal clear to him what he was responding for.

1    And, indeed, he wrote a 12-page submission on his own which

2    indicated his awareness of what he was being questioned about.

3         So, again, the issue on the handbooks is did we comply

4    with 2013 and 2014, not whether or not there were changes made

5    and why they might have been made at a future point.  The

6    argument that somehow those are subsequent remedial measures is

7    just untenable.

8         Thank you.

9         THE COURT:  Okay.  Why don't we -- we have to move on.

10   Let me go to the other motion.

11        MR. PILIERO:  There's so much he said.  If I may just

12   for a minute.

13        THE COURT:  That's exactly why.  So much has been

14   said.

15        MR. ROBERTS:  Our motion.

16        MR. PILIERO:  Wow.

17        MR. ROBERTS:  I listened to you.  You have to listen

18   to me.  That's the way it goes.

19        MR. PILIERO:  It's like a closing.

20        MR. ROBERTS:  You too.

21        Your Honor, we had moved to compel I believe on simply

22   three points.

23        The first one are polygraph documents.  Now, there is

24   no question that while he was at Simon's Rock and in connection

25   with the proceedings, the disciplinary proceedings, Mr. Mobus

1  sat for three polygraph examinations.  He was interviewed by

2  two polygraph examiners.

3        In the LF proceeding he was examined by two examiners.

4  He submitted only one report to the disciplinary committee.  In

5  the JG proceeding, he again met with a polygrapher, contrary to

6  what was suggested at the status conference in January.  Within

7  discovery we initially got only one of the reports from the LF

8  proceeding, the one we already had.  That becomes a bit of a

9  theme.

10        After pushing, we got the other polygraph report.  We

11  still have not received the JG report, nor have we received any

12  documentation which reflects the conversations that occurred

13  between Mr. Mobus and the polygraph examiner.

14        I say conversations because it appears before the

15  report was prepared and the examination was conducted that

16  there were interviews with Mr. Mobus, and at least with respect

17  to the ones in JG there is a suggestion in the documentation in

18  the report that those interviews were either audio or video

19  recorded.  So, not surprisingly, Mr. Mobus was asked about both

20  the LF incident and the JG incident, and he certainly at the

21  time gave some contemporaneous responses.

22        That is quintessential fodder for discovery.  What did

23  he say at the time?  How did he characterize these events in

24  those conversations?

25        So initially the argument vociferously from the

1   plaintiff was, well, polygraph reports and results are not

2   admissible.  So your scope or your request exceeds the scope of

3   discovery.  We responded, well, that's not what Rule 26 says.

4   Rule 26 very clearly says that evidence need not be admissible

5   to be discoverable.  And we also, you know, pointed out that

6   there were cases in other circuits where polygraph reports and

7   results have been ordered produced and, indeed, the First

8   Circuit has recognized, in U.S. v. Black, that statements made

9   during polygraph examination can be used.  So if Mr. Mobus

10  provided a description of events that perhaps is inconsistent

11  with what he said in Maryland, and I'm not going to speculate

12  what he said, certainly that would be fodder for impeachment

13  but, of course, fodder for discovery.

14          Now, after we made these arguments, the argument

15  changed and the motion to compel then became a new argument,

16  which seemed like a post hoc attempt to preclude admissibility.

17  They argued that the JG report with the polygraph examiner was

18  a report prepared by an expert in anticipation of future

19  litigation over the JG proceeding.  And they cite Rule 26(b)(4)

20  -- excuse me, 26(b)(4)(D) -- excuse me -- 26(b)(4)(D), the

21  title of which is as follows:  "Expert employed only" --

22  only -- "for trial preparation."

23          There can be no argument that Mr. Mobus's

24  communication with someone who was colloquially in business

25  called "the lie guy" was only for litigation or that it was its

1   primary motivating purpose.  The law is clear that he told

2   Simon's Rock in writing, "I will now submit again to a

3   polygraph test" because that's the best way to find out what

4   happened.  That's the best way to show what occurred.

5           So in JG's and LF's case, he takes two, submits one.

6   In JG's case he takes another but doesn't submit it.

7           That document was not prepared in anticipation of

8   litigation.

9           Now, they bear the burden of showing that it was.

10  There's only one affidavit in the record from Ms. Frey, and it

11  does not say at all anywhere that the polygraph exam was

12  conducted in anticipation of litigation.  I suggest there's a

13  good reason for that because it would not have been true.  The

14  polygraph report -- he sat for the exam and the report was

15  prepared in connection with the disciplinary proceeding.

16  That's why he did it.

17          So Mr. Mobus's conversations with the polygraph

18  examiner are no different than any other contemporaneous

19  conversation he may have had.  There is no privilege that

20  applies and no preclusion.  And they have failed to meet their

21  burden of showing that they can keep it from us.

22          The next category are medical and psychiatric records.

23  These are requests 49 through 51.  And specifically we've asked

24  for records of consulting and diagnosing healthcare providers,

25  a neurologist who is expressly referenced in the complaint, sex

1  therapist to whom Mr. Mobus consulted in connection with his

2  appeal, and two forensic psychiatrists who prepared a report.

3        Now, in discovery we have received one document.  And,

4  again, it is a document we already have.  It is the forensic

5  psychiatrist's report that he submitted as part of the appeal.

6  We have received nothing else, not a single document from any

7  doctor, nothing.

8        Now, they claim in their motion papers that they sent

9  out 13 HIPAA authorizations to medical providers and not a

10  single one, not a single one responded.  They claim that they

11  made, in their brief, numerous requests.  They supply an

12  affidavit that says no such thing.  It simply says they have

13  made efforts.  But in 30 some-odd years of practice I've never

14  seen a release go out where no documents have come back from

15  one doctor, let alone 13.

16        So they purported to tender the responsibility of this

17  over to us.  And we said, "Okay, we'll send the releases.

18  We'll serve subpoenas, but just give us the authorizations that

19  cover the issues that are at play in this case," i.e., his

20  medical records and psychiatric records.  Remember, this is a

21  young man who claims he suffered 10 million dollars' worth of

22  emotional distress damages.  Plainly at issue in this case.

23        So what do we get back, after weeks of waiting,

24  authorizations in which only medical records are checked, and

25  not a thing about psychiatric or emotional treatment.  No

1    counseling records that provide us -- or medical records that

2    permit us to get that critical information.

3           So I can't help, Your Honor, but feel looking at that

4    that we're getting the proverbial runaround on this.  So I

5    would either request that Your Honor order them to produce that

6    which we requested and get it, or to sign the releases in a way

7    that allows us to make the efforts to do so, because we will

8    get it.

9           Finally, Your Honor, the forensic report that was

10   prepared.  The arguments on this have been -- again, we need a

11   scorecard to keep up with it.  This report was prepared by two

12   forensic psychiatrists and submitted on the appeal to Simon's

13   Rock.  What we have asked for, not surprisingly, as is the case

14   with nearly any purported expert report, is the underlying

15   information, the underlying interviews that Mr. Mobus and

16   apparently his father and I believe his mother, and I could be

17   wrong on that, also had with these forensic psychiatrists.  We

18   were told no, no, no, you can't have those.  They're treatment

19   records.  And there's a citation to Mass. General Laws Chapter

20   233, Section 20B.  That statute doesn't apply here.

21          What applies here is the federal psychotherapist/

22   patient privilege.  And in order to prevent something from

23   being produced, it is, again, Mr. Mobus's burden to show three

24   things, that the conversations were confidential -- they were

25   intended to be and expected to be confidential, that they were

1    with a licensed therapist, and that they were in the course of

2    treatment.  I'll give him that these were with licensed

3    therapists, and I don't even know.  I'm assuming that they

4    were.  But his argument and his claim to invoke any privilege

5    founders on the first and second points.

6          There was no expectation by Mr. Mobus that these

7    conversations with the two sex therapists would be kept

8    confidential and, indeed, Mr. Mobus, as we submitted to the

9    court in a document that we requested to unseal, expressed

10   quite clearly his understanding that the information may be

11   shared with others, including Bard College and Simon's Rock.

12         So there's no showing, and they have made no showing,

13   again as is their burden, that Mr. Mobus ever had an

14   expectation of confidentiality.  The report makes very clear --

15   as a matter of fact, the words are "whatever he says" to the

16   therapist, whatever he says may be disclosed.  That's not an

17   expectation of confidentiality.

18         And finally, there's been no showing from any source,

19   and, again, they failed to meet their burden, that the purpose

20   of this consultation was treatment.  Their own motion papers

21   reveal that the purpose was not treatment.  They say that the

22   only -- underscore the word "only" -- purpose of this

23   consultation was to support his claim on appeal that he was not

24   a sexual deviant.  That's it.

25         Now, he says, well, the notes have zero probative

1    value because you have the report.  Your Honor, I'm sure you're

2    aware there are many times when underlying notes don't quite

3    comport with the final report that we see.  And here the record

4    shows, and we presented to the court, that before this report

5    was prepared Mr. Mobus's consulting psychiatrist communicated

6    25 times -- 25 times -- with Mr. Mobus's then counsel before

7    the report was submitted.  So I'd very much like to see what

8    those interview notes say, as with the conversations with the

9    polygraph examiner.  They're going to reflect what Mr. Mobus

10   said at the time, not a burnished view of it or anything like

11   that.  Certainly that is appropriate fodder for discovery.

12         Finally, Your Honor, we've raised a concern about the

13   redactions of Facebook messages that had been produced.  And

14   we've cited Your Honor to the law that says you shouldn't

15   redact conversations to eliminate everything except that small

16   part that you say is strictly responsive to everything that's

17   been requested because you breed suspicion and you eliminate

18   context.

19         If I may, Your Honor, this is the kind of document

20   we've gotten from the other side in which virtually every piece

21   of contextual information is blacked out.  And we see fragments

22   of sentences and fragments of messages with no ability to

23   discern context.  And they argue, well, we're trying to protect

24   the privacy of whomever it is Mr. Mobus is talking to.

25   Wonderful.  We have a confidentiality agreement in place and a

```
 1    protective order.  And if that's the case, and there's
 2    certainly no legal bearing to providing this information,
 3    unlike the situation with FERPA, you don't get to alter the
 4    documents so that they become incomprehensible.  So I'd like
 5    Your Honor to order them to produce these messages in a form
 6    where they're actually usable as opposed to incomprehensible.
 7              Thank you, Your Honor.
 8              THE COURT:  All right.
 9              MR. FREY:  Good afternoon, Your Honor.  My name is
10    Lisa Frey.  I'd like to introduce myself to you.  Just so that,
11    for the benefit of the court and my adversary, I have been on
12    this case since 2013, 2014.  In other words, I have been an
13    attorney for the family.  They had some issues before Andrew
14    Mobus even went to Simon's Rock that they consulted me on, and
15    then there was a prior lawyer, Mr. Roth, who was handling the
16    investigation that Simon's Rock did of Andrew starting in 2014.
17    I was an attorney helping Mr. Roth at the time.  The privilege
18    log that we submitted to Simon's Rock has my name on it with
19    confidential communications with Mr. Mobus Senior, the father,
20    starting in March of 2014.  And Mr. Roth has retired from the
21    practice of law.  The case then went to Mr. Piliero, and I went
22    from Mr. Roth's office to Mr. Piliero's office.  So I'm the one
23    who's been there from the get-go.  So I wanted to give you some
24    background on where I am, why I'm on the privilege log before
25    Mr. -- back in the spring of 2014.
```

1          Let me start with the easy things and move to the

2    harder things.  First, the Facebook messages that you see.

3    Well, this is very nice.  This is two pages of the Facebook

4    messages and it does look like we're hiding things, but I can

5    tell you very clearly what's going on.  Andrew is very, very

6    good friends with this woman MM, that we've called MM.  If you

7    ask for all his Facebook messages with MM from Facebook --

8    there's a utility that you use with Facebook, and then they

9    produce for you -- it comes back to you in an email with a

10   link, every single communication between MM and Andrew,

11   everything, for years that they've been friends.

12          So what we did is we went to the document request and

13   said, We're not going to give the other side everything that

14   she's ever said to Andrew and everything Andrew has ever said

15   to her, every single text message for three or four years now.

16   Let's look at what they asked and give them what they asked

17   for.  So I personally went through every one of them.  There's

18   a lot of very private things, they're very close friends, that

19   MM talks about her own personal sex life with Andrew and her

20   personal life and her romantic life and, quite honestly, I

21   think it's kind of creepy that they want to know everything

22   about this girl.  Anything that had to do with Julia, anything

23   that had to do with Simon's Rock, anything that had to do with

24   the hearing, anything that they could possibly find relevant

25   under that document request I let them see.

1          If they want to come back to me and say, "We don't get

2     this one.  We really think you should give us a couple things

3     before and a couple things after," I'm perfectly willing to

4     talk about that.  I am open to that.  But to have this girl,

5     whose closest friend was Andrew, go and expose everything that

6     she's ever said about her personal life to me, quite honestly,

7     it was creepy.  So I wanted to have a little bit more

8     cooperation from them about what they wanted.

9          Now let's go to the health care reports.  I'm

10    absolutely baffled with this being something that we're using

11    time of the federal court for.  We submitted HIPAA requests to

12    every single one of Andrew's doctors.  We said, please give us

13    the things.  I would like to tell you that doctors are more

14    responsive to things they make no money from and you send them

15    paper requests, but they're not.  We had a paralegal calling

16    their offices, resending their things.  People were saying,

17    "They're not here anymore.  We don't know where those records

18    are."  Some of these records were from Andrew when he was quite

19    young or younger.  They weren't all from 2014, 2013.  It was

20    very difficult to track it down.

21         So I said to Mr. Crawford in our conference before the

22    motions to compel went out, I said, "Look, I'll do whatever you

23    want.  I'm as frustrated as you are.  We're not trying to hold

24    this back.  How about if we give you the HIPAA authorizations,"

25    which I think is very unusual for a party to do, to say, "You

1   can have it.  We'll sign anything.  You go try to chase these

2   down.  You can have everything.  As long as it

3   contemporaneously comes to our office, you can have it."  So we

4   get Andrew in our office.  He signs all the HIPAA forms.  We

5   send them up there.  I'm sorry I didn't check off another box.

6   All they had to do was call me up and say, "You didn't check

7   off the box, send it back to me."  I have said over and over

8   again, "You can have these documents.  Tell us what you want."

9   If our paralegal neglected to have Andrew click off the right

10   box, just call me.  You don't have to make a motion to the

11   court for this.

12        So those are the easy ones.  Now, let's get to the

13   polygraph reports, because that's what this motion is all

14   about.

15        THE COURT:  Just to be clear on the last point, you

16   have no substantive objection to those requests?

17        MS. FREY:  No, not at all.  We've told them just give

18   us the things, we'll have Andrew check off whatever.

19        So now we're going to go to the polygraph and the sex

20   therapist.  I'm putting those together for one thing.  First

21   I'm going to talk about the initial polygraph reports that were

22   done in the LF proceeding.  Andrew sat for two polygraph -- in

23   front of two polygraph experts.  And we produced -- we produced

24   both of those to the other side.  We produced reports.

25        We put the communications back and forth from the

1   lawyers to them in a privilege log.  We called the -- Simon's

2   Rock is saying that there were more documents and they should

3   have more documents in the LF investigations.  So we called

4   over there.  Apparently they were concerned that Mr. Barndollar

5   had interviewed or had kept an audio video of Andrew's

6   interview with the polygraph people.  Now, I don't know why

7   that's relevant, because nobody's trying to reverse the

8   decision in the LF matter.  So what Andrew said to a polygraph

9   guy about LF when Andrew was exonerated, they're not trying to

10  reverse that decision, I don't know, but we called Mr. Barn --

11  we tried to reach Mr. Barndollar.  Anyway, it turns out

12  Mr. Barndollar has passed.  We tried to find out where the

13  audio video was, don't know, nobody has it.  New polygraph

14  people that we talked to, "We can't find it."  So I think it's

15  irrelevant.  I think that we're going down a rabbit hole.  I

16  don't know why we need to get it.  There's nothing in the LF

17  matter that is at issue now in terms of the outcome of LF.

18  Everybody agrees Andrew was exonerated.

19          Now let's jump forward to the JG polygraph exam, which

20  is I think what everybody is concerned about here.  I am very,

21  very concerned about not waiving any attorney/client privilege,

22  but I would like to hand up to the court and to the other side

23  just for a very limited purpose a letter from Mr. Roth, who was

24  the attorney who I was working for back in the spring of 2014

25  -- starting in the spring of 2014.  This is a letter from

1    Mr. Roth on August 26 to the polygraph examiner.  And you can

2    see the date is August 26.

3          Andrew was already expelled when Mr. Roth hired the

4    forensic examiner to take Andrew's test.  This was so clearly

5    in anticipation of litigation, it could not be more clear.  He

6    was expelled.  There was an application that went to the

7    provost afterwards.  It was -- I think the family -- I was

8    involved in the case at the time.  The family was very

9    concerned and very aware of the fact that Andrew's case had

10   been shepherded out, they wanted that kid out and they knew if

11   -- they thought the provost might be a hail Mary, but they knew

12   they were going to have to fight this case.  And this was done

13   in anticipation of litigation after Andrew was expelled.

14         Therefore, under Rule 26(b)(4)(D) this is a

15   non-testifying expert.  It is not discoverable.  None of the

16   notes are discoverable.  Now, there was no report made.  But

17   even that is not something that we are required to divulge.

18   This is our work that we did, non-testifying experts.  It's not

19   discoverable under Massachusetts -- under the federal rules,

20   and the PolyMedica Corp. case is very clear about that.  So

21   that's why we have not produced anything about that report.

22         Now, I want to talk about the sex therapist who was

23   consulted also after Andrew was expelled.  Another expert,

24   non-testifying expert, retained to determine where we were

25   going to go going forward.  Yes, we presented that report to

1    the provost after Andrew was expelled, again, as a hail Mary,

2    but this was all in anticipation of litigation.  At the time

3    the family said Andrew's been expelled from Bard.  There's a

4    letter in the file that Ms. Lyon -- Dr. Lyon from Bard had

5    already told the finance office, "Andrew's out.  He's not

6    coming back," and the family was getting ready for litigation

7    against Bard for the treatment of their son.

8            Therefore, the underlying documents of the sex

9    therapist report are also protected.  These are not

10   discoverable and in the PolyMedica case it says, with

11   Pricewaterhouse, that even if you produce the report you don't

12   have to produce the underlying documents if this is a

13   non-testifying expert.

14           I believe I've covered all of the elements.

15           Is that right?

16           MR. PILIERO:  Do you want to give the cite for

17   PolyMedica?

18           MR. DESMERY:  The PolyMedica case is 235 F.R.D. 28.

19           Thank you, Your Honor.

20           THE COURT:  Okay.

21           MR. ROBERTS:  Briefly?

22           THE COURT:  No, I didn't let him do that.

23           MR. ROBERTS:  I figured I was going to get hit with

24   that as well.

25           MR. PILIERO:  Thank you.

1           THE COURT:  Motion to amend the answer, what's the

2    range of dispute about that?

3           MR. ROBERTS:  I think we're good on it.

4           MR. PILIERO:  We're not disputing it.  We're allowing

5    it.

6           THE COURT:  Well, it had an effect on the discovery

7    deadlines, I think.

8           MR. ROBERTS:  I think -- well, I think that we've

9    agreed to extend discovery through August 30.

10          THE COURT:  Okay.  So those issues are --

11          MR. PILIERO:  Yeah.

12          MR. ROBERTS:  We're going to adhere to the ten

13   depositions per side.  I think we're good on that.

14          THE COURT:  So there's no controversy there?

15          MR. ROBERTS:  No controversy, Your Honor.

16          THE COURT:  All right.  Very good.  I'll take these

17   matters under advisement.

18          MR. PILIERO:  Thank you for your time, Your Honor.

19          MR. ROBERTS:  Thank you, Your Honor.

20          MS. FREY:  Thank you, Your Honor.

21          (3:39 p.m.)

22

23

24

25

```
1                   C E R T I F I C A T E

2

3

4   UNITED STATES DISTRICT COURT )

5   DISTRICT OF MASSACHUSETTS     )

6

7

8          I certify that the foregoing is a correct transcript

9   from the record of proceedings taken May 7, 2018 in the

10  above-entitled matter to the best of my skill and ability.

11

12

13

14  /s/ Kathleen Mullen Silva              May 25, 2018

15  _____     _____

16  Kathleen Mullen Silva, RPR, CRR          Date

17  Official Court Reporter

18

19

20

21

22

23

24

25
```