# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

ANDREW MOBUS,

      Plaintiff and Defendant-in-Counterclaim,

      v.

BARD COLLEGE,

      Defendant and Plaintiff-in-Counterclaim.

C.A. No. 1:17-cv-11011-GAO

**LEAVE TO FILE BRIEF OVER 20 PAGES GRANTED ON MARCH 29, 2019**

## MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S CLAIMS

Scott A. Roberts (BBO No. 550732)
sroberts@hrwlawyers.com
Arielle B. Kristan (BBO No. 677048)
akristan@hrwlawyers.com
HIRSCH ROBERTS WEINSTEIN LLP
24 Federal Street, 12th Floor
Boston, Massachusetts 02110
Tel. (617) 348-4300 / Fax (617) 348-4343

Counsel for Defendant Bard College

Dated: April 1, 2019

## Table of Contents

INTRODUCTION ................................................................................................................. 1

ARGUMENT ...................................................................................................................... 2

    A.    Standard of Review .............................................................................................. 2

    B.    The Court Should Grant Summary Judgment on Plaintiff's Breach of Contract
        Claim in Count II. ................................................................................................. 3

        1.    Simon's Rock Followed the Sexual Misconduct Policy. ............................ 4

                a.    Simon's Rock Learns of Allegations by JG Against Mobus During
                        Its Investigation of Allegations by Another Student. ..................... 5

                b.    Simon's Rock Forms a Committee to Investigate JG's Allegations.
                        ............................................................................................... 5

                c.    Mobus is Provided with Notice of the Allegations Against Him and
                        an Opportunity to Respond in Writing and in Person. .................... 6

                d.    Simon's Rock Works with Mobus to Connect Him With an
                        Advocate in Accordance with the Sexual Misconduct Policy. ....... 8

                e.    Mobus Had the Advice of Counsel in Connection with the
                        JG/Mobus Proceedings. ................................................................. 9

                  f.    The JG/Mobus Committee Interviews the Parties and Provides
                        Mobus an Opportunity to Respond in Full to JG's Allegations. ...... 9

                  g.    The JG/Mobus Committee Deliberates and Refers Its Report and
                        Recommendations to Dean Graves, Who Accepts the Committee's
                        Recommendation of Expulsion. .................................................... 10

                  h.    Mobus is Afforded an Opportunity to Appeal. ............................. 12

        2.    Mobus Cannot Premise His Breach of Contract Claim on Generalized
              Representations Contained in the Sexual Misconduct Policy. ................... 13

        3.    The JG/Mobus Proceedings Were Conducted with Basic Fairness. ......... 15

        4.    The Decision to Expel Mobus was not Arbitrary or Capricious. .............. 16

    C.    The Court Should Grant Summary Judgment on Plaintiff's Claim for Breach of
        the Implied Covenant of Good Faith and Fair Dealing (Count VII). .................... 16

    D.    The Court Should Grant Summary Judgment on Plaintiff's Claim for Violation of
        Title IX (Count I) Because Plaintiff Has Identified No Evidence of Gender Bias.
        ............................................................................................................................ 17

        1.    Mobus Has Identified No Statement Demonstrating the Improper
              Influence of Gender on the JG/Mobus Proceedings. .............................. 19

        2.    Professor Oyogoa's Participation in the JG/Mobus Proceedings Does Not
              Evidence Gender Bias. ........................................................................... 19

        3.    Mobus's Allegations of Procedural Error Do Not Establish Gender Bias. 21

        4.    The "Threat" of Investigation by the Department of Education Does Not
              Establish Gender Bias. ........................................................................... 22

    E.    The Court Should Grant Summary Judgment on Plaintiff's Claim for Promissory
        Estoppel (Count III). .......................................................................................... 23

F.      The Court Should Grant Summary Judgment on Plaintiff's Claims for Negligence
        (Count VIII) and Negligent Infliction of Emotional Distress (Count IV). ........... 23

G.      The Court Should Grant Summary Judgment on Plaintiff's Claim for Intentional
        Infliction of Emotional Distress (Count V). ........................................................ 24

H.      The Court Should Grant Summary Judgment on Plaintiff's Claim for Tortious
        Interference with Contract (Count VI)................................................................. 26

I.      The Court Should Grant Summary Judgment on Plaintiff's Claim for Declaratory
        Judgment (Count IX). ......................................................................................... 26

CONCLUSION ....................................................................................................................... 27

## **Table of Authorities**

1.  *Akins v. Penobscot Nation*, 130 F.3d 482 (1st Cir. 1997)................................................. 32

2.  *Bleiler v. College of Holy Cross*, 2013 WL 4714340 (D. Mass. Aug. 26, 2013) . 16,17, 18, 22

3.  *Cloud v. Trustees of Boston University*, 720 F.2d 721 (1 Cir. 1983)........................... 4, 16

4.  *Conley v. Romeri*, 60 Mass. App. Ct. 799 (2004)............................................... 24

5.  *Coveney v. President & Trustees of College of Holy Cross*, 388 Mass. 16 (1983) .......... 16

6.  *Doe v. Amherst College,* 238 F. Supp. 3d 195, 228 (D. Mass. 2017)............................... 23

7.  *Doe v. Bradshaw*, No. 11-11593-DPW, 2013 WL 5236110 (D. Mass. Sept. 16, 2013).... 3

8.  *Doe v. Brandeis University*, 177 F. Supp. 3d 561, 612–13 (D. Mass. 2016).............. 23, 25

9.  *Doe v. Brown University*, 166 F. Supp. 3d 177 (D.R.I. 2016)......................................... 27

10. *Doe v. Case W. Reserve University*, No. 14-cv-2044, 2015 WL 5522001 (N.D. Ohio Sept. 16, 2015) ....................................................................................................................... 3

11. *Doe v. Colgate University*, 2017 WL 4990629........................................................... 21, 22

12. *Doe v. Colgate University*, 2019 WL 190515 (2d Cir. 2019)........................................... 22

13. *Doe v. Emerson College*, 153 F. Supp. 3d 506 (D. Mass. 2015)................................ 24, 25

14. *Doe v. Miami University*, 882 F.3d 579 (6th Cir. 2018).................................................... 20

15. *Doe v. Trustees of Boston College*, 2016 WL 5799297 (D. Mass Oct. 4, 2016)....... passim

16. *Doe v. Trustees of Boston College*, 892 F.3d 67(1ˢᵗ Cir. 2018) ............................... passim

17. *Doe v. University of Cincinnati*, 173 F. Supp.3d 586 (S. D. Ohio 2016) ........................ 22

18. *Doe v. University of Colorado, Boulder*, 255 F. Supp. 3d 1064 (D. Colo. 2017) ........... 22

19. *Doe v. University of Massachusetts–Amherst*, 2015 WL 4306521 ........................... 21, 22

20. *Doe v. University of the South*, 687 F. Supp. 2d 744 (E.D. Tenn. 2009)........................... 4

21. *Doe v. Western New England University,* 228 F. Supp. 3d 154 (D. Mass. 2017) ........... 15

22. *Driscoll v. Board of Trustees of Milton Academy*, 1187, 70 Mass. App. Ct. 285 (2007). 15

23. *Fellheimer v. Middlebury Coll*ege, 869 F. Supp. 238 (D. Vt. 1994) ............................... 26

24. *Frazier v. Fairhaven School Comm.,* 276 F.3d 52 (1st Cir. 2002) ................................. 17

25. *G v. Fay School, Inc. by and through its Board of Trustees,* 282 F. Supp. 3d 381 (D. Mass. 2017) ........................................................................................................... 13, 14

26. *Gebser v. Lago Vista Independent School Dist.*, 524 U.S. 274 (1998) ...................... 3, 17

27. *Guckenberger v. Boston Univ.,* 974 F. Supp. 106 (D. Mass. 1997) ................................. 3

28. *Havlik v. Johnson & Wales University*, 509 F.3d 25 (1st Cir. 2007) .............................. 18

29. *Morris v. Brandeis University,* No. 01-P-1673, 60 Mass. App. Ct. 1119, 2004 WL 369106 (Mass. App. Ct. Feb 27. 2004) .................................................................. 4, 13, 14

30. *Polay v. McMahon*, 468 Mass. 379 (2014) .................................................................. 25

31. *Schaer v. Brandeis University*, 432 Mass. 474 (Mass. 2000) ........................... 3, 15, 16, 23

32. *Shin v. Mass. Inst. of Tech.*, No. 020403, 2005 WL 1869101 (Mass. Sup. June 27, 2005) ....................................................................................................................... 13, 14

33. *Speakman v. Allmerica Fin. Life Ins*. (D. Mass. 2005) ................................................ 16

34. *Sprint Spectrum L.P. v. Town of Easton*, 982 F. Supp. 47 (D. Mass. 1997) ................... 26

35. *Sullivan v. Boston Architectural Ctr.*, 57 Mass. App. Ct. 771 (2003) ............................ 17

36. *Urman v. South Boston Sav. Bank*, 424 Mass. 165 (1997) ............................................ 24

37. *Walker v. President and Fellows of Harvard College*, 840 F.3d 57 (1st Cir. 2016) ...... 2, 4

38. *Wilborn v. Wall*, No. 13-cv-11783-GAO, 2015 WL 5662717 (D. Mass. Sept. 25, 2015) 27

39. *Yu v. Vassar College*, 97 F. Supp. 3d 448 (S.D.N.Y. 2015) ........................................... 27

40. *Yusuf v. Vassar Coll*ege, 35 F.3d 709 (2d Cir. 1994) .................................................... 18

**INTRODUCTION**

Plaintiff Andrew Mobus ("Mobus") asks this Court to sit as a super-disciplinary committee to re-adjudicate a determination by Bard College at Simon's Rock ("Simon's Rock" or the "College") that Mobus violated the College's Sexual Misconduct Policy when he anally penetrated Simon's Rock student JG without her consent, took photographs of JG in sexual situations without her consent, and retained those photographs after JG asked him to delete them. Based on those findings, Simon's Rock expelled Mobus, a sanction that Mobus now seeks to have "expunged." This Court should decline Mobus's entreaty that it second-guess the College's disciplinary process, which complied at all times with Simon's Rock policy and was conducted without bias. While Mobus is clearly disappointed in how his time at Simon's Rock ended, discovery in this matter (including, most damningly, Mobus's own testimony) has made it clear that Mobus cannot succeed on any of his claims against Simon's Rock. Because there is no dispute as to the material facts foreclosing Mobus's claims, this Court should grant summary judgment to Defendant.

In its handling of JG's allegations against Mobus, Simon's Rock was guided by, and at all times complied with, the procedures set forth in the Sexual Misconduct Policy. In both his Complaint (Docket No. 1) and Motion for Partial Summary Judgment (Docket No. 112), Mobus takes an aspirational view of the College's contractual duties to him, arguing that Simon's Rock was obligated to conduct its investigation and adjudication of JG's allegations in accordance with his preferred process and outcome. That, of course, is not the standard to which the College (or any contracting party) is held. Instead, the College was required to follow the Sexual Misconduct Policy as it would reasonably expect a student to understand it, and in a way that provided "basic fairness." As established by the evidence revealed in discovery, including

1

Mobus's own testimony, that is precisely what Simon's Rock did, and, accordingly, judgment should enter for Defendant on Mobus's claim for breach of contract (Count II).

Mobus's Title IX claim (Count I) is equally defective.  Mobus purports to proceed under an "erroneous outcome" theory of Title IX, which requires as a threshold matter that he offer evidence indicating that gender bias was a motivating factor in the College's decision to expel him.  Mobus has identified not one iota of cognizable evidence of gender bias, instead casting scattershot aspersions against the Simon's Rock personnel involved in the disciplinary proceedings and complaining that "threats" from the Department of Education forced Simon's Rock to act in a biased manner.  Not only are these unsupported assertions plainly insufficient to maintain a claim under Title IX, but Mobus's own admissions in his deposition testimony, in which he acknowledged having no evidence of gender bias on the part of the members of the disciplinary committee, compel summary judgment for Defendant on Count I of the Complaint.

In addition to his contract and Title IX claims, Mobus alleges an array of state-law claims (Counts III-VII) and a claim for declaratory judgment (Count IX) that are invalid on their face. Mobus has no way to salvage these claims and, as such, Defendant is entitled to judgment on them.

## ARGUMENT

### A.    Standard of Review

The Court must grant summary judgment when no genuine issue of material fact exists and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  *See also Walker v. President and Fellows of Harvard College*, 840 F.3d 57, 61 (1st Cir. 2016).  "A genuine issue is one that can 'be resolved in favor of either party' and a material fact is one which 'has the potential of affecting the outcome of the case.'" *Walker*, 840 F.3d at 61.  If the movant shows the absence of a genuine issue of material fact, the

non-moving party must "with respect to each issue on which she would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in her favor instead of merely resting upon allegations or denials in the pleadings." *Doe v. Trustees of Boston College*, No. 15-cv-10790, 2016 WL 5799297, at \*1 (D. Mass. Oct. 4, 2016) (internal citation omitted). "More than 'conclusory allegations, improbable inferences, and unsupported speculation' is required to defeat summary judgment." *See Doe v. Trustees of Boston College*, 892 F.3d 67, 92–93 (1st Cir. 2018).

### B.  The Court Should Grant Summary Judgment on Plaintiff's Breach of Contract Claim in Count II.

Simon's Rock is entitled to summary judgment on Mobus's assertions that the College breached its express and implied contractual obligations to him in connection with the College's investigation and adjudication of allegations of sexual misconduct against Mobus asserted by another student, JG (the "JG/Mobus Proceedings").[1]  *See* Compl. ¶¶ 93-102.   It is well established in Massachusetts that a private college's handling of student discipline matters is entitled to significant deference. *See Guckenberger v. Boston Univ.*, 974 F. Supp. 106, 150-51 (D. Mass. 1997) ("'[C]ourts should be slow to intrude into the sensitive area of the student-college relationship, especially in areas of curriculum and discipline.'" (citation omitted)); *Schaer v. Brandeis University*, 432 Mass. 474, 482 (2000) ("A college must have broad discretion in determining appropriate sanctions for violations of its policies.")  (citation

---

[1]    To the extent that Mobus attempts to premise his contract claim on an allegation that Simon's Rock "fail[ed] to adhere to Title IX rules and regulations," *See* Compl., ¶ 99, he cannot succeed because there is no private right of action to enforce Title IX's procedural regulations or guidance promulgated by the Department of Education in connection with those regulations. *Gebser v. Lago Vista Independent School District*, 524 U.S. 274, 291-92 (1998). *See also Doe v. Bradshaw*, No. 11-11593-DPW, 2013 WL 5236110, at \*10 (D. Mass. Sept. 16, 2013) (allegation that school violated regulation promulgated under Title IX "not actionable"); *Doe v. Case W. Reserve University*, No. 14-cv-2044, 2015 WL 5522001, \*4 (N.D. Ohio Sept. 16, 2015) (no private cause of action for "fail[ure] to promulgate a grievance procedure or comply with other Title IX administrative requirements"); *Doe v. University of the South*, 687 F. Supp. 2d 744, 758 (E.D. Tenn. 2009) (no private right of action for "alleged violation of the U.S. Department of Education's guidelines").

omitted)); *Morris v. Brandeis University,* No. 01-P-1673, 60 Mass. App. Ct. 1119, 2004 WL 369106, at *3 (Mass. App. Ct. Feb 27. 2004) (citing cases).  A student therefore cannot prevail on a breach of contract claim where, as here, the college follows its policies and procedures as it would reasonably expect a student to understand them and in a way that provides "basic fairness."  *See Walker*, 840 F.3d at 61-2; *Cloud v. Trustees of Boston University*, 724-25 (1st Cir.1983).  That is precisely what Simon's Rock did in connection with the investigation and adjudication of JG's allegations and, as such, Simon's Rock is entitled to summary judgment on Mobus's claims for breach of contract.

### 1.   *Simon's Rock Followed the Sexual Misconduct Policy.*

The sexual misconduct policy that was effect during the 2013 - 2014 Academic Year at Simon's Rock is located at Appendix C of the 2013 - 2104 Simon's Rock Student Handbook (the "Sexual Misconduct Policy").  Statement of Undisputed, Material Facts in Support of Defendant's Motion for Summary Judgment (hereinafter "SUMF"), ¶ 8.  The Sexual Misconduct Policy provides that the investigation of all sexual misconduct allegations will be overseen by the College's Title IX Coordinator, and will be conducted by "an ad hoc three-person Sexual Misconduct Committee."  *Id*. at ¶ 12.  The makeup and process of the ad hoc Sexual Misconduct Committee are "described fully" within the Sexual Misconduct Policy. [2]  *See id*.  As set forth in detail below, Simon's Rock complied with the provisions of the Sexual Misconduct Policy throughout the JG Proceedings.

---

[2]     Mobus asserts in Plaintiff's Motion for Partial Summary Judgment (Docket No. 112), that Simon's Rock was also contractually bound by an Annual Security Report published by Simon's Rock in 2011.  This assertion is patently incorrect, and is addressed in full in Defendant's Opposition to Plaintiff's Motion for Partial Summary Judgment, filed on April 1, 2019.  In the interest of brevity, Defendant does not repeat that argument here, but instead incorporates by reference Defendant's Opposition to Plaintiff's Motion for Partial Summary Judgment.

       a.      <u>Simon's Rock Learns of Allegations by JG Against Mobus During</u>
                     <u>Its Investigation of Allegations by Another Student.</u>

On May 2, 2014, JG testified to a Simon's Rock sexual misconduct committee in connection with an investigation into complaints by Simon's Rock student LF against Mobus (the "LF/Mobus Proceedings").  *See* SUMF, ¶ 28.  ███████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████  *Id.*  Following JG's testimony, Susan Lyon, a member of the committee investigating LF's allegations, informed Marty Checchi, Simon's Rock's Title IX Coordinator, that JG had reported conduct by Mobus that might be in violation of the Sexual Misconduct Policy.  *Id.* at ¶ 30.  Ms. Checchi determined that JG had made allegations that, if true, would constitute violations of the Sexual Misconduct Policy, and therefore required an investigation.  *Id.* at ¶ 31.

       b.      <u>Simon's Rock Forms a Committee to Investigate JG's Allegations.</u>

The Sexual Misconduct Policy requires that the three people comprising a committee investigating allegations of sexual misconduct are drawn from a pool of potential ad hoc committee members appointed at the start of each academic year and trained in College policy and established procedures.  *See* SUMF, ¶ 13.  Further, "[a]ny combination of committee members may be called on throughout the year."  *See id.*  Simon's Rock complied with these contractual obligations in forming the committee that investigated JG's allegations against Mobus.

On June 9, 2014, Ms. Checchi notified Mobus that two faculty members, Patty Dooley and Ben Krupka, and one staff member, Beth Sack, would constitute the committee for the

investigation of JG's allegations (the "JG/Mobus Committee") and wrote, "Please let me know if you have any questions or concerns about the committee members."  SUMF, ¶¶ 59, 90.  On July 22, 2014, Dr. Lyon, who had taken over as Title IX Coordinator when Ms. Checchi left the College at the end of June, learned that Professor Krupka would be unable to serve on the committee after he was injured in an accident.  *Id*. at 91.  On July 23, 2014, Dr. Lyon informed Mobus that Professor Francisca Oyogoa would be serving on the committee in Professor Krupka's place, and asked Mobus to let her know about "any concerns" about the substitution. *Id*. at 94.

Plaintiff did not raise concerns about Professor Oyogoa's participation on the JG/Mobus Committee or the all-female composition of the JG/Mobus Committee until after he was found responsible for sexual misconduct and expelled.  *See* SUMF, ¶¶ 95-96.  Plaintiff never raised concerns about the participation of Colonel Dooley or Ms. Sack on the JG/Mobus Committee. *See id*. at ¶ 97.

Each member of the JG/Mobus Committee was trained as required by the Sexual Misconduct Policy, as were Ms. Checchi, Dr. Lyon, Dean of Students Robert Graves, and Provost Peter Laipson.  *See* SUMF, ¶¶ 187-193.

> c.   Mobus is Provided with Notice of the Allegations Against Him and an Opportunity to Respond in Writing and in Person.

The Sexual Misconduct Policy provides that, when the Sexual Misconduct Committee initiates an investigation of a complaint of sexual misconduct, "[t]he accused student will be informed of the investigation and will have the opportunity to submit a written response to the complaint."  SUMF, ¶ 36.  Pursuant to this policy, Ms. Checchi emailed Mobus a letter on May 23, 2014, informing him that Simon's Rock would investigate JG's allegations against him (the "JG/Mobus Notification Letter").  *Id*. at ¶¶ 37-39.  The JG/Mobus Notification Letter contained a

summary of JG's allegations that Mobus had engaged in anal sex with her without her consent, taken photographs of JG in sexual situations without her consent, and had kept the photographs of JG after she had requested that Mobus delete them. *See id*. at ¶ 38.

Based on the information in the JG/Mobus Notification Letter, Mobus was able to work with his father and his attorney on a response to JG's allegations. *See* SUMF, ¶ 27, 52, 103, 181, 183, 184. Between receiving the JG/Mobus Notification Letter on May 23, 2014 and submitting a written statement to the JG/Mobus Committee on August 12, 2014, Mobus did nothing to learn more about the nature of JG's allegations. *See id*. at 104. On August 12, 2014, Plaintiff emailed to Dr. Lyon a four-page "formal statement" "with respect to the allegations" that JG had raised against him (the "Mobus Statement"). *See id*. at 105. In the Mobus Statement, Plaintiff addressed JG's allegations that he had engaged in anal sex with her without her consent, taken photographs of JG in sexual situations without her consent, and had kept the photographs of JG after she had requested Plaintiff delete them. *See id*. at 106.

JG also submitted a written statement to the JG/Mobus Committee (the "JG Statement",

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████  *See* SUMF, ¶¶ 98-102. Simon's Rock did not provide a copy of the JG Statement to Plaintiff. *See id*. at ¶ 108. Nor did Simon's Rock provide a copy of the Mobus Statement to JG. *See id*. at ¶ 109.

As described in detail in section 1.f. below, Mobus was provided with additional information about JG's allegations during his investigation with the JG/Mobus Committee. The JG/Mobus Committee afforded Mobus the opportunity to respond JG's allegations, and he testified that he responded, fully and truthfully. *See* SUMF ¶¶ 114-147.

        d.      <u>Simon's Rock Works with Mobus to Connect Him With an
Advocate in Accordance with the Sexual Misconduct Policy.</u>

There is no dispute that Simon's Rock complied with the Sexual Misconduct Policy's

requirement that "[t]he Title IX coordinator will work with the complainant and the accused to

connect each with a faculty or staff member who can act as an advocate.  The advocate does not

act on the student's behalf but provides support and guidance throughout the process."  *See*

SUMF, ¶ 75.  Mobus understood that, under these provision, the College would, if he wished,

work to connect him with someone to serve as his advocate, but that the College would not

assign him an advocate.  *See* SUMF, ¶¶ 76-77.  *See also id.* at ¶¶ 20-21 (discussing Mobus's

request for an advocate in connection with the LF Proceedings).

The JG/Mobus Notification Letter, dated May 23, 2014, identified a pool of six Simon's

Rock employees from which an investigatory committee would be assembled, and stated that

individuals on that list not picked to serve on the investigatory committee would be available to

serve as an advocate.  *See* SUMF, ¶¶ 78-79.  Mobus did not ask to be connected with an

advocate until August 10, 2014, just days before his scheduled meeting with the JG/Mobus

Committee.  *See id.* at ¶ 80.  This was in marked contrast to his conduct during the LF

Proceedings, when he asked for an advocate the day after he received the LF/Mobus Notification

Letter.  *See id.* at ¶ 21.

The day after Mobus's request for an advocate, Dr. Lyon advised him that Gabriel

Salgado would serve as his advocate for the meeting with the JG/Mobus Committee. SUMF, ¶¶

81-82.  Later that same day, Mr. Salgado contacted Mobus by phone and they discussed his role

in the process.  *See id.* at ¶ 83.  At no time before his meeting with the JG/Mobus Committee did

Mobus tell anyone at the College that he wanted a different advocate or that did not want Mr.

Salgado to serve as his advocate because Mr. Salgado had previously served as a resident advisor

in JG's dorm.  *See id.* at ¶¶ 87-88.  Mobus nonetheless declined to have Mr. Salgado accompany

him to his interview with the JG/Mobus Committee.  *See id.* at ¶ 84.  Mobus included no

concerns about Mr. Salgado's appointment as his advocate in his appeal of the decision of the

JG/Mobus Committee.  *See id.* at ¶ 89.

        e.      <u>Mobus Had the Advice of Counsel in Connection with the</u>
              <u>JG/Mobus Proceedings.</u>

The Sexual Misconduct Policy allowed students to consult with legal counsel while

preparing written responses and supporting documentation for the Sexual Misconduct Committee

but did not allow students to have attorneys present during interviews with the Sexual

Misconduct Committee.  SUMF, ¶ 180.  Plaintiff took full advantage of Simon's Rock's

adherence to this policy, meeting with Attorney William Roth about JG's allegations multiple

times during the summer of 2014.  *See id.* at ¶¶ 181-185.  Plaintiff's preparations with Attorney

Roth began on May 18, 2014, just days after he returned home from campus, and included at

least five meetings and additional email communications.  *See id.*  Mobus's mother also

communicated by email with another attorney, N. Kelley, regarding the JG/Mobus Proceedings.

*See id.* at ¶ 186.

        f.      <u>The JG/Mobus Committee Interviews the Parties and Provides</u>
              <u>Mobus an Opportunity to Respond in Full to JG's Allegations.</u>

The Sexual Misconduct Policy stated that, in considering allegations of sexual

misconduct, the Sexual Misconduct Committee "will speak with both parties, as well as

witnesses, and review all information and evidence."  *See* SUMF, ¶ 110.  Simon's Rock

complied with this obligation.

On August 14, 2018, the JG/Mobus Committee interviewed Mobus, JG, and JG's

advisor, Rebecca Fiske.  *See* SUMF ¶¶ 111, 153-54.  During JG's interview, the JG/Mobus

Committee informed JG about the contentions in the Mobus Statement, allowed her the

opportunity to respond to those contentions, and asked her questions about those contentions. *See id*. at ¶ 156. The JG/Mobus Committee also asked JG about her allegations that Plaintiff had engaged in anal sex with her without her consent during the February 28 Incident, that Plaintiff had taken photographs of JG in sexual situations without her consent, and that Plaintiff had retained those photographs after she had requested that Plaintiff delete them. *See id*. at ¶ 155.

During Mobus's interview, the JG/Mobus Committee read portions of the JG Statement to him, and asked him questions about those portions. *See* SUMF, ¶ 114. █████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████ Mobus has testified that he responded "fully" and "truthfully" to JG's allegations ███████████████

█████. *Id*. at ¶ 129. *See also id*. at ¶¶ 130-131. Mobus has also testified that he had responded truthfully, and without leaving anything out of his response, to the JG/Mobus Committee concerning ████████████████████████████████████████████████████

███████████████████████████████████████[3] *See id*. at 139, 141, 147.

        g.      <u>The JG/Mobus Committee Deliberates and Refers Its Report and Recommendations to Dean Graves, Who Accepts the Committee's Recommendation of Expulsion.</u>

The Sexual Misconduct Policy provided that "[i]f an investigation concludes that a policy violation has occurred – or may have occurred – the committee's report and recommendations on

---

[3]     Although Mobus expressed during his deposition that he had "concerns" about allegedly not being able to ask "clarifying questions" during his August 14 interview with the JG/Mobus Committee about one of the photographs, he could not identify any clarifying questions that he had sought to ask the JG/Mobus Committee. SUMF, ¶ 141.

the matter will be referred to the dean of students for disciplinary action."  SUMF, ¶ 14.  The

Sexual Misconduct Policy further stated that, with regard to sanctions, "[i]f a student is found to

have violated the sexual misconduct policy, actions taken to sanction the student will vary

depending on the offense . . . .  For non-consensual sexual intercourse, sanctions include

suspension and expulsion."  *See id*. at ¶ 15.  There is no dispute that Simon's Rock followed

these provisions of the Sexual Misconduct Policy.

Following the interviews on August 14, 2014, the JG/Mobus Committee deliberated and

ultimately concluded that Plaintiff should be expelled.  *See* SUMF, ¶ 157.  It subsequently

provided multiple drafts of its findings to Dr. Lyon, who was then serving as Title IX

Coordinator.[4]  *See id*. at ¶ 158.  On August 18, 2014, Dr. Lyon met with the JG/Mobus

Committee to discuss the committee's findings and sanction recommendation.  *See id*. at ¶ 159.

Consistent with Simon's Rock's typical procedure for the preparation of an outcome letter, Dr.

Lyon drafted an outcome letter based on the JG/Mobus Committee's findings and

recommendations, as well as their discussion during the August 18, 2014 meeting.  *See id*. at ¶

160.

On August 19, 2014, Dr. Lyon sent Dean Graves a draft outcome letter, which stated that

the JG/Mobus Committee "has recommended to the Dean of Students that [Plaintiff] be *expelled*

from the College *for a period of two full semesters*, and the Dean has accepted this

recommendation." (emphasis added).  *See* SUMF ¶ 161.  The draft outcome letter also purported

to provide the definition of "suspension" but instead provided the definition of "expulsion" from

Simon's Rock's Student Handbook.  *See id*.  Dr. Lyon and Dean Graves had a follow-up

conversation about the draft outcome letter, and they discussed whether the JG/Mobus

---

[4]      Ms. Checchi left the College at the end of June 2014 due to a relocation.  SUMF ¶ 4.

Committee had decided to impose a sanction of expulsion or suspension.  *See id*. at ¶ 162.  Dr. Lyon informed Dean Graves that the JG/Mobus Committee had recommended expulsion, not suspension.  *See id*.  Dean Graves accepted the recommendation of the JG/Mobus Committee that Mobus be expelled from the College.  *See id*. at ¶¶ 163, 170.

Dr. Lyon sent the final outcome letter to Plaintiff on August 22, 2014.  SUMF, ¶ 164.  As set forth in the Outcome Letter, the JG/Mobus Committee found that Plaintiff (1) engaged in anal sex with JG without JG's consent, (2) took compromising photographs of JG in sexual situations without her consent, and (3) retained possession of the photographs without JG's consent after telling JG that he would delete them.  *See id*. at ¶¶ 166-67.  The JG/Mobus Committee determined that Plaintiff had violated the following policies of the College: (1) the prohibition against non-consensual sexual intercourse; (2) the prohibition against sexual exploitation; and (3) the prohibition against intimate partner abuse.  *See id*. at ¶ 169.  In addition, the Outcome Letter stated that the Dean of Students had accepted the recommendation of the JG/Mobus Committee that Plaintiff be expelled by the College.  *See id*. at ¶ 170.  ███████████████

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████

h.     Mobus is Afforded an Opportunity to Appeal.

The Sexual Misconduct Policy provides that either party to a sexual misconduct proceeding may file an appeal on certain enumerated bases.  *See* SUMF, ¶ 172.  Appeals must be submitted within forty-eight hours of a decision.  *See id*. at ¶ 174.  The Sexual Misconduct Policy also provides that the Provost of the College may respond to an appeal in certain enumerated ways, including by accepting the decision of the committee and dismissing the appeal.  *See id*. at ¶ 173.  Simon's Rock complied in full with these provisions.

The Outcome Letter informed Mobus that he was eligible to pursue an appeal and provided him with instructions on how to initiate an appeal.  *See* SUMF, ¶ 171.  Simon's Rock subsequently granted Mobus an extension of more than a month (which it had no obligation to do).  *See id.* at ¶ 175.  On September 26, 2014, Mobus submitted appeal materials that included the following: (1) a nine-page letter from Plaintiff to Provost Laipson; (2) a statement from Plaintiff's mother; (3) four emails between Plaintiff and his father; (4) three photos purporting to document an "experiment" that Plaintiff and his mother performed with a Sharpie marker and a tissue; (5) CVs of two forensic psychologists who examined Plaintiff; and (6) the reports of the two forensic psychologists.  *See id.* at ¶¶ 176-177.  Provost Laipson reviewed the Appeal Materials and issued a letter on October 20, 2014 in which he affirmed the decision of the JG/Mobus Committee and denied Plaintiff's request that he reverse the decision of the JG/Mobus Committee.  *See id.* at ¶ 179.

**2.** ***Mobus Cannot Premise His Breach of Contract Claim on Generalized Representations Contained in the Sexual Misconduct Policy.***

The Sexual Misconduct Policy contains a section titled "Rights of an Accused in a Sexual Misconduct Investigation."  *See* SUMF, ¶ 16.  The generalized representations in this section do not constitute the sort of "certain and definite" promises necessary to create a contractual obligation and, as such, cannot form the basis of a contract claim by Mobus.  *See G v. Fay School, Inc. by and through its Board of Trustees,* 282 F. Supp. 3d 381, 399 (D. Mass. 2017) ("[W]here a handbook contains generalized representations that are aspirational or too vague to form a certain and definite promise, such provisions are not contractually enforceable."); *Morris*, 2004 WL 369106 at *3 n. 6 ("generalized representations" to treat students with "fairness and respect  "were too vague and indefinite to form an enforceable contract"); *Shin v. Mass. Inst. of Tech.*, No. 020403, 2005 WL 1869101, at *7–8 (Mass. Sup. June 27, 2005) ("generalized

representations" in university's publications not "definite and certain" enough to form enforceable contract). Instead, they constitute the sort of "aspirational and indefinite" statements that courts routinely determine to fall short of creating a contractual obligation. *See Fay School,* 282 F. Supp. 3d at 399 (provisions setting forth school's commitment to civility, diversity, and equal opportunity not sufficiently definite or certain to form contractual obligation); *Morris,* 2004 WL 369106, at *3 n. 6 (statement of commitment to treat students with "fairness and beneficence" not sufficiently defined to form enforceable contract term); *Shin,* 2005 WL 1869101 at *7 (promise to make clinicians available to "care for your physical and psychological needs" and "help you maintain good health" were "too vague and indefinite to form an enforceable contract").

Even if the generalized statements of rights set forth in the Sexual Misconduct Policy constituted binding contractual obligations, however, Mobus cannot establish that Simon's Rock fell short of meeting those obligations. In particular:

- Mobus was fully informed of the nature of JG's allegations against him. *See* SUMF, ¶¶ 36-39;

- Mobus was fully informed of the policies and procedures and rules and possible sanctions (namely those set forth in the Sexual Misconduct Policy) in the investigation of JG's allegations against him. *See* SUMF, ¶ 41-43.

- Mobus had the opportunity to "present information, evidence, and/or witnesses to the investigators." *See* SUMF, ¶¶ 150-154; 103-107, 110-152.

- Mobus had a "fundamentally fair hearing that [was] consistent with the procedures described in the [Sexual Misconduct Policy]." *See* SUMF, ¶¶ 36-97, 103-156; and

- Mobus was able to choose "an advocate for assistance throughout the investigation process." *See* SUMF ¶¶, 75-89.

- Mobus was provided "written notice of the outcome of the investigation." *See* SUMF, ¶ 164-171.

Accordingly, Mobus cannot sustain any claim for breach of contract premised on an alleged violation of any of the statements set forth in the section of the Sexual Misconduct Policy titled "Rights of an Accused in a Sexual Misconduct Investigation."

### 3.   *The JG/Mobus Proceedings Were Conducted with Basic Fairness.*

To meet the requirement that student disciplinary proceedings be conducted with basic fairness, a college must provide "some minimum level of fair play" to a student during a disciplinary proceeding. *Doe v. Trustees of Boston College*, 2016 WL 5799297, at *9. The process afforded Mobus easily met this standard. To briefly recap the facts set forth in full above and in Defendant's Statement of Undisputed Material Facts, Mobus was given notice of the allegations against him and had ample time to prepare a written statement and to prepare for his interview with the JG/Mobus Committee. Mobus was assisted in these preparations by counsel, with whom he met on at least five occasions during the summer of 2014. Simon's Rock responded promptly to Mobus's request that the College assist him with identifying an advocate, and Mobus never informed Simon's Rock about any concerns about that advocate. Then, during his interview with the JG/Mobus Committee, Mobus was given further information about the substance of JG's allegations against him, and he was able to address those allegations in full. Mobus was informed of the disciplinary determination in writing and provided the opportunity to appeal the decision. The process Mobus was afforded thus easily meets the test of basic fairness. *See Doe v. Western New England University,* 228 F. Supp. 3d 154, 185 (D. Mass. 2017) (dismissing claim for failure to provide basic fairness where university complied with policies and there was no evidence of bias by hearing officers); *Schaer*, 432 Mass. at 481 (disciplinary proceeding provided "basic fairness" despite admission of testimony that would not be admissible in court proceeding); *Driscoll v. Board of Trustees of Milton Academy*, 1187, 70

Mass. App. Ct. 285, 295 (2007) (basic fairness standard met where student was given opportunity to explain conduct).

### 4.    *The Decision to Expel Mobus was not Arbitrary or Capricious.*

Courts review a private college's disciplinary action under an "arbitrary and capricious" standard only where a contract does not govern the aspect of the student-college relationship at issue. *Compare Coveney v. President & Trustees of College of Holy Cross*, 139, 388 Mass. 16, 19-20 (1983) (applying arbitrary and capricious standard to student discipline) *with Schaer*, 432 Mass. at 482 (stating that *Coveney* "applies in cases where there is no contractual relationship") and *Cloud v. Trustees of Boston University*, 720 F.2d 721, 724 (1st Cir. 1983) (stating that *Coveney* "applies when . . . there is no contractual right to a hearing"). Here, the Sexual Misconduct Policy explicitly governed the JG Proceedings, and thus those proceedings are not subject to review under the "arbitrary and capricious" standard. Even if the standard did apply, however, it requires only that there be "reasonable grounds" to support the College's determination. *Cloud*, 720 F.2d at 724 (quoting *Coveney*, 388 Mass. at 19). For the reasons discussed above, Simon's Rock easily meets this requirement.

### C.    The Court Should Grant Summary Judgment on Plaintiff's Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing (Count VII).

Mobus's claim that Simon's Rock breached the implied covenant of good faith and fair dealing (Count VII) fails at the outset because the implied covenant of good faith and fair dealing "cannot 'create rights and duties not otherwise provided for in the existing contractual relationship'." *Doe v. Trustees of Boston College*, 2016 WL 5799297, at *9; see also Bleiler v. College of Holy Cross*, 2013 WL 4714340, at *17 (D. Mass Aug. 26, 2013). As such, "the requirement of good faith performance is circumscribed by the obligations in the contract." *Bleiler*, 2013 WL 4714340at *17 (internal quotation marks omitted). Moreover, "[I]in

evaluating [covenants of good faith and fair dealing] in the educational milieu, courts must accord a school some measure of deference in matters of discipline." *Doe v. Trustees of Boston College*, 2016 WL 5799297 at *9 (quoting *Havlik v. Johnson & Wales University*, 509 F.3d 25, 35 (1st Cir. 2007)).  Because, as described above, Simon's Rock complied with the Sexual Misconduct Policy and met the reasonable expectations thereunder, Mobus's claim for breach of the implied covenant of good faith and fair dealing necessarily fails.  *See Bleiler*, 2013 WL 4714340 at *17 (finding no breach of implied covenant where there was "no probative evidence that the College has not met the 'reasonable expectations' underlying the terms of the [student handbook]"); *Sullivan v. Boston Architectural Ctr.*, 57 Mass. App. Ct. 771, 774 (2003) (holding that a student had not shown a breach of the implied covenant where "[t]he policies and procedures contained well-defined processes for addressing [the student's] grievance", "these procedures [were made].available ... and applied ... as articulated").

> **D.** **The Court Should Grant Summary Judgment on Plaintiff's Claim for Violation of Title IX (Count I) Because Plaintiff Has Identified No Evidence of Gender Bias.**

"Title IX prohibits gender-based discrimination in a wide array of programs and activities undertaken by educational institutions." *Frazier v. Fairhaven School Comm.*, 276 F.3d 52, 65 (1st Cir. 2002).  *See also* 20 U.S.C. § 1681(a) ("No person in the United States shall on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance….").  The purpose of Title IX is two-fold: "[t]o avoid the use of federal resources to support discriminatory practices and to provide individual citizens effective protection against those practices." *Gebser v. Lago Vista Independent School Dist.*, 524 U.S. 274, 286 (1998) (internal quotation marks and citation omitted).

Plaintiff contends that Simon's Rock violated Title IX by "arriving at an erroneous outcome [in the JG/Mobus Proceedings], based on a flawed proceeding, and motivated by gender bias."  *See* Compl. ¶ 91.  To succeed on an "erroneous outcome" theory of Title IX, Plaintiff must "offer evidence 'cast[ing] some articulable doubt on the accuracy of the outcome of the disciplinary proceeding,' and indicating that 'gender bias was a motivating factor.'"  *Doe v. Trustees of Boston College*, 892 F.3d 67, 90 (1st Cir. 2018) (quoting *Yusuf v. Vassar Coll*ege, 35 F.3d 709, 715 (2d Cir. 1994)).  "The predominant question is whether the college's actions were motivated by gender bias or if the disciplinary procedures establish a pattern of decision-making that applies a chauvinistic view of the sexes."  *Doe v. Trustees of Boston College*, 2016 WL 5799297 at *24 (D. Mass. Oct. 4, 2016).  Here, the answer to that question is a resounding and unequivocal "no."

To establish the requisite causal link between the outcome of the disciplinary proceedings and gender bias, Mobus "cannot merely rest on superficial assertions of discrimination, but must establish that 'particular circumstances suggest[] that gender bias was a motivating factor.'"  *Doe v. Trustees of Boston College*, 892 F. 3d at 90 (citation omitted).  This can be shown by, for example, "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that...show the influence of gender."  *Doe v. Trustees of Boston College*, 2016 WL 5799297 at *24 (citation omitted).  "Assertions that fail to show a causal link between a plaintiff's protected characteristic and a defendant's conduct are insufficient; a plaintiff must demonstrate particular circumstances that suggest gender bias was the motivating factor."  *Id*.  *See also Bleiler v. College of Holy Cross*, 2013 WL 4714340, at *6 (D. Mass. Aug. 26, 2013) (granting summary judgment for college on erroneous outcome claim

where plaintiff "[did] not cite 'competent evidence' and 'specific facts' such that a reasonable jury could resolve his sex-based Title IX claim in his favor").

### 1. *Mobus Has Identified No Statement Demonstrating the Improper Influence of Gender on the JG/Mobus Proceedings.*

In his Complaint, Mobus points to "admissions" by two Bard administrators – Valerie Fanarjian, Simon's Rock's Director of Activities, Student Affairs, and Dean Graves – as "evidence of gender bias in the [JG/Mobus Proceedings]." *See* Compl. ¶ 72(a) and (b).  Mobus admitted at his deposition, however, that Ms. Fanarjian had no role in the JG/Mobus Proceedings and, in an event, that he could not could not identify any comment made by Ms. Fanarjian that indicates she acts with a gender bias.  SUMF, ¶¶ 213-14.  Mobus similarly admitted at his deposition that he could not identify any comment made by Dean Graves indicating that he harbored gender bias.  *See id*. at ¶ 210.  In fact, Mobus could not identify comments by *any* member of the JG/Mobus Committee or any administrator involved in the JG/Mobus Investigation, *i.e.* Dr. Lyon, Mr. Graves, Provost Laipson, that indicated gender bias.  *See* SUMF, ¶¶ 202-211.  Mobus also testified that he did not believe that the JG/Mobus Committee treated him discourteously because of his gender.  *See* SUMF, ¶ 201.  As such, Mobus lacks evidence of any statement showing "the influence of gender" on the JG Proceedings.  *See Doe v. Trustees of Boston College*, 2016 WL 5799297, at \*24.

### 2. *Professor Oyogoa's Participation in the JG/Mobus Proceedings Does Not Evidence Gender Bias.*

While launching scattershot salvos against nearly everyone involved in the JG/Mobus Proceedings, Mobus takes particular aim at Professor Oyogoa, who he describes as a "self-styled

radical feminist and activist for women's causes."[5]  Compl. ¶¶ 72, 73(b).  As a member of the JG/Mobus Committee, Professor Oyogoa is entitled to "a presumption of honesty and integrity absent a showing of actual bias."  *Bleiler v. College of Holy Cross*, 2013 WL 4714340, at *13 (D. Mass. Aug. 26, 2013).  To overcome this presumption, Mobus must identify more than "mere speculation and tenuous inferences."  *Id.*  He cannot meet this burden.

In alleging that Professor Oyogoa's mere participation on the JG/Mobus Committee reflected evidence of gender bias, Mobus claims that Professor Oyogoa "could not be neutral toward [Mobus]" in the context of the LF/Mobus Proceedings and "had admitted to be biased against [Mobus]."  Compl. ¶¶ 72(b), 73(b).  These disingenuous claims are reflective of the factual manipulation to which Mobus has resorted in order to try to establish any indicia of gender bias in the JG/Mobus Proceedings.  Mobus's decision to choose Professor Oyogoa as an advocate in the LF/Mobus Proceedings, *see* SUMF ¶ 21, undercuts any assertion by Mobus that he perceived that she was biased against him.  So, too, do Mobus's admissions that (1) Professor Oyogoa's decision not to participate in the LF/Mobus Proceedings was "understandable," "made sense," and was "probably the right thing to do"[6], *see* SUMF ¶ 24, (2) he had no basis to say that Professor Oyogoa treated him with gender bias in connection with the JG/Mobus Proceedings, *see* SUMF ¶ 206, and (3) he could not identify any comment made by Professor Oyogoa indicating that she harbored gender bias, *see* SUMF ¶ 207.  As such, Mobus cannot maintain a claim that Professor Oyogoa was motivated by gender bias, or that her service on the JG/Mobus Committee evidenced an improper influence of gender on the committee's decision.

---

[5]     Whether Professor Oyogoa identifies as a feminist is entirely irrelevant to Mobus's bias claim, as "merely being a feminist or researching topics that affect women does not support a reasonable inference that a person is biased."  *Doe v. Miami University*, 882 F.3d 579, 601 (6th Cir. 2018).

[6]  ██████████████████████████████████████████████████████████████████████████████

      3.      ***Mobus's Allegations of Procedural Error Do Not Establish Gender Bias.***

Mobus contends that a panoply of alleged errors in the conduct of the JG/Mobus

Proceedings evidences that Simon's Rock was motivated by gender bias. *See* Compl. ¶¶ 73-77.

Even if Simon's Rock had departed from its policies in the administration of the JG Proceedings,

which the record establishes is incorrect, such procedural missteps would not satisfy the

requirement that a plaintiff offer evidence indicating that gender bias was a motivating factor in a

disciplinary body's decision. *See Doe v. Trustees of Boston College*, 2016 WL 5799297, at *26

(D. Mass. Oct. 4, 2016); *Doe v. Colgate University*, No. 5:15-cv-1069, 2017 WL 4990629, at

*17–18 (N.D.N.Y. Oct. 31, 2017) (granting summary judgment for university on erroneous

outcome claim where plaintiff "detail[ed] a list of perceived procedural flaws and tack[ed] on a

conclusory allegation that these procedural flaws were motivated by gender bias"); *Doe v.

University of Massachusetts–Amherst*, No. 14-30143-MGM, 2015 WL 4306521, at *8 (D. Mass.

July 14, 2015) (plaintiff's allegations about "difficulties getting information, deficiencies in the

investigation, limits placed on his ability to cross-examine witnesses, the exclusion of some

documentary evidence he wished to introduce, and the misuse of witness testimony by the

hearing board" was insufficient to show gender bias). Instead, Mobus must provide evidence of

a "causal relationship between the alleged procedural irregularities alleged and a pattern of

decision making based upon gender bias." *Doe v. Trustees of Boston College*, 2016 WL

5799297 at *26. He has not done so, and, accordingly, his Title IX erroneous outcome claim

cannot survive summary judgment. *See Doe v. Trustees of Boston College*, 892 F.3d 67, 93 (1st

Cir. 2018) (affirming summary judgment for university on Title IX erroneous outcome claim).

It bears emphasis that Plaintiff's complaints of "slanted" or "unequal" treatment of

himself and JG during the JG Proceedings, even if established, do not constitute evidence of

gender bias. *See* Compl. ¶¶ 73-75. Even if Mobus were able to establish that the JG/Mobus

Committee was biased against respondents in sexual misconduct hearings (which he cannot),

such bias would "not equate to bias against men." *Doe v. Colgate University*, 2017 WL

4990629, at *11. *See also Doe v. Trustees of Boston College*, 2016 WL 5799297, at *25; *Doe v.

University of Massachusetts–Amherst*, 2015 WL 4306521, at *8 (dismissing erroneous outcome

claim where plaintiff failed to "cite [ ] examples of any comments that targeted him based on his

gender—as opposed to his status as a student accused of sexual assault—or any conduct

suggestive of gender bias").

### 4. *The "Threat" of Investigation by the Department of Education Does Not Establish Gender Bias.*

Finally, Mobus contends that the "threat" of an investigation by the Department of

Education's Office of Civil Rights ("OCR") "motivated" Simon's Rock to act in a biased manner

because "if the school finds against a female complainant, it risks losing its federal funding."

*See* Compl. ¶¶ 78-79.  Courts routinely reject such claims.  *See Doe v. Trustees of Boston*

*College*, 892 F.3d 67, 92–93 (1st Cir. 2018) (rejecting argument that university administrators

were influenced by outside pressure, including pressure from OCR, to act in a biased manner);

*Doe v. Colgate University*, 2019 WL 190515, at *5 (2d Cir. 2019) (rejecting claim that OCR

guidance created "pressure to punish male students for sexual misconduct"); *Doe v. University of*

*Colorado, Boulder*, 255 F. Supp. 3d 1064, 1078 (D. Colo. 2017) ("[P]ressure from the federal

government to investigate sexual assault allegations more aggressively . . . says nothing about

the University's alleged desire to find men responsible because they are men."); *Doe v.*

*University of Cincinnati*, 173 F. Supp.3d 586, 602 (S. D. Ohio 2016) ("[I]t is not reasonable to

infer that [a college] has a practice of railroading students accused of sexual misconduct simply

to appease the Department of Education and preserve its federal funding.").  This court should

follow their lead, especially given that Mobus has not – and cannot – identify any directive from

OCR requiring colleges to treat female students any differently from male students.  *See Doe v.*

*Trustees of Boston College*, 892 F.3d at 92–93 (plaintiffs' failure to explain how OCR guidance

"reflects or espouses gender bias" foreclosed bias argument).

    **E.**    **The Court Should Grant Summary Judgment on Plaintiff's Claim for Promissory Estoppel (Count III).**

Mobus's claim for promissory estoppel is duplicative of his claim for breach of contract

claim, and therefore fails for the same reasons as his breach of contract claim.  *See* Section C,

above.  Moreover, because the Student Handbook governed Simon's Rock's handling of the

JG/Mobus Proceedings, Mobus cannot recover under a theory of promissory estoppel.  *See Doe*

*v. Brandeis University*, 177 F. Supp. 3d 561, 612–13 (D. Mass. 2016) ("It is well-established that

recovery under a quasi-contract theory is not available where there is a written contract

governing the same subject matter.").

    **F.**    **The Court Should Grant Summary Judgment on Plaintiff's Claims for Negligence (Count VIII) and Negligent Infliction of Emotional Distress (Count IV).**

It is well settled under Massachusetts law that the rights and obligations of students and

universities in connection with student discipline proceedings are contractual in nature.  *See Doe*

*v. Trustees of Boston College,* 892 F.3d 67, 94–95 (1st Cir. 2018); *Schaer,* 432 Mass. at 735.

Accordingly, where, as here, a student challenges the disciplinary process arising from his

contract with a college, the college owes the student no "additional independent duty outside of

their existing contractual relationship" and "[a]ny remedy for a breach of this contractual

obligation must sound in contract, not in tort."  *Id.  See also Doe v. Amherst College,* 238 F.

Supp. 3d 195, 228 (D. Mass. 2017) (declining to impose "a legal duty on college administrators .

. . relating to the implementation of student disciplinary proceedings"); *Doe v. Emerson College*,

153 F. Supp. 3d 506, 513-515 (D. Mass. 2015) (dismissing claim that college and administrators

were negligent in failing to implement and enforce school regulations, including policies governing Title IX investigations).  Accordingly, Defendant is entitled to summary judgment on Mobus's claim of negligence in Count VIII of the Complaint.

Plaintiff's inability to establish any of duty of care that would support a claim of negligence necessarily vitiates his claim for negligent infliction of emotional distress.  *See Doe v. Trustees of Boston College*, 892 F.3d at 95 ("Because we are unable to find an independent duty outside of the contractual relationship between the Does and B.C., the Does' claim [for negligent infliction of emotional distress] fails. . . .").  Negligence is a threshold element of any claim for negligent infliction of emotional distress, and therefore Plaintiff cannot maintain his claim for negligent infliction of emotional distress where, as here, he has no viable negligence claim.  *See id.  See also Conley v. Romeri*, 60 Mass. App. Ct. 799, 801 (2004) ("It is fundamental that there must be a showing of a duty of care owed to the plaintiff, because [t]here can be no negligence where there is no duty."); *Urman v. South Boston Sav. Bank*, 424 Mass. 165, 171 (1997) (affirming summary judgment on claim for negligent infliction of emotional distress where defendant did not owe plaintiff a duty and did not engage in conduct warranting finding of negligence).  Accordingly, Defendant is entitled to summary judgment on Count IX of the Complaint.

## G.     The Court Should Grant Summary Judgment on Plaintiff's Claim for Intentional Infliction of Emotional Distress (Count V).

To maintain a claim for intentional infliction of emotional distress, Mobus must show that (1) Simon's Rock intended, knew, or should have known that its conduct would cause emotional distress; (2) that Simon's Rock's conduct was "extreme and outrageous"; (3) that Simon's Rock's conduct caused emotional distress; and (4) that this emotional distress was severe.  *Doe v. Trustees of Boston College*, 2016 WL 5799297, at *30 (D. Mass. Oct. 4, 2016).

The bar to assert and maintain a claim for intentional infliction of emotional distress is "set very high." *Id*. *See also Doe v. Emerson College*, 153 F. Supp. 3d 506, 518, (D. Mass. 2015) (scrutiny applied to claims of intentional infliction of emotional distress is "very high"). This is particularly true with regard to the second prong, with regard to which courts require a showing that the complained-of conduct is "'beyond all possible bounds of decency'" and is "'intolerable in a civilized community.'" *Doe v. Trustees of Boston College*, 2016 WL 5799297, at *30–31 (quoting *Polay v. McMahon*, 468 Mass. 379, 385 (2014)). This burden is satisfied only by evidence that the defendant engaged in misconduct that was "targeted, deliberate, and malicious." *Doe v. Brandeis University*, 177 F. Supp. 3d 561, 617 (D. Mass. 2016).

As set forth above, Simon's Rock's handling of the JG/Mobus Proceedings was in full compliance with its legal and contractual obligations. Even if Simon's Rock had somehow failed to fulfill its obligations, however, the conduct of which Mobus complains falls far short of the sort of "targeted, deliberate, and malicious" actions required to maintain a claim for intentional infliction of emotional distress. *See Doe v. Trustees of Boston College*, 2016 WL 5799297 at *30–31 (granting summary judgment on intentional infliction of emotional distress claim premised on alleged procedural errors in handling of sexual misconduct investigation); *Doe v. Brandeis University*, 177 F. Supp. 3d at 617 (dismissing intentional infliction of emotional distress claims premised on university's alleged mishandling of sexual misconduct investigation); *Doe v. Emerson College*, 153 F. Supp. 3d at 518 (granting judgment on pleadings on intentional infliction of emotional distress claim premised on college's allegedly flawed policies, mishandling of sexual misconduct investigation, and perceived insensitivity to plaintiff); *Fellheimer v. Middlebury Coll*ege, 869 F. Supp. 238, 246–47 (D. Vt. 1994) ("A [c]ollege's decision, when confronted with a female student's accusation of rape, to confront the

male student with the charges, hold a hearing, and support the findings of the initial tribunal on

appeal, even where various procedural errors are alleged, cannot form the basis of an [intentional

infliction of emotional distress] claim."). Simon's Rock is therefore entitled to summary

judgment on Mobus's claim for intentional infliction of emotional distress.

### H.   The Court Should Grant Summary Judgment on Plaintiff's Claim for Tortious Interference with Contract (Count VI).

In his Complaint, Mobus asserts a claim for tortious interference with contract only

against two individuals – Dr. Lyon and Provost Laipson – who were dismissed as defendants in

this matter by agreement of the parties on July 20, 2017 (Docket No. 17). Accordingly, the

Court should now grant summary judgment as to Count VI of the Complaint.

### I.   The Court Should Grant Summary Judgment on Plaintiff's Claim for Declaratory Judgment (Count IX).

Mobus's claim for declaratory judgment is untimely because it seeks relief for conduct

that has already occurred. "Declaratory judgment is relief sought in connection with *future* legal

rights to assist parties in 'conform[ing] their conduct to avoid future litigation.'" *Doe v. Trustees

of Boston College*, 2016 WL 5799297, at *23 (D. Mass. 2016) (citation omitted)(emphasis in

original). A request for declaratory judgment is "untimely if the questionable conduct has

already occurred or damages have already accrued." *Id. See also Sprint Spectrum L.P. v. Town

of Easton*, 982 F. Supp. 47, 52–53 (D. Mass. 1997) ("[D]eclaratory relief is an inappropriate

remedy for a violation that has already occurred.")

Here, rather than asking the Court to clarify *future* legal rights, Mobus seeks a declaration

nullifying the outcome of the JG Proceedings, expunging his disciplinary record, and erasing his

expulsion for his educational file. *See* Compl. ¶ 137. In doing so, Mobus acknowledges that,

through his declaratory judgment claim, he seeks redress for Simon's Rock's past actions,

namely the allegedly "unfair outcome of the [JG Proceedings]." *See id.* at ¶ 135. In effect, then,

Mobus is asking the Court to rewrite the past, a power it lacks under the Declaratory Judgment Act.  *See Doe v. Trustees of Boston College*, 2016 WL 5799297 at *23 (declaratory judgments not available "simply to proclaim liability for a past act"); *Wilborn v. Wall*, No. 13-cv-11783-GAO, 2015 WL 5662717, at *6 (D. Mass. Sept. 25, 2015) (declaratory judgment inappropriate where challenged "hearing and all that led up to it are in the past").  The Court must therefore decline this invitation, and grant summary judgment to Simon's Rock on Mobus's claim for declaratory judgment.

Even if Mobus's declaratory judgment claim were timely – which it is not – it fails for the separate and independent reason that it is predicated entirely on Mobus's deficient substantive claims.  *See* Compl. ¶¶ 134-137.  For the reasons stated above, none of these claims survive summary judgment, and therefore his declaratory judgment claim meets the same fate. *See Akins v. Penobscot Nation*, 130 F.3d 482, 490, n. 9 (1st Cir. 1997) (Declaratory Judgment Act does not create an independent substantive cause of action); *Doe v. Brown University*, 166 F. Supp. 3d 177, 197 (D.R.I. 2016) ("Brown is correct that the Declaratory Judgment Act does not create its own substantive cause of action."); *Yu v. Vassar College*, 97 F. Supp. 3d 448, 484, (S.D.N.Y. 2015) ("Given that [Plaintiff] has failed to establish his other claims, and the declaratory relief sought rests on those claims, his claim for declaratory judgment also fails.")

## CONCLUSION

For the reasons stated above, Defendant respectfully requests that the Court grant summary judgment to Defendant on all counts of Plaintiff's Complaint.

Respectfully submitted,

**BARD COLLEGE**

By its attorneys,

/s/ Scott A. Roberts
Scott A. Roberts (BBO No. 550732)
      sroberts@hrwlawyers.com
Arielle B. Kristan (BBO No. 677048)
      akristan@hrwlawyers.com
HIRSCH ROBERTS WEINSTEIN LLP
24 Federal Street, 12th Floor
Boston, Massachusetts 02110
(617) 348-4300

Dated: April 1, 2019

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on April 1, 2019.

/s/ Scott A. Roberts
Scott A. Roberts