1                   UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2

3    ANDREW MOBUS,                      )
                         Plaintiff      )
4                                       )
     vs.                                )  No. 1:17-cv-11011-GAO
5                                       )
     BARD COLLEGE, ET AL.,              )
6                        Defendants.    )

7

8

9
             BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
10                  UNITED STATES DISTRICT JUDGE
                           MOTION HEARING
11

12

13

14         John Joseph Moakley United States Courthouse
                         Courtroom No. 22
15                      One Courthouse Way
                    Boston, Massachusetts 02210
16

17                         July 17, 2019
                             2:07 p.m.
18

19

20

21
                   Kathleen Mullen Silva, RPR, CRR
22                      Official Court Reporter
           John Joseph Moakley United States Courthouse
23                One Courthouse Way, Room 7209
                    Boston, Massachusetts 02210
24              E-mail: kathysilva@verizon.net

25         Mechanical Steno - Computer-Aided Transcript

```
 1    APPEARANCES:

 2

 3              PILIERO & ASSOCIATES, PLLC

 4              Lisa A. Frey, Esq.

 5              Robert Donald Piliero, Esq.

 6              444 Madison Avenue, 4th Floor

 7              New York, New York 10022

 8              646.854.1273.

 9              and

10              Partridge Snow & Hahn LLP

11              Devon H.M. Villarreal, Esq.

12              30 Federal Street

13              Boston, Massachusetts 02110

14              617.267.2300

15              for Plaintiff

16

17              Hirsch Roberts Weinstein LLP

18              Scott A. Roberts, Esq.

19              Arielle B. Kristan, Esq.

20              24 Federal Street, 12th Floor

21              Boston, Massachusetts 02110

22              617.348.4300

23              for Defendants

24

25
```

```
1                    P R O C E E D I N G S
2              THE CLERK:  All rise.
3    (Court enters.)
4              THE CLERK:  United States District Court for the
5    District of Massachusetts.  Court is in session.
6              Be seated for a motion hearing in the case of Andrew
7    Mobus versus Bard College et al., 17-11011.
8              Would counsel identify yourselves for the record.
9              MR. PILIERO:  Good afternoon, your Honor.  I'm Robert
10   Piliero representing the plaintiff, Mobus.
11             MS. FREY:  I'm Lisa Frey for plaintiff.
12             MS. VILLARREAL:  Devon Villarreal for plaintiff.
13             MS. KRISTAN:  Good afternoon, your Honor, Arielle
14   Kristan for the defendants.
15             MR. ROBERTS:  Good afternoon, your Honor.  Scott
16   Roberts for Bard College and Bard College at Simon's Rock.
17             THE COURT:  All right.  We have a number of matters.
18   The papers are extensive.  The argument need not be.  I think
19   I'll restrict you each to 15 minutes to highlight the matters.
20   The matters are very thoroughly dealt with.  But there are some
21   issues I know you want to address with me.
22             MR. PILIERO:  Thank you, your Honor.
23             May I move this over?
24             THE COURT:  Yes.
25             MR. PILIERO:  Thank you for the opportunity to be
```

1  heard, Judge.  As you mentioned, there's a bunch of motions.

2  I'm going to tell you what I'm going to be doing and then how

3  it will break out otherwise.

4       I'll be arguing the plaintiff's motion for partial

5  judgment on the breach of contract claim.  I'll also be --

6  you'll hear from me again as I oppose part of defendants'

7  motion for summary judgment.  My colleague Lisa Frey will be

8  addressing one aspect of that defendants' motion to dismiss the

9  Title IX claim.  I'll be addressing the rest of those issues,

10 and Ms. Frey will be addressing our motion to strike evidence

11 on evidentiary grounds.

12      Let me begin very quickly, and hopefully succinctly.

13 The partial judgment motion we're making is really, really

14 simple.  The relief we're going for is really, really simple.

15 We're not asking for a judgment of breach of contract.  We're

16 not asking for that.  We are asking for a determination, a

17 partial judgment that a contract existed and that at least one

18 or more provisions of that contract were breached.  That's the

19 really grasp.

20      The interesting part about it is that with respect to

21 the first one, I don't think there's any dispute whatsoever

22 that a contract existed, certainly with respect to the student

23 handbook.  We say with respect to another document as well, but

24 for the student handbook we still have got very, very strong

25 evidence of breach.

1          I would say respectfully that they, defendant, does

2    not dispute that there was a breach of contract.  I say that

3    for two reasons.  One is Rule 56.1, if your Honor is familiar

4    with that motion.  I know you're familiar with the rule -- with

5    the motion.  They didn't file a counter statement.  We filed

6    our motion for summary judgment and our Rule 56.1 statement on

7    January 1.  They timely filed their opposition papers April 1.

8    They did not file a document doing a paragraph-by-paragraph

9    refutation, if you will, of our Rule 56.1 statement.  We balked

10   about it.  And in their papers they acknowledged they weren't

11   going to do it.  They said, We don't want to waste our time,

12   Bard's money and the court's time.  The reason they said that

13   I'll get to in a minute, was because, they said, we have a

14   fraudulent inducement counterclaim.  So it really doesn't

15   matter whether or not there was a breach of contract, which

16   I'll get to in a minute, the legal fallacy on that one.

17          But in any event, just as a matter of Rule 56.1, I

18   don't think you can just ignore the rule.  In their submission

19   on April 1, when they said they didn't think it was worth their

20   time, they said, So we ask for relief.  We ask for leave.

21   Well, they never made a motion.  So we waited a little bit to

22   see if a motion was coming.  Then on April 24 we made what we

23   called a memorandum regarding it, which was basically an

24   opposition to the unmade motion.  They didn't respond to that

25   April 24th.  The parties had agreed June 28 was the date for

1   final submissions of our reply papers and their opposition

2   papers.

3          April 24, May 24, June 24 came and went.  Two days

4   before our papers were due on June 26 they then filed a

5   detailed response under Rule 56.1 and said, you know, we still

6   don't think we need to, but we're doing it anyway.

7          So the first thing is Rule 56.1 itself says what

8   respectfully should be done, which is to deem admitted whatever

9   was not the subject of a timely Rule 56.1 statement.  I

10  wouldn't say that if they were untimely by a day, by a week,

11  but three months is a lot, and coming on the eve of our

12  filings.  So that's one thing.  That's one way in which I

13  believe they've admitted the facts that give rise to a breach.

14         The second way is a longer way.  We've briefed it

15  extensively, as your Honor noted, in the papers.  There are at

16  least ten separate provisions of the contract that we believe

17  the evidence is really quite overwhelming of a breach, and they

18  go to a number of issues, including bias, including failure to

19  give notice, including whatever.  I'm going to touch on those,

20  with your indulgence, very briefly in a moment.

21         But what I really wanted to do is start, and still

22  like to do it as a start, is to say -- to tell the court or

23  suggest to the court what the case is not about.  The case is

24  not about whether or not Andrew is a bad boy.  Andrew's not a

25  bad boy, but put that aside for the moment.  Okay?  What their

1   papers really are have been a magnificent instruction on how to

2   distract attention.  So we have all these facts which they

3   haven't been able to dispute.  So what do they do?  They go

4   into things like his medical history, his emotional history and

5   other things and ask the court to look at all these things

6   which make him look rather unsavory.

7         Well, we're not here because Andrew Mobus smoked

8   marijuana in high school.  We're not here because he was caught

9   in bed with a girl in high school.  We're not here for a lot of

10  the things that they're talking about.  Certainly Lisa --

11  Ms. Frey is going to talk a lot more about this, but that's not

12  even admissible evidence.  The stuff about his medical stuff is

13  not -- his medical history is not admissible under federal law,

14  which their admissions director admitted during her deposition.

15  The other stuff is just not admissible because it has nothing

16  to do with this case, but Ms. Frey will cover all that.

17        So that's what the case is not about.  The big picture

18  on the case is he matriculated at Simon's Rock, Bard College at

19  Simon's Rock January of 2014.  He was expelled August of 2014,

20  and he's expelled because there was a disciplinary hearing that

21  resulted in a finding that he had committed rape in the form of

22  unconsented-to anal intercourse.  He was one semester shy of

23  having enough credits to graduate high school.

24        Today, five years later, Andrew Mobus is still

25  devastated.  He hasn't gone back to school.  He doesn't have a

1    job.  He's living with his parents.  He's a wreck, and I'm glad

2    he's not in this courtroom because it will be bad enough at

3    trial, if we get there, to have him hear me say that.

4          So every case is important, criminal cases because

5    they're freedom or worse, civil cases because it's moving money

6    from a pocket to another pocket, and sometimes that really

7    matters a lot.  This case is about the boy's future.  This case

8    is about having been robbed of his potential future.  And so

9    can we ever undo it?  We can't ever unring the bell.  No, we

10    can't.  But I can tell you that winning this case will do a lot

11    for him emotionally.  And he deserves it because he really,

12    really was mistreated.

13          Let me start briefly just to give you a sense of him a

14    little bit.  Everybody agrees Andrew's a very smart guy.  The

15    school caters to very smart guys.  It's called itself an early

16    college.  It basically caters to kids who are ready to start

17    junior or senior year in high school and they say don't bother

18    with that.  We'll give you something which if you work it out,

19    you can get an associate's degree and shave some time off your

20    education.  So you've got to be smart, and he was.

21          The record is very clear.  His SAT scores were very,

22    very high.  But more than that, insofar as it's relevant to

23    some of the slander that we've heard, are the words of his

24    prior schools.  The head of school at Collegiate, which the

25    papers erroneously say kicked him out or disciplined him or did

1    something terrible, the head of school described him as a,

2    quote, terrific young man, a good citizen in all ways.  That

3    was in the recommendation letter which she sent to Simon's

4    Rock.

5         A physics teacher at Putney described him as brilliant

6    and perceptive.  Carrie Ann White, the head of the -- the

7    academic dean of the Putney School, which supposedly he was

8    kicked out for disciplinary reasons, which he wasn't, which

9    we'll get to in a minute -- said he was, quote, "intelligent,

10   deep thinker, earnest, affable, creative, interesting, and

11   passionate.  He has much talent, quick mind and much to give to

12   a community."  This is the school that he left right before

13   Simon's Rock.  This is the one that you're being asked to say

14   proves what a fraudster he was because he lied about his

15   departure from Putney.  That's the head of academics.

16        So what happened that transformed this brilliant,

17   earnest, affable, good citizen into a pariah?  I think -- I

18   know what happened.  An overzealous view and, quite frankly, a

19   very smug view, that we've really got to take care of girls.

20   There's a lot going on in the world.  There's a lot going on

21   about campus violence.  The Obama administration properly teed

22   that up, and I think like a lot of times people go too far and

23   they overreact.  In fact, interestingly, the dean of students

24   at Simon's Rock told Andrew privately, well, you know, the

25   pendulum has swung a bit.  What did that mean?  We can fight

1    about what that means.  But the point of the matter is the

2    pendulum did swing a lot and it's starting to swing back.

3    There are cases in this district, cases in federal courts

4    throughout the country, that are grappling with trying to find

5    the right balance between protecting female victims without

6    totally running roughshod over the rights of accused males.

7         It's almost like we're in the middle of seeing the

8    development of an innocence project for this because that's

9    where we're going.  The cases are starting to turn around.

10        So if we put aside what happened to him -- well, you

11   can't put it aside -- put aside the slander -- we have a young

12   woman who was referred to in this case as JG, who accused him

13   of sexual misconduct, which I will go through very briefly

14   because it's in the papers, because -- we say, because she was

15   failing out.  Her academic performance was horrible.  She had

16   already dropped two of the four courses by May when she first

17   mentioned this.  She had two courses left that she was failing.

18   She met with her academic advisor, Rebecca Fiske, and said,

19   It's my relationship.  It's just terrible.  That's what's

20   really, really distracting me.  Rebecca Fiske says, well, you

21   ought to break up with him.  She breaks up with him.  And

22   within two weeks that morphs into a rape allegation.

23        I'll give you more facts on that, but interestingly

24   for this purpose, she then talks to -- a year later talks to

25   the same academic advisor and the same dean of academic

1    affairs, who subsequently became dean of students, and said,

2    you know, I really would like you to change my record so that

3    it doesn't show that I failed out.  I'd like you to sanitize it

4    and say that I withdrew.  And they did it.

5           So at the end of the day, this young lady, who made

6    Andrew the scapegoat for a terrible academic record, I don't

7    know if she's graduated college or not, but she's well on her

8    way.  Andrew is sitting at home without a high school degree.

9           I'm going to try and shorten this up, Judge, because I

10   know that we have time constraints.

11          Briefly about the relationship, because I want you to

12   have an appreciation for how thin and absurd the case was from

13   the get-go, the case against Andrew, that is.

14          JG and Andrew met mid-February.  They begin having sex

15   immediately.  The record is clear.  She admits it.  She

16   testified that over the next ten weeks of their relationship

17   they had sex numerous times, 30 times at least.  On February 28

18   she makes dinner in her dorm room for Andrew.  He goes over.

19   And they have anal sex.  Andrew's testimony and her testimony

20   are different.  Andrew says that she had said she wanted to do

21   it because she had tried it once before outdoors, it was not

22   fun, but she wanted to try it again.  She denies it and says he

23   snuck up on her.  She makes no complaint to anybody.  There are

24   text messages to him over the next weeks and months professing

25   her love for him and how everything is great.  She says nothing

1   at all about him being a problem until she meets with Becky

2   Fiske on May 2, that's ten weeks later.  Even then she doesn't

3   say she was raped or there was unconsented-to anal sex.  Becky

4   says break up.

5          Andrew had been tagged by another girl because

6   supposedly he did something to her which he was exonerated

7   from, by the way, but one of the women who was on that

8   committee heard about JG breaking up with Andrew and said, you

9   know what, nothing like an ex-girlfriend for a witness.  So she

10  calls her in, and during the course of that testimony, this

11  ex-girlfriend for the very first time accused him of rape in

12  the form only of unconsented-to anal intercourse.

13         During her deposition testimony in another case, she

14  admitted that there were four or five occasions after February

15  28 where she had anal sex with him on a consensual basis.

16  There was no problem.  And she said she never had a problem

17  with having vaginal sex with him.  This is your complainant.

18         THE COURT:  So I'm pretty much familiar with this

19  recitation.

20         MR. PILIERO:  Okay.  I'm sorry.  I'm overdoing it.

21         THE COURT:  What I'd like to hear is why you think you

22  should get summary judgment or partial summary judgment on

23  the --

24         MR. PILIERO:  Okay.  I can go through the specific

25  issues and tell you the evidence if you'd like me to do that.

1   I have tried to boil it down -- of the ten, I have tried to

2   boil it down to four, I can do that, or that's all in the

3   papers as well.  I can try to really highlight them quickly, if

4   I may.

5          The obligation to provide notice, which we as lawyers

6   certainly, but they're not lawyers at the school I understand,

7   but we as lawyers know there's nothing more fundamental than

8   telling somebody what you did wrong.  The record is very, very

9   clear that they gave him a charging letter which had seven

10  lines in a two-page letter, only seven lines telling him what

11  he did, and it was very, very generic.  That was on May 23.

12  The record is clear that the Title IX coordinator at the time

13  who wrote the letter had never spoken to the complainant.  She

14  just didn't know.  She was given very general information about

15  it.  We know that JG then a month later submitted a very, very

16  detailed complaint laying out chapter and verse, everything

17  that she wanted to say that was negative about Andrew.  There's

18  no dispute that they did not give that to Andrew.  There's no

19  dispute that even though Andrew asked on the eve of the trial,

20  Is there anything else I should see, they didn't give it to

21  him.  There's no dispute that the people -- the three women who

22  were on the committee testified unequivocally, no, he can't see

23  that.  One of them said, gee -- and she was wrong -- it's

24  against school policy to let him see what he's accused of.  I

25  mean, just a total travesty, total travesty.

```
 1              THE COURT:  Is there anything in school policy that
 2    requires it --
 3              MR. PILIERO:  Yes.  Yes.
 4              THE COURT:  -- explicitly?
 5              MR. PILIERO:  Yes.  I don't know if you have your
 6    books or not, but I have cites for that, and maybe for the
 7    record it will help you, volume 2, tab 115 -- no, that's not
 8    it.  It's the student handbook.
 9              MR. ROBERTS:  Your Honor, if I may, it's appended to
10    our affidavit, so you can find it at the -- the filing number
11    is 131, Exhibit 3.
12              THE COURT:  Okay.
13              MR. PILIERO:  Bear with me, Judge, please.
14              THE COURT:  Well, you don't have to -- the answer is
15    sufficient for present purposes.
16              MR. PILIERO:  It's in the student handbook.  What it
17    says is that the complaint has got to give details, chapter and
18    verse, et cetera, et cetera, if she's going to make a claim,
19    and it says -- and I can't quote, and I wish I could, but let's
20    see if I can, that he has the opportunity -- the school will
21    give him the opportunity to respond in writing to the
22    statement, and he was never given the statement.
23              The argument that Bard makes is, well, the committee
24    had the statement, and the committee -- the committee asked him
25    questions off the statement.  And so that was like telling him
```

1   what was in the statement, and that's just kind of like going

2   to trial and doing cross-examination or, you know -- and

3   saying -- well, you know what I'm saying.

4           I'm sorry.  Anyway --

5           All right.  That's notice.

6           Then there's bias.  Three weeks before the hearing,

7   which was scheduled for August 14, three weeks before, July 25,

8   the three members of the committee get together and they talk

9   to one another, and they decide Andrew's guilty, and they write

10  an email that says that.  They write that email to the Title IX

11  coordinator.

12          If I may, Judge, it says -- this is Colonel Dooley,

13  who is the senior member of the committee.  It's a three-women

14  committee.  It started out being two women and one man but the

15  guy on the committee got sick.  He broke -- he fell off a

16  ladder or something so they replaced him with a man two days or

17  three days before the hearing -- they replaced the man with a

18  woman.  So these three women got together on January 25 -- on

19  July 25, Colonel Dooley writes, "Francisca and I concurred, and

20  based on Beth's strong feelings about it expressed

21  Wednesday" -- that's the three people, Francisca and Beth are

22  two of the members with Dooley -- based on her views expressed

23  on Wednesday, "I think she would concur -- we find Drew did

24  indeed violate the college's policies."

25          There's an email above that, and this is the Frey

1  affidavit, Exhibit 53, tab 115 of volume 2.  She goes on to

2  say, "We interpret his silence" -- "Drew" is Andrew -- "his

3  silence to mean he does not deny the allegations or he will not

4  respond because he chooses not to self-incriminate.  If the

5  next thing you wish us to do" -- she's writing to the Title IX

6  coordinator -- "is discuss imposition of a sanction....  my

7  recommendation:  irrevocable, irretrievable suspension.  Wait,

8  that's expulsion, right?"  So three weeks before the hearing

9  they've decided that he ought to be expelled.

10         THE COURT:  Okay.  You said Ms. Frey had something to

11  say.

12         MR. PILIERO:  No, no, I didn't.

13         THE COURT:  No, I --

14         MR. PILIERO:  She has more to say on the same thing,

15  and I'm trying not to step on her lines.

16         THE COURT:  You misunderstand.  Actually, you've gone

17  over the time allowed.

18         MR. PILIERO:  Oh, sorry.

19         THE COURT:  So If you want to get something from

20  Ms. Frey, this is the chance to do it.

21         MS. FREY:  Oh, I see.  Yes.  Excuse me, your Honor.  I

22  am going to be arguing the motion to strike.  Should I argue

23  that now?

24         MR. ROBERTS:  Your Honor, the motions to strike aren't

25  on today.

1          MS. FREY:  Is that right?

2          THE COURT:  Everything is on.

3          MS. FREY:  The motion to strike the medical evidence

4    that was submitted, we submitted a motion that said that on

5    their affirmative defense they used Andrew's medical records

6    from the psychiatric center.

7          THE COURT:  All right.  You can briefly address that.

8          MS. FREY:  Can I give you a brief argument on that?

9          THE COURT:  Yes.

10         MR. PILIERO:  I'm going to want to say one more thing

11   when she's done.  Maybe I can say it first.

12         THE COURT:  I don't think so.

13         MR. PILIERO:  Oh, dear.  It's a legal argument.  No?

14         THE COURT:  We're going to move on.

15         MR. PILIERO:  Thank you for your time.  I'm sorry I

16   went over.

17         MS. FREY:  Thank you, your Honor.  I'm just speaking

18   very briefly about the evidentiary issues.

19         Number one, on the motion to strike medical records.

20   We went down to Texas to interview -- to depose the admissions

21   counselor from Simon's Rock who was in charge of Andrew's

22   admission.  And in that deposition Mr. Roberts was asking

23   extensively about records from Silver Hill Psychiatric, where

24   Andrew spent 30 days in tenth grade.  He was voluntarily

25   committed to a psychiatric center.  After that he had spent 103

1    days in a therapeutic wilderness program out in Utah, again

2    under the supervision of a psychiatrist.  And Mr. Roberts was

3    asking Andrew -- Alexandra Taylor quite a few questions about

4    that.  Why didn't you know about this, why didn't you know

5    about that when Andrew applied.  And one of the things she

6    answers in that deposition is "The submission" -- this is

7    Alexandra Taylor in the deposition.  "The submission of

8    psychological documents is not a part of any college admissions

9    process under the Americans with Disabilities Act."  And she

10   makes very clear, "I can't decide that."  I've also quoted

11   other parts in our motion to strike.  I don't have to burden

12   you with that now.

13         So when we made this objection, Mr. Roberts came back

14   in his papers and said, okay, they only gave two things that

15   they're really interested in in the medical records.

16   Everything else is just basically smearing Andrew's name.  They

17   came up with reasons why they thought the medical records

18   should stay in the case.  One was why Andrew went to Silver

19   Hill and the other one is why Andrew cut himself.  There was an

20   incident where Andrew cut himself something like 38 times.  One

21   incident, but he cut himself extensively, about two months

22   before he went to the psychiatric center.

23         Now, Alexandra Taylor said you can't -- once you find

24   out somebody goes to a psychiatric center, you can't ask them

25   why.  You can't ask them the circumstances about that.  That's

1    against the rules.  The way the Americans With Disabilities Act

2    works is if a person is otherwise qualified to come into your

3    college, and there's no question this man is -- Andrew's a

4    brilliant guy.  He was qualified, and Bard does not say he

5    wasn't qualified.  Once they come in, afterwards you can talk

6    about whether you're going to give them accommodations, but you

7    cannot make your admissions decision based on any problems that

8    they had.  They say, well, he lied.  They try to kind of cut a

9    thing between medical issues and behavior.  They say, well, he

10   lied about why he went to Silver Hill.  He lied about why he

11   cut himself.

12        What I want to say about that is, those are not facts.

13   I don't think anybody here today or anyone knows why Andrew had

14   a mental breakdown, why Andrew cut himself 38 times.  Isn't

15   that a medical -- maybe a doctor can give an opinion about why

16   a young man decides to take a razor blade and cut himself 38

17   times, but to ask him why, that's not a fact.  They want to

18   base a fraud claim based on an 18-year-old's opinion about why

19   he ended up in a psychiatric center.  It's just ridiculous.

20        Secondly, they say that -- and, by the way, the reason

21   why he really went to Silver Hill, they want the court to

22   conclude, was because he had an alcohol problem.  This is the

23   most absurd thing that I have ever seen in 30 years.  Andrew's

24   alcohol use was three beers and one unopened bottle of vodka.

25   Now, I submit that three beers in tenth grade and one unopened

1  bottle of vodka does not land you into a psychiatric hospital,

2  if we can make note of that.

3        Secondly, the -- so that, again, is not a statement of

4  fact.  Why he cut himself, not a statement of fact.  Now I'm

5  going to move on to the hearsay exceptions just briefly.

6        They say that they can submit documents to you that

7  are from third parties, Putney School, Ross School, other

8  people, and that, don't worry, at trial we'll get somebody to

9  testify to make these documents admissible.  Well, they did not

10 present them in an admissible form, and I don't think that

11 that's proper in this court.

12       Number two, they ask you to use those documents for

13 the truth of statements stated therein, and those statements

14 have hearsay, double hearsay and triple hearsay.  Putney

15 School, a girl said, a girl apparently told somebody else that

16 Andrew was grabby, and that person told the dean, and the dean

17 wrote it to somebody else, and they want you to use that --

18 they want to use that as an evidentiary document on the

19 judgment motion.

20       Lastly, there's a document, TPS 157, which is the

21 Putney School saying that Andrew had solicited a 14-year-old

22 girl to smoke marijuana.  Now, there's a couple of reasons why

23 that document can't come in.  First of all, no authentication.

24 Second of all, no affidavit.  Thirdly, it's hearsay.  Fourth,

25 Bard took the deposition of Andrew, Mr. Mobus, Andrew's father,

1  Ms. Malanoski, Andrew's mother.  They all testified that that

2  actually did not happen.

3          Bard never went and took Putney's deposition.  We had

4  had a lot of depositions in this case.  They never took

5  Putney's deposition.  They never tried to get down to the

6  facts.  What happened was Andrew was dismissed for academic

7  reasons.  Subsequently his parents tried to get them to

8  reconsider, and a letter came back that said, Well, we're not

9  going to reconsider because there were these other issues.

10          Those issues never got resolved.  Andrew never was

11 disciplined for those.  There was -- he was never sent to the

12 standards committee for those.  Those were not actual decisions

13 of the school.  It was a letter that has hearsay in it, and it

14 is not authenticated.  So they say that they're not asking for

15 you to assume the truth of that -- to consider the truth of

16 those statements, but they very much are.  Thank you.

17          THE COURT:  All right.  Thank you.

18          Mr. Roberts.

19          MR. ROBERTS:  Just so I can be clear, we have 15

20 minutes in total for both motions?

21          THE COURT:  Well, you have a little more than 15 now.

22          MR. ROBERTS:  Thank you.  I appreciate that.

23          Ms. Kristan will respond --

24          THE COURT:  I wouldn't -- I remind you that I am

25 familiar with the record.

1          MS. KRISTAN:  Thank you, your Honor.  May I have leave

2     to proceed from the table?

3          THE COURT:  I'm sorry?

4          MR. ROBERTS:  May I have leave to argue from the

5     table?

6          THE COURT:  Yes.

7          MS. KRISTAN:  Mr. Piliero came up here and said that

8     we're not here because Mr. Mobus smoked pot or slept with a

9     girl while he was at Putney School, but, your Honor, frankly,

10    we are here because Mr. Mobus lied about the discipline that he

11    received in response to those actions.  He lied about his

12    ability to return to the Putney School, and he lied about the

13    reason he subsequently did not attend a school called the Ross

14    School.

15         We're also here because his father and his educational

16    consultant also made misrepresentations about Mr. Mobus's

17    conduct, his discipline record and his educational history.

18    Not about his mental health history, but about these things

19    that are the core of what Simon's Rock was entitled to look at

20    in determining whether Mr. Mobus could join the Simon's Rock

21    community.

22         Simon's Rock relied on those representations.  They

23    allowed Mr. Mobus to attend the school, and we are here because

24    of what happened while Mr. Mobus was attending the school.

25    Your Honor, that is the core of defendant's fraudulent

1   inducement defense.  It is a clearly viable defense.  We have

2   mustered significant evidence supporting it, and it

3   conclusively prohibits the defendant from going forward on the

4   motion for summary judgment.

5           THE COURT:  So is your argument that because

6   there's -- there was some deception in inducing the

7   relationship, the admission of the student to the school, that

8   nothing in the student handbook applies to him?

9           MS. KRISTAN:  Your Honor, as it applies to Simon's

10  Rock?

11          THE COURT:  At least as a contractual matter.  I guess

12  I should refine the question to that point.

13          There's no contractual obligation under any provision

14  of the student handbook, or is it unique to the provisions that

15  might be germane?

16          MS. KRISTAN:  Your Honor, as far as this case, we are

17  contending it in terms of the sexual misconduct policy and

18  Simon's Rock's obligations under that sexual misconduct policy.

19  So that's the shape of the fraudulent inducement defense at

20  this point.

21          So, your Honor, that conclusively bars defendant's

22  motion for summary judgment.

23          I'm going to turn it over to Mr. Roberts to talk about

24  the merits of the breach of contract defense here because, as

25  Mr. Roberts will explain, the facts in the record when they're

1    stripped of innuendo and hyperbole demonstrate that it's

2    defendant, not the plaintiff, that's entitled to summary

3    judgment here.

4         But before I do that, I want to briefly talk about two

5    very quick things, which is what is the shape of the

6    contractual obligation on Simon's Rock?  We've talked about the

7    student handbook, the sexual misconduct policy contained

8    therein.  The plaintiff has also contended in his briefing that

9    there are three additional documents that shape that

10   contractual relationship.  Two of them are guidance documents

11   that were published by the Department of Education and have

12   since been rescinded.  And they rely on a statement in the

13   student handbook that says that college policy is consistent

14   with, and I quote, federal statutes and regulations.  Your

15   Honor, those guidance documents are not federal statutes.

16   They're not regulations.  So that language in no way can be

17   read to incorporate those guidance documents into the

18   contractual relationship between Mr. Mobus and Simon's Rock.

19        In addition, your Honor, the plaintiff points to a

20   2011 annual security report which the college published

21   pursuant to the Cleary Act.  Again, your Honor, it's clear that

22   this document cannot be part and is not part of the contractual

23   relationship between Mr. Mobus and Simon's Rock.  And the plain

24   -- and the easy reason for that, your Honor, is because

25   Mr. Mobus did not rely on that 2011 annual security report in

1    determining whether to matriculate at Simon's Rock.

2            This court's decision in Guckenberger controls, your

3    Honor.  It says very clearly that when we're looking at the

4    contractual relationship between a student and a college or

5    university and you're looking at publications by the college

6    that might shape that contractual relationship, the student

7    must rely on that document, and the reliance must be reasonable

8    in order for it to become part of the contractual relationship.

9            Mr. Mobus has never asserted in any sworn pleading

10   that he relied on the 2011 annual security report.  It is

11   mentioned nowhere in the complaint and it's clear, your Honor,

12   that what happened here is that this document was produced in

13   discovery and became a post facto justification or basis for

14   this breach of contract claim.  Under Guckenberger it's clear

15   Mr. Mobus cannot proceed on those grounds.

16           Your Honor, I'll turn it over to Mr. --

17           THE COURT:  Let me just ask you on that before you do.

18   Does the recent Doe v. Boston College case alter that at all?

19           MS. KRISTAN:  No, your Honor.  I don't think so.

20           THE COURT:  They found an implied contract.

21           MS. KRISTAN:  Based on the student handbook, yes, your

22   Honor.

23           THE COURT:  Okay.  All right.

24           MS. KRISTAN:  I'll turn it over to Mr. Roberts.

25           THE COURT:  Mr. Roberts.

1          MR. ROBERTS:  I feel like I should hop on a motorcycle

2     to do this argument.

3          Your Honor, I'm going to start this argument from the

4     perspective of I'm going to assume that the 2013-2014 student

5     handbook is the contract at issue.  So they've moved for

6     summary judgment on that.  I want to touch upon three things:

7     Process, bias and behavior, because those are the only things

8     really left in this case anymore given the withdrawal of

9     claims.

10         I do want to walk through quickly what the handbook

11    actually says and what we did.  As I said, it's in front of you

12    as Exhibit 3, but because it's been altered a little bit in its

13    presentation in some of the briefing, I want to go through with

14    your Honor what it actually says.

15         I also want to focus on what was the highlight of the

16    complaint in this case and the one fact that I knew going into

17    this matter I had to deal with, and that was the fact that

18    Mr. Piliero, as he did today, likes to say over and over again

19    they didn't give him the JG statement, they didn't give him the

20    JG statement, just like we didn't give JG the Mobus statement.

21    I'm going to concede that.  They did not hand it to him.  This

22    is, however, what he alleged in his complaint.  He alleged that

23    they refused to even disclose to him at the hearing what the JG

24    statement said.  "And Andrew was denied the opportunity even to

25    know," underlined, "much less refute, deny or even explain his

1  version of facts with respect to the JG allegation."

2        So I knew going into this case, that's my tough fact.

3  I've got to be able to try to address that head on, meet it and

4  overcome it.  And about a year ago, your Honor, that is exactly

5  what I did.  I sat there with Mr. Mobus at his deposition and I

6  walked through that JG statement.  I walked through every part

7  of it that addressed the allegations against him, and he

8  confirmed in his testimony over and over again that the

9  substance was presented to him.  He was afforded a full

10  opportunity to respond, and did respond.  And his position has

11  never changed.  The anal sex she says was non-consensual, I say

12  was consensual.  The photographs of her in sexual situations

13  she says I took of her without her consent, I say they were

14  consensual.  Not a word would have changed.

15        So I had to meet that.  I did meet that.  And now what

16  we're doing in these papers before us is looking at an

17  alteration of what Mr. Mobus purportedly said in his

18  deposition.  No errata sheet was submitted at the time, even

19  though we three times asked for one from Ms. Frey.  No errata

20  sheet was submitted.  Instead we get a three-line affidavit

21  right now saying, well, when Mr. Roberts asked him that, I kind

22  of understood this.  So I say to your Honor in reply, I commend

23  you his testimony.  Read it, see what I asked him.  See what he

24  said.  Because it ended this case.

25        Your Honor, this is what the policy actually says and

1    what actually happened.  The policy says that, "The accused

2    student will be informed of the investigation."  Then it says,

3    "The accused party has the right to be fully informed of the

4    nature of the alleged violations and of the policies,

5    procedures and rules regarding the investigation."  Note, the

6    policy does not say, as they have claimed, that the complaint

7    should include all date, time, place and other relevant

8    details.  That provision applies specifically to anonymous and

9    third-party complaints.  Now, that said, we let him know

10   through the course of this process all of those things.  But

11   the suggestion that that's what the policy says the complaint

12   must say is wrong.

13        So what did we do?  We received the oral report from

14   JG at the LF proceeding that Andrew pressured her into anal

15   sex, got her drunk first, didn't tell her.  This was not okay

16   with her.

17        We then send him a notice on May 23 that JG has

18   alleged you engaged in anal sex without her consent, took

19   photos of her in sexual situations without her consent and kept

20   them.  We also informed him of where the procedures could be

21   found, specifically citing him to the specific portions of the

22   sexual misconduct policy, the citation to it on the website,

23   and a copy of it.  So first observation, notice of the

24   investigation, met in full.

25        Advocate, what the policy says.  "The Title IX

```
 1   coordinator will work with the complainant and accused to
 2   connect each with a faculty or staff member who can act as an
 3   advocate.  The advocate does not act on the student's behalf
 4   but provides support and guidance."  What did we do?  And the
 5   party has a right to choose an advocate.  What did we do?  We
 6   advised him that he was entitled to support from an advocate.
 7   Then we listed, and said, hey, it's summer, we have six people
 8   who could possibly be on this committee.  Three who are not.
 9   They will be available to you, if you want them as an advocate.
10           Now, when the complaint was filed, the argument was,
11   or the contention was, we assigned him an advocate that was
12   biased, namely Gabe Salgado, and the sole reason for saying he
13   was biased was he happened to be JG's resident advisor.  So I
14   asked him at his deposition, "Are you aware of any relationship
15   at all between JG and Gabe Salgado?"  Answer, "No, other than
16   like saying hi in the hallway."  So that kind of blew the whole
17   JG resident advisor was not going to be serving my needs.  So
18   they changed it now to say that we limited his ability to
19   select an advocate.  We did no such thing.  We told him the
20   people who would be available.  He could go to them or not.
21   And then ultimately, a couple days before the hearing, he says,
22   hey, I want to be assigned an advocate.  We do that,
23   Mr. Salgado.  He chooses not to bring him to the hearing.
24   There's nothing we did with respect to the advocate obligations
25   that we haven't met.
```

1           Legal representation.  You can have legal

2     representation.  You just can't have it at the hearing.  That's

3     what the policy was.  Now under the Violence Against Women's

4     Authorization Act you are entitled to an advisor of your

5     choice, including an attorney, who can show up at the hearing.

6     But the law that was in effect at this time, that was not the

7     case.  The policy said this is not a legal proceeding.  Lawyers

8     aren't involved.  But you're allowed to have a lawyer involved.

9           So what did Mr. Mobus testify?  "I had a lawyer

10    involved.  I had a lawyer involved in the LF proceeding before.

11    I had a lawyer involved in this proceeding.  I met with that

12    lawyer a couple of times and reviewed the details of the

13    complaint that had been provided to me and formulated a

14    response.  And then I met with the attorney at least five times

15    before I showed up at the hearing."  So by August 12 he had

16    submitted a formal statement with respect to the allegations

17    that JG made, just as he was permitted to do.  Students are

18    free to consult their own legal resources when preparing a

19    written response or supporting documentation to the committee.

20    The evidence in front of you, your Honor, shows he did exactly

21    that.

22           Written response, what the policy says.  "The accused

23    student will have the opportunity to submit a written response

24    to the complaint."  He did so.  On August 12 he submitted a

25    document that he called his formal statement with respect to

1    the allegations JG made against him in her complaint.  And he

2    addressed the two things in the notification letter, engaging

3    in oral (verbatim) sex, taking photos without her consent and

4    keeping them.  That was complied with.

5          Meeting with the committee and the opportunity to

6    respond.  "The sexual misconduct committee will speak with

7    both, as well as witnesses, will review all information."  They

8    have a right, again, to be fully informed of the nature of the

9    allegations, and the accused party will have the right to

10    produce information, evidence and/or witnesses.

11          This is another one of my favorite allegations in the

12    complaint:  Mr. Mobus alleged that he was told that he was not

13    allowed to present any evidence at the hearing.  Again, I

14    thought, boy, that's another fact I've got to meet head on.  I

15    did, and he testified that no one ever told him that.  He

16    testified that in the LF proceeding he could and did submit the

17    evidence in the form of a polygraph.  He testified that he

18    could, but did not, submit text messages with his girlfriend

19    JG.  He didn't put that evidence in.  He told me, "No one ever

20    told me that I could not present evidence or present witnesses

21    at the hearing."

22          So what happened at the hearing?  They discussed JG's

23    statement with him, contrary to what was alleged in paragraph

24    40.  They discussed it in detail, and he confirmed this in 100

25    pages of deposition testimony.  They reviewed it with him.  He

1   obtained his response, and he testified, "I responded

2   truthfully.  I responded fully with respect to each."  They

3   reviewed everything.  Non-consensual anal sex, taking of

4   photographs, everything that he ultimately was found

5   responsible for, and he was afforded the opportunity to

6   respond.

7       What didn't happen at the hearing?  The allegation

8   that he did not submit any text messages ever or seek to.  We

9   think there's a pretty good reason for that, your Honor.  And I

10  will direct you to -- they are in ECF 116 -- by the way, your

11  Honor, I have a copy of this if you'd like it.  There's a text

12  exchange with JG the day after.  Remember, she says he got me

13  drunk, and I couldn't really fight back, and I was in too much

14  pain to say anything.  That's what she said.  The text going

15  into that night, "We are getting classy crunk tonight."  If you

16  look up in an Urban Dictionary -- your clerk is younger than I

17  am, but I had to look it up last night -- crunk is getting

18  drunk in a classy fashion.

19      The next day, "Hey, how are you feeling this morning?"

20  She responds, "Not really.  I threw up seven, I think, times

21  today."  There's a good reason he didn't put those text

22  messages in front of the committee, your Honor.  He didn't seek

23  to present any evidence, and I asked him at his deposition,

24  "You were never told at any point that you were not allowed to

25  present a witness or documents as evidence; is that correct?"

1   "I think it's correct."

2          "You did not seek to present any evidence to the

3   committee on August 14 that heard JG's allegations, other than

4   your own testimony; is that correct?"  And "That's correct."

5          Your Honor, with respect to the contractual

6   obligations that might have applied in the student handbook, we

7   met them all, every single one.  I take seriously, your Honor,

8   what I say to the court, and then I assure what I've done is

9   cited you to stuff that is in the record supported by

10  documents, meticulously so.  It's just the way I roll.

11         With respect to the issue of bias, because that just

12  came up quickly, again, I explored that in detail in

13  Mr. Mobus's testimony and the Title IX claim.  He said over and

14  over again, I can't point to anything that anybody ever said to

15  me that is reflective of gender bias.  That testimony stood,

16  was never changed, was never corrected, and it is binding.

17         So they came up with a few tactics on how to get

18  around it.  First, as your Honor knows, they submitted a motion

19  to you contending that we had failed to comply with this

20  court's order directing us to turn over documents for 17

21  investigations with which we complied in full.  And they asked

22  that the sanction be that the issue of gender bias be decided

23  in Andrew's favor preclusively for all time.  And your Honor

24  denied that motion, for which we were grateful, because we

25  complied with it.

1          By the way, your Honor, in contending that we had

2     failed to comply with it, as your Honor I would hope

3     recognized, they rewrote the book.  We provided them a chart to

4     show what your order said and what the claim had said.  They

5     tried to say we hadn't complied with it.  Well, they've done

6     the same thing now.

7          The second thing they've done is rewrite evidence, and

8     this is the one that bothers me the most in the reply,

9     particularly because Mr. Piliero just stood up and purported to

10    read from a document.  They said in one of the documents in

11    their opposition that Colonel Dooley, who chaired the

12    committee, announced that she believed that men accused of rape

13    will tell lies in the adjudication process.  I was really

14    surprised to see that because one would have thought I would

15    have caught that document where a representative of my client

16    said men accused of rape will tell lies.  Your Honor, I just

17    commend it to your reading.  It is in ECF 115, Exhibit 57.  It

18    says no such thing.  It doesn't even come close.

19         They claim Dean Graves suggested that where women were

20    once believed, now men are disbelieved, or where women were

21    disbelieved, men are disbelieved.  Dean Graves says no such

22    thing.  He says simply that with respect to a pendulum

23    swinging, that since the April 4, 2011 Dear Colleague letter

24    there's been an enhanced focus on sexual assault on college

25    campuses resulting in greater responsiveness, not gender bias.

1              THE COURT:  I'm going to ask you to finish up.

2              MR. ROBERTS:  You need me to finish up?

3              THE COURT:  Please.

4              MR. ROBERTS:  Your Honor, I've gone through it in the

5      reply, and as you can tell I don't come in here today saying

6      Andrew Mobus is a bad kid.  I don't care about that.  I am

7      saying that contrary to what was represented in the complaint,

8      in which they allege that he had fully disclosed his academic,

9      psychological, emotional and social history in great detail --

10     his words, not mine -- he did not.  So to the extent he thinks

11     he has a contract claim, he does not because of our very viable

12     defense for fraudulent inducement.  Your Honor, you need not

13     even reach that because you can simply look at the handbook as

14     it is, what it actually says, and it is clear that we did not

15     violate it.  We're entitled to summary judgment on the breach

16     of contract claim, the Title IX claim, and I'll rest on the

17     papers on both the intentional infliction of emotional distress

18     and declaratory judgment.

19             MR. PILIERO:  Am I pushing asking for rebuttal?

20             THE COURT:  Two minutes.

21             MR. ROBERTS:  Thank you.

22             THE COURT:  Literally.

23             MR. PILIERO:  Literally two minutes.

24             I'm glad you said that, because all I want to do is

25     say I really, really agree with Mr. Roberts on one thing in

1   this case, and I don't mean to be impertinent in saying it, if

2   you do read the papers, and I hope you will, he basically

3   vouched for his integrity, and I think he's a great guy, but a

4   lot of what he told you just isn't true.  And he says that's

5   not how I roll.  Well, I got to tell you he rolls very fast

6   that way.  I really ask you, Judge, look at the facts.  The

7   summary judgment on the breach is a no-brainer.  Okay?  They

8   didn't do what he says they did.  He's making it up.  Thank

9   you.

10          MR. ROBERTS:  I don't intend to respond, your Honor.

11          THE COURT:  Okay.

12          MR. ROBERTS:  I get accused of that, and Mr. Piliero

13   has accused me of Rule 11 violations and the like, and I think

14   I've substantiated everything.

15          Your Honor, if you would like, I'm more than happy to

16   hand you this document, which is that chalk with the citations

17   on it, if it will be helpful --

18          THE COURT:  That's fine.

19          MR. ROBERTS:  -- because if someone is going to say I

20   misrepresented things, I'm happy to show I did not.

21          MS. FREY:  Your Honor, I never got a chance to respond

22   to just the Title IX part of his motion.  Can I just give two

23   minutes?  Please, two minutes.

24          THE COURT:  No, I think we're done.  I'll take the

25   matters under advisement.

 1          MS. FREY:  Thank you, your Honor.

 2          THE COURT:  We'll take a short recess.

 3          THE CLERK:  All rise for the court.  The court will

 4  take a short recess.

 5  (Proceedings adjourned at 2:58 p.m.)

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4    UNITED STATES DISTRICT COURT )

5    DISTRICT OF MASSACHUSETTS     )

6

7

8            I certify that the foregoing is a correct transcript

9    from the record of proceedings taken July 17, 2019 in the

10   above-entitled matter to the best of my skill and ability.

11

12   /s/ Kathleen Mullen Silva                7-26-19

13   Kathleen Mullen Silva, RPR, CRR          Date
     Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25