UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ANDREW MOBUS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 17-11011-GAO |
| | ) | |
| BARD COLLEGE, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION IN LIMINE TO PRECLUDE EVIDENCE AND ARGUMENT REGARDING U.S. DEPARTMENT OF EDUCATION GUIDANCE AND BARD'S ANNUAL SECURITY REPORTS**

Plaintiff Andrew Mobus ("Plaintiff," "Andrew," or "Mobus") submits this opposition to Defendant's Second Motion in Limine (Doc. 241) to exclude promises Bard made in sexual misconduct policy statements contained in annual security report publications Defendant Bard College ("Bard") published on Bard's website in 2011 and 2014 ("Annual Reports"),[1] and to preclude references to U.S. Department of Education regulatory and guidance materials for schools seeking to comply with Title IX ("Title IX Materials").

Bard's motion in limine argues that the 2013-14 Student Handbook is the "only relevant description of any contractual obligations on the part of the College to Mobus in connection with the handling of the allegations against him." Doc. 241 at 1 (Motion); Doc. 241-1 (Student Handbook). But Bard should have reasonably expected that a student would rely on other materials

---

[1] *See* Doc. 241-4 (October 2011 Annual Report) at BCSR-0004813-15; Doc. 241-5 (October 2014 Annual Report) at BCSR-0004825-27. The relevant contractual promises in the Annual Reports are identical. Students are the intended audience of these "Right-to-Know" publications, which are required under the Jeanne Clery Disclosure of Campus Security Policy and Crime Statistics Act, 20 U.S.C. § 1092(f) ("Clery Act"). Although required to be published annually, Bard did not produce Annual Reports for October 2012 and October 2013 during discovery.

that Bard widely published on its own website for universal distribution to its students.[2] The Annual Reports contain promises, the clarity and definiteness of which Bard does not challenge. Thus, the provisions in the Annual Reports providing rights to students accused of sexual misconduct can be the basis for a breach of contract claim premised on Bard's failure to follow its own policies. Bard's arguments to the contrary defy the plain reading of the sexual policy statement it authored and published in the Annual Reports. Bard also seeks to improperly insert an actual reliance element into a claim for breach of contract.

Bard's arguments form part of a broader pattern of picking and choosing the terms of the contract without heeding the reasonable expectations standard. Bard claims that the Student Handbook is the only document that applies, yet simultaneously seeks to disclaim the express representation on the second page of the Student Handbook that Bard's policies are consistent with Title IX. *See* Doc. 241 at 4 n.6. The Student Handbook by its own terms applies only to enrolled students, yet Bard seeks to rescind the Student Handbook altogether based on misrepresentations Mobus allegedly made as an applicant for admission. *See* Doc. 244-1 (Student Handbook) at Page 85 of 97 and Doc. 244 (Mobus Motion for Judgment on the Pleadings). Now, Bard seeks to improperly import the elements of promissory estoppel into a dispute about the scope of the contract, arguing the sexual misconduct policy in the Annual Reports cannot be part of the contract because Mobus allegedly did not personally and actually rely on those documents. These self-

---

[2] Bard's unequivocal position here that the Student Handbook is the only relevant document is highly relevant to, and supports, Plaintiff's pending motion for judgment on the pleadings and motion to strike affirmative defense. Doc. 244. While claiming the Student Handbook is the only relevant document for its own liability, Bard is simultaneously asking the Court to rescind the Student Handbook based on misrepresentations Mobus allegedly made in connection with his entirely separate application for admission.

2

serving arguments were rejected at summary judgment and still do not withstand the slightest scrutiny.

### A. The Sexual Misconduct Provisions of the Annual Reports are Enforceable Terms of the Contract.

The Annual Reports and Student Handbook share many of the same attributes that make them enforceable parts of a contract between Mobus and Bard. Each was (1) prepared by Bard, (2) distributed to its students, (3) maintained on Bard's official website, and (4) addressed Bard's sexual misconduct proceedings and procedures. Doc. 241-4 at BCSR-0004808 (prepared by Bard and distributed to students); BCSR-0004813-14 (addresses Bard's proceedings dealing with sexual assault) and BCSR-0004815 (maintained on the school website for all students); Doc. 241-1 at BCSR-0003684 (prepared by Bard, distributed to students and maintained on website) and BCSR-0003746-59 (addressing sexual misconduct proceedings). The Annual Report refers to the Student Handbook, and the Student Handbook references Bard's compliance obligations under the Clery Act. Doc. 241-1 at p. 81 of 97 (Clery Act Compliance) and Doc. 241-4 at BCSR-0004814-15 (detail in the Student Handbook). Neither document contains terms of exclusion negating or supplanting the other, and together they contain the terms of Bard's contractual obligations to students accused of sexual misconduct.

As the Court suggested at the summary judgment hearing, *see infra* note 5, the terms of the contract between a student and school include official statements made by the school to its students, which are part of an implied-in-fact contract. *Mangla v. Brown Univ.,* 135 F.3d 80, 83 (1st Cir. 1998) (the terms of the contract between a student and his school may include statements in various official publications of the school); *Doe v. Brandeis Univ.,* 177 F. Supp. 3d 561, 593 (D. Mass. 2016) (student-college contract is found in official school documents); *Bleiler v. Coll.*

3

*of the Holy Cross,* 2013 WL 4714340, at *14 (D. Mass. 2013) (student contract terms were contained in student handbook and other college materials).

Recent contract cases decided after this Court's ruling on summary judgment involving COVID-19 and the cancellation of in-person activities have only confirmed this Court's instinct that implied-in-fact contracts between students and universities include materials outside a student handbook if published, disseminated, or made available to students. *See Bridget McCarthy v. Loyola Marymount Univ.*, 2021 WL 268242, at *4 (C.D. Cal. 2021) (enforcing promises in publications relating to in-person teaching); *Saroya v. Univ. of the Pac.*, 2020 WL 7013598, at *5 (N.D. Cal. 2020) (absent "express agreement between the university and the student, catalogues, bulletins, circulars, and regulations of the institution made available to the matriculant may become implied terms of an implied-in-fact contract depending on the conduct of the parties." (citations omitted)); *Salerno v. Fla. S. Coll.*, 2020 WL 5583522, at *4 (M.D. Fla. 2020) (explaining that university publications are terms of an implied-in-fact contract); *Bergeron v. Rochester Inst. of Tech.*, 2020 WL 7486682, at *8 (W.D.N.Y. 2020) (statements on website "sufficiently specific" to state a claim for breach of contract). The authorities now seem to point in a single direction: schools like Bard are bound by the specific and definite promises they make to their students, whether contained in a Student Handbook or published on their website.

Bard first argues that the Annual Reports cannot be part of the contract because the documents themselves provide that the Student Handbook is the sole governing document for sexual misconduct proceedings. Doc. 241 at 5. But the Annual Reports speak for themselves and do not, as Bard argues, provide that "investigations of sexual misconduct are governed *solely* by the Sexual Misconduct Policy contained in the College's Student Handbook." *Id.* (emphasis in Bard's motion). The relevant provisions are under the heading "**Regulatory Citation 34 CFR**

4

**668.46(b)(11)**: Statement of policy regarding campus sexual assault program to prevent sex offenses, and procedures to follow when a sex offense occurs." Doc. 241-4 at BCSR-0004813 (emphasis in original). Bard's "statement of policy" provides, among other things, that a "person accused of rape or sexual assault" may choose a responder to provide support throughout the process," who "may be present during investigation interviews and may speak on behalf of the student represented," and "will receive a minimum of eight hours of training regarding sexual assault.³ *Id.* at BCSR-0004813-14.

As Bard notes, the Annual Report also states that "Simon's Rock Sexual Assault Policy and Procedures which outline disciplinary proceedings, as well as special guidelines for cases involving sexual misconduct, are detailed in the Student Handbook." *Id.* at BCSR-0004814-15 (emphasis in original). But a plain reading of this provision does not mean the Student Handbook is the sole source of any promises relating to sexual misconduct proceedings, as Bard argues. It is not at all a disclaimer or similarly-strong statement precluding any reliance on the Annual Report by any student as a matter of law. *See Derrig v. Wal-Mart Stores, Inc., 942 F. Supp. 49, 55 (D. Mass. 1996)* (finding employer's disclaimer that the handbook "merely provides guidance and is not legal contract" was patently inadequate to off-set employee's reasonable expectations that the manual and associate handbook set forth basic terms and conditions of employment"). Neither of the documents use "subject to" or similar terms of exclusion of limitation that would clearly exclude the Annual Report as a source of rights for a person accused of sexual misconduct.

---

³ In this respect, Bard's promises appear to have gone beyond what was required by the Clery Act. *See* 24 C.F.R. § 668.46(k)(2)(iv) ("[T]he institution may establish restrictions regarding the extent to which the advisor may participate in the proceedings, as long as the restrictions apply equally to both parties."), *id.* § 668.46(k)(2)(ii) (requiring annual training but not specifying number of hours).

5

A more plausible construction of the statement is that the Annual Report incorporates the Student Handbook by reference. *See Awuah v. Coverall N. Am., Inc.*, 703 F.3d 36, 43 (1st Cir. 2012) (internal quotation marks and citations omitted) ("Under Massachusetts law, the language used in a contract to incorporate extrinsic material by reference must clearly communicate that the purpose of the reference is to incorporate the referenced material into the contract."). Thus, the key provision Bard relies on arguably brings Appendix C of the Student Handbook into a construction of the Annual Report, but it should not be construed to supplant Bard's statement of policy regarding "procedures to follow when a sex offense occurs" in the Annual Report, as "a contract must not, whenever possible, be construed so as to render any of its terms meaningless." *Baybank Middlesex v. 1200 Beacon Properties, Inc.*, 760 F. Supp. 957, 963 (D. Mass. 1991) (citing *Shea v. Bay State Gas Co.*, 418 N.E.2d 597 (Mass. 1981)).[4] This commonsense construction is further supported by the fact that the Annual Reports and Student Handbook cross-reference each other. *See* Doc. 241-1 at p. 81 of 97 (Clery Act Compliance) and Doc. 241-4 at BCSR-0004814-15 (detail in the Student Handbook).

Bard next makes a specious argument that Andrew must have prospectively and actually relied on the statements of policy in the Annual Reports to bring a claim for breach. Bard appears to confuse the elements of promissory estoppel, requiring actual and reasonable reliance, with the reasonable expectations inquiry that governs the contractual relationship between students and colleges. The First Circuit's approach is clear: "In reviewing a student's breach of contract claim

---

[4] Bard also argues that the charging letter sent to Plaintiff "made clear to Mobus that the Student Handbook – *and the Student Handbook alone* – governed the investigation and adjudication of the allegations against him." Doc. 241 at 5-6. This argument is a red herring. Bard does not argue that the charging letters Bard authored are part of the contract, nor could Bard's unilateral and self-serving statements contained in the charging letters modify the contract contained in the Student Handbook and Annual Reports.

against his or her university," courts "employ a reasonable expectations standard in interpreting the relevant contracts," asking "what meaning the party making the manifestation, the university, should reasonably expect the other party[, the student,] to give it." *Doe v. Trustees of Bos. Coll.*, 892 F.3d 67, 80 (1st Cir. 2018) (citations omitted).  Accordingly, whether the promises in the Annual Report are enforceable terms depends solely on whether Bard, in posting the Annual Reports on its website as a statement of its policy regarding procedures for sexual assault offenses, should have reasonably expected a student to rely on them.  *See id.*

As the Court suspected at the summary judgment hearing,[5] this reasonable expectations standard is at odds with Bard's rigid reliance on *Guckenberger v. Bos. Univ.*, 974 F. Supp. 106, 150 (D. Mass. 1997).  Bard is misreading *Guckenberger*'s combined discussion of claims for breach of contract and promissory estoppel.  In doing so, Bard mistakes reliance—an essential element of a claim for promissory estoppel—as an element for a breach of contract claim.  As the *Guckenberger* court made clear, the reliance element is a key point of distinction between the two claims:

> To state a claim for breach of contract under Massachusetts law, a plaintiff must allege, at a minimum, that there was a valid contract, that the defendant breached its duties under its contractual agreement, and that the breach caused the plaintiff damage.  Even in the absence of consideration to support a binding contractual

---

[5] MS. KRISTAN: . . . This court's decision in Guckenberger controls, your Honor. It says very clearly that when we're looking at the contractual relationship between a student and a college or university and you're looking at publications by the college that might shape that contractual relationship, the student must rely on that document, and the reliance must be reasonable in order for it to become part of the contractual relationship.
. . .
THE COURT: Let me just ask you on that before you do.  Does the recent Doe v. Boston College case alter that [Bard's  at all?
MS. KRISTAN: No, your Honor. I don't think so.
THE COURT: They found an implied contract.
MS. KRISTAN: Based on the student handbook, yes, your Honor.
THE COURT: Okay. All right.
Doc. 192, Summ. J. Hr'g Tr. at 24:19-25:23.

>agreement between the parties, a party reasonably relying on a promise may prevail under a theory of promissory estoppel. A claim in promissory estoppel is essentially a claim in breach of contract; ***however, the plaintiff must prove reasonable reliance on a promise, offer, or commitment by the defendant rather than the existence of consideration***.

*Id.* (internal quotation marks and citations omitted) (emphasis added).[6]

To illustrate further, Bard's motion features the quote from *Guckenberger*: "So long as the promise is 'definite and certain so that the promisor should reasonably foresee that it will induce reliance,' . . . <u>and reliance occurs</u>, a party can maintain an action for breach." Doc. 241 at 6 (emphasis in Bard motion) (quoting *Guckenberger*, 974 F. Supp. at 150). But the two cases the *Guckenberger* court cited for that reliance proposition are promissory estoppel cases. *See Guckenberger*, 974 F. Supp. at 150 (quoting *Santoni v. Fed. Deposit Ins. Corp.*, 677 F.2d 174, 179 (1st Cir. 1982), citing *Rhode Island Hosp. Trust Nat'l Bank v. Varadian*, 647 N.E.2d 1174, 1178-79 (Mass. 1995)).[7]

Moreover, the *Guckenberger* court's ultimate conclusion that only a plaintiff who relied on the brochure at issue could state a claim for breach of contract was based on the school's unrebutted evidence and argument that it did not widely distribute the brochure. *Guckenberger*,

---

[6] *See also Coll v. PB Diagnostic Sys., Inc.*, 50 F.3d 1115, 1124 & n.4 (1st Cir. 1995) (citing Restatement (First) of Contracts § 90 and setting forth elements of claim for promissory estoppel, including reasonable reliance); *See* 4 Williston on Contracts § 8:8 (4th ed.) ("Restatement § 90 was drafted in an attempt to bring principle to the large group of cases in which courts had held promises binding despite the absence of consideration."); *Loranger Const. Corp. v. E. F. Hauserman Co.*, 374 N.E.2d 306, 310-11 (Mass. App. 1978), *aff'd,* 384 N.E.2d 176 (1978) (adopting Restatement (First) of Contracts § 90 and stating that "[r]ecovery in these circumstances requires no more than a promise upon which the promisee could reasonably have placed reliance, and attention is to be focused upon the reasonableness of that reliance.").

[7] In *Varadian*, the court explained that the ultimate inquiry in contract or claims for promissory estoppel is whether a sufficiently definite promise has been made. 647 N.E.2d at 1178-79 (holding promise at issue was not intended by the promisor and not understood by promisee). Bard does not argue that the promises in the Annual Reports are too indefinite or vague to be enforced, nor could it.

974 F. Supp. at 151.  Therefore, under the *reasonable expectations standard*, except for one student who testified that he received and relied on the brochure, the school in *Guckenberger* could not have reasonably expected students to rely on a brochure it did not widely distribute.  *Id.*  In contrast, here it is undisputed that the sexual misconduct policy statement in the Annual Reports was widely distributed to students through Bard's official website.

Bard's final argument that Mobus is impermissibly attempting to bring a private action under the Clery Act merits little discussion.  Doc. 241 at 9 (collecting cases).  Plaintiff's claim is based on the specific and definite promises Bard made in a document that on its face is intended for students, was published on Bard's own website, and specifically addressed the disciplinary procedures and protections Bard supposedly provided to students accused of sexual misconduct. In these crucial respects, the statement of policy in the Annual Reports is similar to the sexual misconduct provisions in the Student Handbook.  For these reasons, Bard should have reasonably expected students would rely on the promises in the Annual Reports, just as Bard concedes it reasonably expected students would on the promises in the Student Handbook.

Bard's contractual liability here has nothing to do with whether Bard violated the Clery Act, which is exclusively enforced by the U.S. Department of Education.  In fact, Bard's promises appear to have exceeded what was required by the Clery Act in some instances, which only reinforces that the statement of policy in the Annual Reports was promissory in nature.  *See supra* note 3.  None of the authorities Bard marshals exclude a school's own statement of sexual misconduct policy contained in a Clery Act report as a basis for a breach of contract claim.[8]  Bard's private right of action argument is simply inapplicable.

---

[8] *Z.J. v. Vanderbilt Univ.*, 355 F. Supp. 3d 646, 703 (M.D. Tenn. 2018) (arguing Clery Act created a statutory duty of care for negligence per se claim); *Souders v. Mount St. Joseph Univ.*, 2016 WL 8671966, at *6 (S.D. Ohio 2016) (asserting statutory claim based on college's improper

9

### A. The Title IX Materials are Relevant to Plaintiff's Claims and Bard's Representation that its Sexual Misconduct Policy was Consistent with Title IX.

Plaintiff does not and will not argue that the Student Handbook expressly incorporates Title IX or its regulations, such that the mandates of Title IX, its regulations, and guidance should be applied as enforceable promises under the law of contracts. But that is not the end of the inquiry. As Bard acknowledges, the Student Handbook does expressly represent that "College policy is consistent with . . . federal statutes and regulations, including but not limited to . . . Title IX of the Education Amendments of 1972 . . . ." Doc. 241-1 at 2. This representation is contained in the "Notice of Nondiscrimination" that is the very first text on the second page of the Student Handbook. *Id.*

The Title IX Materials are, therefore, admissible because they are probative of whether Bard breached its own express representation that its sexual misconduct policy was consistent with Title IX.[9] *See Cigal v. Leader Dev. Corp.*, 557 N.E.2d 1119, 1121 (Mass. 1990) (holding breach of representations in agreement can be basis for a claim for breach of contract). If Bard's sexual misconduct policy was, in fact, *inconsistent* with Title IX, that would be a breach giving rise to

---

classification of incident under the Clery Act's reporting requirements); *Doe v. United States Dep't of Health & Human Servs.*, 85 F. Supp. 3d 1, 11 (D.D.C. 2015) (dismissing APA claim based on Clery Act violation); .*Dziedzic v. State Univ. of New York at Oswego*, 2014 WL 7331926, at *2 (N.D.N.Y. 2014) (dismissing claim based on university's alleged violation of the Clery Act).

[9] Bard argues in a footnote, Doc. 241 at 4 n.6 (citing *G v. Fay Sch., Inc. by & through its Bd. of Trustees*, 282 F. Supp. 3d 381, 400 (D. Mass. 2017)), that this "consistent with" representation is too vague to be enforceable. But the representation to a specific statute and regulations is not at all like the vague, aspirational, indefinite, or open-ended statements found unenforceable in *Fay School*. *See Fay School*, 282 F. Supp. 3d at 400 (alleging school school failed to fulfill its commitments to "recognize, respect, and celebrate the full range of human diversity," to treat student health as a "core value," to "help when students are in physical need," to "recognize and celebrate . . . disabilities," respect individual differences, ensure that "all community members feel supported," and to not discriminate in affording all students the rights, privileges, programs and activities enjoyed by students in general")

liability and damages.[10]  For a more detailed discussion on Plaintiff's Title IX evidence and Bard's breach of this express representation, Plaintiff incorporates by reference his opposition to Defendant's First Motion in Limine to Preclude Expert Testimony of Brett A. Sokolow, to be filed contemporaneously with this opposition.

## CONCLUSION

For the reasons set forth above, the Court should deny Bard's second motion in limine and permit evidence relating to the Annual Reports and Title IX Materials as relevant to Bard's contractual liability.

---

[10] Bard does not appear to contest that Plaintiff's Title IX expert may rely on the Title IX Materials under Fed. R. Evid. 703.

Respectfully submitted,

Andrew Mobus

By His Attorneys,

DLA PIPER LLP (US)


/s/ Matthew J. Iverson_____
Matthew J. Iverson (BBO # 653880)
33 Arch Street, 26th Floor
Boston, MA 02110
(617) 406-6000
(617) 406-6100 (fax)
matthew.iverson@dlapiper.com


/s/ Charles B. Wayne_____
Charles B. Wayne (*pro hac vice*)
Brian J. Young (*pro hac vice*)
500 8th Street, N.W.
Washington, D.C. 20004
(202) 799-4000
(202) 799-5000 (fax)
charles.wayne@dlapiper.com
brian.young@dlapiper.com


/s/ Lisa A. Frey_____
Lisa A. Frey (*pro hac vice*)
50 Old Main Road, #1857
Quogue, NY  11959
(917) 565-1066
lisaxfrey@gmail.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 18th day of February, 2021, a copy of the foregoing was served by electronic mail using the CM/ECF system, which will then send notification of such filing to all counsel of record.

/s/Charles B. Wayne
Charles B. Wayne