UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ANDREW MOBUS, </br></br> Plaintiff, </br></br> v. </br></br> BARD COLLEGE, </br></br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) Civil Action No. 17-11011-GAO |

**PLAINTIFF'S TRIAL MEMORANDUM**

DLA PIPER LLP (US)

Matthew J. Iverson (BBO #653880)
33 Arch Street, 26th Floor
Boston, MA 02110
(617) 406-6000
(617) 406-6100 (fax)
matthew.iverson@dlapiper.com

Charles B. Wayne (*pro hac vice*)
Brian J. Young (*pro hac vice*)
500 8th Street, N.W.
Washington, D.C.  20004
(202) 799-4253
(202) 799-5253 (fax)
charles.wayne@dlapiper.com
brian.young@dlapiper.com

Lisa A Frey (*pro hac vice*)
50 Old Main Road, #1857
Quogue, NY 11959
917-565-1066
lisaxfrey@gmail.com

*Counsel for Plaintiff*

**TABLE OF CONTENTS**

Page

I. Plaintiff's Evidence Will Establish a Title IX Erroneous Outcome Claim ............................. 1

    A. Satisfying the "Articulable Doubt" Standard ................................................................. 1

    B. Evidence Suggesting Gender Bias Was a Motivating Factor ........................................... 3

II. Plaintiff's Evidence Will Demonstrate Bard Breached Its Contract in Multiple Respects ......................................................................................................................................... 6

III. Plaintiff's Evidence Will Show Bard Violated the Implied Covenant of Good Faith and Fair Dealing and the Resulting Duty of Basic Fairness ....................................................... 7

IV. Categories of Damages Available to Plaintiff .............................................................................. 9

    A. Title IX .................................................................................................................................. 9

    B. Breach of Contract ............................................................................................................. 11

V. Post-Verdict Equitable Relief ........................................................................................................ 13

Pursuant to the Court's March 5, 2021 order (Doc. 286), plaintiff Andrew Mobus submits this trial memorandum to address significant issues not fully briefed in the pretrial filings.

## I. Plaintiff's Evidence Will Establish a Title IX Erroneous Outcome Claim.

To prevail on his erroneous outcome claim, plaintiff "must offer evidence (1) that would cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding and (2) show gender bias was a motivating factor." *Doe v. Trs. of Boston Coll.*, 892 F.3d 67, 91 (1st Cir. 2018) (quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994)) (internal quotation marks omitted).[1]

### A. Satisfying the "Articulable Doubt" Standard

Although the Supreme Court and First Circuit have not formally adopted a framework for analyzing claims by students challenging a university's disciplinary's procedures as discriminatory under Title IX,[2] other courts have identified the types of proof that satisfy the "articulable doubt" prong of the erroneous outcome standard.

The Second Circuit in *Yusuf*, which is the decision relied on by the First Circuit in *Boston College*, identified two primary categories of proof: (1) "particular procedural flaws affecting the proof"; and (2) evidentiary weaknesses underlying the decision of guilt, including "a motive to lie

---

[1] The parties in *Boston College* agreed the "articulable doubt" standard applied; however, the First Circuit noted that the Sixth Circuit had applied the same framework to Title IX erroneous outcome claims. *Boston Coll.*, 892 F.3d at 90 n.12 (citing *Doe v. Miami Univ.*, 882 F.3d 579, 592 (6th Cir. 2018); *Doe v. Cummins*, 662 F. App'x 437, 451-52 (6th Cir. 2016); *Mallory v. Ohio Univ.*, 76 F. App'x 634, 638-39 (6th Cir. 2003)).  *See also Doe v. Oberlin Coll.*, 963 F.3d 580, 586 (6th Cir. 2020); *Doe v. Baum*, 903 F.3d 575, 585 (6th Cir. 2018); *Doe v. Brown Univ.*, 166 F. Supp. 3d 177, 185 (D.R.I. 2016).

[2] *Boston Coll.*, 892 F.3d at 90.

on the part of a complainant or witnesses, particularized strengths of the defense, or other reason to doubt the veracity of the charge." *Yusuf*, 35 F.3d at 715.

The Sixth Circuit has likewise held that a procedural defect alone can establish articulable doubt. *Doe v. Baum*, 903 F.3d 575, 585-86 (6th Cir. 2018) (finding articulable doubt where school did not provide opportunity for cross-examination even though credibility was at stake). Other courts have endorsed this approach, requiring evidence such as "(i) pointing to procedural flaws in the investigatory and adjudicative processes, (ii) noting inconsistencies or errors in the adjudicator's oral or written findings, or (iii) challenging the overall sufficiency and reliability of the evidence." *Doe v. Marymount Univ.*, 297 F. Supp. 3d 573, 584 (E.D. Va. 2018).[3]

The following evidence, among other evidence to be presented by plaintiff at trial, will show significant procedural flaws that cast articulable doubt on the outcome of the J.G. disciplinary proceeding:

- Bard failed to evaluate the sufficiency of J.G.'s complaint and did not conduct a preliminary investigation. The evidence will show the Title IX Coordinator, Marty Checchi, ignored this requirement altogether.

- Bard failed to conduct a proper formal investigation. Among other things, the evidence will show the J.G. committee members failed to request critical documentary evidence, such as contemporaneous communications between J.G. and Andrew over their 10-week intimate and sexual relationship, or even photographs that were central to some of the accusations.

---

[3] *See also Doe 2 by & through Doe 1 v. Fairfax Cty. Sch. Bd.*, 384 F. Supp. 3d 598, 607 (E.D. Va. 2019), *aff'd*, 832 F. App'x 802 (4th Cir. 2020) ("Plaintiffs have demonstrated numerous deficiencies with the investigatory process that were relied upon and compounded at each stage of the disciplinary proceeding."); *Doe v. Univ. of Arkansas – Fayetteville*, 2019 WL 1493701, at *12 (W.D. Ark. 2019) ("procedural flaws affecting the record" and "evidentiary weaknesses"); *Doe v. Grinnell Coll.*, 473 F. Supp. 3d 909, 923 (S.D. Iowa 2019) (same); *Doe v. Washington & Lee Univ.*, 2015 WL 4647996, at *10 (W.D. Va. 2015) (holding articulable doubt satisfied by "host of flaws" in school's handling of the case, including omissions in witness summaries and failure to consider post-incident sexual encounter); *Wells v. Xavier Univ.*, 7 F. Supp. 3d 746, 751 (S.D. Ohio 2014) (holding articulable doubt shown by rush to judgment, inadequate training, denying counsel to accused, and denying witnesses).

- Bard failed to give Andrew adequate notice of the charges, including the details of the alleged offense or the provisions of the Student Handbook he allegedly violated. Among other things, the evidence will show J.G. admitted that she and Andrew had anal sex multiple times after the first time on February 28 — the alleged rape. The evidence will show Andrew only learned at the hearing in August 2014 on which of these occasions the alleged rape took place because the committee members interrogated him about it. When asked if he could see or review the detailed statement provided by J.G. that provided the date and other details of the charge, the committee members denied his request.

- Bard failed to conduct a fundamentally fair hearing. Among other things, the evidence will show Andrew was barred from the hearing, except when he testified. This denied him the most basic right of confrontation. The evidence will further show that committee members, such as Col. Patty Dooley, and administrators who influenced the hearing, such as Sue Lyon, prejudged Andrew as guilty. Dooley declared Andrew guilty before hearing any testimony, and admitted that she is predisposed to doubt the veracity of accused students. Lyon, who was conflicted due to her service as a committee member for the L.F. proceeding, provided the J.G. Committee with propensity evidence from the L.F. proceeding.

- The evidence will show Lyon compromised the deliberations by being present in the room, discussing the case with the committee members, and drafting the outcome letter. As a result, the evidence will show the final outcome letter was substantially and meaningfully different than the committee's initial draft with respect to the critical issues of consent, incapacity, and the punishment recommendation.

- The appeal provided to Andrew was meaningless. The evidence will show there was no record of the hearing recorded or transcribed. The inadequately trained appellate officer, the provost Mr. Laipson, only reviewed the final outcome letter authored by Lyon. The evidence will show the appeal failed to review each part of the proceeding to ensure the school's policies and requirements of Title IX were followed.

Evidence of these procedural flaws, among others, will carry plaintiff's burden to establish articulable doubt at trial.

**B.   Evidence Suggesting Gender Bias Was a Motivating Factor**

To meet the second prong of his erroneous outcome claim, plaintiff must adduce evidence showing "particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." *Yusuf*, 35 F.3d at 715 (internal citations omitted). Gender-bias evidence can "include . . . statements by members of the disciplinary tribunal, statements by pertinent university

3

officials, or patterns of decision-making that also tend to show the influence of gender." *Id.* Bias can also be shown through "policies and procedures that are designed to reach gender-specific outcomes . . . ." *Marymount*, 297 F. Supp. 3d at 585 (citing *Cummins*, 662 F. App'x at 452). *See also Doe v. Trs. of Boston College*, 2016 WL 5799297, at *24 (D. Mass. 2016), *rev'd on other grounds by Boston Coll.*, 892 F.3d at 67 (explaining gender bias "can be shown via 'statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that . . . show the influence of gender'") (internal quotation marks and citations omitted).[4]  A plaintiff may rely on "circumstantial evidence alone to prove there was a discriminatory pattern of decision-making." *Boston Coll.*, 892 F.3d at 92 (citation omitted).

Clear procedural irregularities can support an inference of gender bias. *Doe v. Oberlin*, 963 F.3d 580, 586-87 (6th Cir. 2020); *Menaker v. Hofstra Univ.*, 935 F.3d 20, 34 (2d Cir. 2019).[5] Moreover, when "combined with [such] clear procedural irregularities . . . even *minimal* evidence of pressure on the university to act based on invidious stereotypes will permit a plausible inference of sex discrimination." *Id.* (emphasis in original).[6]

---

[4] On appeal, the First Circuit clarified that a plaintiff need not offer direct proof of gender bias in the form of statements from members of the disciplinary tribunal or pertinent university officials. *Boston Coll.*, 892 F.3d at 90 n.14. Rather, as stated above, there are multiple categories of direct and indirect evidence that can suffice to show gender bias.

[5] "While the Fifth Circuit has not directly addressed the issue, other circuits have found that 'clear procedural irregularities . . . will permit a plausible inference of sex discrimination.'" *Doe v. Texas A&M Univ.*, 2021 WL 257059, at *3 (S.D. Tex. 2021) (quoting *Oberlin*, 963 F.3d at 587).

[6] *See also Oberlin*, 963 F.3d at 587; *Baum*, 903 F.3d at 586-87 (holding "adjudicator bias, combined with the external pressure facing the university, makes Doe's claim plausible. Indeed, other courts facing similar allegations have reached the same result") (citing *Miami*, 882 F.3d at 594; *Columbia*, 831 F.3d at 56-57; *Doe v. Amherst Coll.*, 238 F. Supp. 3d 195, 223 (D. Mass. 2017); *Doe v. Lynn Univ., Inc.*, 235 F. Supp. 3d 1336, 1340-42 (S.D. Fla. 2017); *Wells v. Xavier Univ.*, 7 F. Supp. 3d 746, 751 (S.D. Ohio 2014)); *Marymount*, 297 F. Supp. 3d at 587 (holding statement by Title IX coordinator that 'the Title IX process is increasingly politicized, especially in Virginia," was an "implicit acknowledgement that [school's] sexual assault policies and Title

The following evidence, among other evidence presented at trial, will carry plaintiff's burden to show gender bias was a motivating factor in Bard's decision to find Andrew responsible.

- Administrator Sue Lyon, who sat on the L.F. committee and would become the Title IX Coordinator for the J.G. proceedings, declared it was her "happy day" when Andrew was summarily kicked off campus before the school had even notified Andrew that he was being charged with sexual misconduct.

- Committee member Oyogoa had previously declined to serve as Andrew's advocate in the L.F. matter, yet agreed to serve as a committee member judging his guilt in the J.G. matter.

- Committee members Dooley, Oyogoa, and Sack prejudged Andrew as guilty before he submitted his statement of defense or testified. The evidence will show that, having only received and reviewed J.G.'s written statement, they declared Andrew violated the school's policies and should be permanently expelled.[7]

- Before the hearing, committee member Dooley announced that she believed men accused of rape (those "who are out to defend themselves from these accusations") will tell lies in the adjudication process. Dooley also predicted Andrew would lie at the hearing.

- The only non-party witness permitted to testify or even be present at the hearing was Rebecca Fiske, who was J.G.'s advocate and academic advisor who had no personal knowledge regarding J.G.'s allegations. The evidence will show that Fiske told the committee that Andrew is a "menace." Andrew was not allowed to have his advocate speak at the hearing.

- Dean Graves, who was responsible for imposing punishment, told Andrew the "pendulum" had swung on college campuses towards believing female accusers rather than male accused students. Dean Graves did not take disciplinary action when Andrew was the subject of sexual harassment, reasoning that he thought "men and women are different in the way they respond to things."

- Lyon, who sat on the L.F. committee, instigated the J.G. proceeding, and presided over the J.G. matter as a Title IX coordinator, acknowledged schools were under pressure in

---

IX procedures were influenced, at least in part, by political pressure to convict respondents . . . who are almost invariably male").

[7] *See Doe v. Purdue Univ.*, 928 F.3d 652, 669 (7th Cir. 2019) (holding where adjudicator chose to credit complainant's accusation alone without taking other evidence into account or even talking to accused student created plausible inference of gender bias).

>2014 from the federal government, and that one of Simon's Rocks affiliated campuses had a high number of sexual assaults. This was important information to her at the time of the J.G. proceeding.

This gender-bias evidence, combined with the procedural flaws discussed above, is sufficient to carry plaintiff's burden on his Title IX erroneous outcome claim.

## II. Plaintiff's Evidence Will Demonstrate Bard Breached Its Contract in Multiple Respects.

There are two sources for the contractual promises between Andrew and Bard: (1) the 2013-14 Student Handbook governing the rights of accused students in sexual misconduct disciplinary proceedings at Simon's Rock; and (2) Bard College at Simon's Rock Annual Report Concerning the Student Right-to-Know and Campus Security Act. *See* Tr. Ex. 1 (Student Handbook) and Tr. Ex. 105 (Annual Report). The evidence will show Bard at least breached its contractual promises in the following respects.

- The Student Handbook stated that accused students "are entitled to due process," but Bard repeatedly violated that promise.

- The Student Handbook represented that Bard's policies were consistent with Title IX. The evidence will show they were not.

- The Student Handbook provided "an ad hoc Sexual Misconduct Committee will review all complaints" in order to determine whether a disciplinary proceeding is warranted. Tr. Ex. 1 at 79. The evidence will show Title IX Coordinator, Marty Checchi ignored this step entirely.

- The Student Handbook provided the accuser's statement "should describe the alleged incident(s) with as much clarity and detail as possible"; the accused student has "[t]he right to be fully informed of the nature of the alleged violations"; and will be informed of the investigation and will have the opportunity to submit a written response to the complaint." Tr. Ex. 1 at 79, 82. As stated above, Andrew's charging letter provided a few bullet points that lacked critical details of the offense and did not specify which violations he was alleged to have committed. He was denied access to J.G.'s more detailed written allegations.

- The Student Handbook gave Andrew the right to "choose an advocate for assistance throughout the investigation process." Tr. Ex. 1 at 82. The Annual Report stated Andrew could "choose a responder to provide support throughout the process [and to] be present during investigation interviews and [to] speak on behalf of the student represented." Tr.

6

   Ex. 105 at BCSR-0004813.  The evidence will show Andrew was given a limited pool of advocates to select, and he was *assigned* an advocate he did not choose only three days before the hearing  He was not given a responder at all and completely denied the ability to have anyone speak on his behalf at the hearing.

- The Student Handbook required Bard to "speak with both parties, as well as witnesses, and . . . review all information and evidence" in conducting an investigation of sexual misconduct.  Tr. Ex. 1 at 79.  The evidence will show the committee did not speak with any witnesses with knowledge of the alleged events and failed to request any documentary evidence whatsoever.

- The Student Handbook promised a fundamentally fair hearing.  Tr. Ex. 1 at 82.  The evidence will show administrators in charge of the hearing and committee members responsible for adjudging responsibility had conflicts of interest and prejudged Andrew as guilty before he submitted any defense to the charges.

- The Student Handbook provided Andrew the "right to present information, evidence, and/or witnesses" at the hearing.  Tr. Ex. 1 at 79, 82.  The Annual Report likewise obligated Bard to provide "[t]he accuser and accused [with] the same opportunities to have others present during a disciplinary proceeding."  Tr. Ex. 105 at BCSR-0004813.  The evidence will show Bard breached these promises by refusing to allow Andrew to present his own witnesses and refusing to provide Andrew the same opportunities provided to J.G. – to have a character witness testify on his behalf.  J.G.'s character witness, a faculty member, told the committee Andrew was a "menace."

- The Student Handbook provides that the Sexual Misconduct Committee (1) determines whether it is more likely than not that a College policy has been violated; and (2) prepares a report and recommendation to be referred directly to the Dean of Students.  Tr. Ex. 1 at 79-82.  The evidence will show Title IX Coordinator for the J.G. proceeding, Sue Lyon, took over the decision-making process by deliberating with the committee members and rewriting the outcome letter in a manner that concealed incoherencies in the committee's reasoning and findings regarding incapacity, consent, and recommended punishment.

   The evidence at trial will establish at least the foregoing breaches of express contractual promises, each of which caused Andrew significant prejudice and injury.

### III. Plaintiff's Evidence Will Show Bard Violated the Implied Covenant of Good Faith and Fair Dealing and the Resulting Duty of Basic Fairness.

   In addition to the express contractual promises discussed above, Bard had a duty to comply with the implied covenant of good faith and fair dealing contained in every contract governed by Massachusetts law.  *See Uno Restaurants, Inc. v. Boston Kenmore Realty Group Corp.*, 805 N.E.2d

7

957, 964 (Mass. 2004); *Fortune v. Nat'l Cash Reg. Co.*, 364 N.E.2d 1251, 1256 (Mass. 1977). A plaintiff need not present evidence of bad faith; rather, plaintiff's burden is only to show lack of good faith in the manner of performance, which may be inferred by the totality of the circumstances. *T.W. Nickerson, Inc. v. Fleet Nat. Bank*, 924 N.E.2d 696, 704 (Mass. 2010). Moreover, "the implied covenant of good faith and fair dealings imposed on every contract by Massachusetts law, applied in the context of school disciplinary proceedings, creates an independent duty to provide basic fairness." *Boston Coll.*, 892 F.3d at 87 (citing *Uno,* 805 N.E.2d at 964).[8] To be clear, a school's "obligation to provide basic fairness in its proceedings is separate from and in addition to its contractual obligation to follow the rules it set forth in the Handbook." *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 601 (D. Mass. 2016) (citing *Cloud*, 720 F.2d at 725).

> As Judge Saylor observed in *Brandeis*:
>
> "Basic fairness" is an uncertain and elastic concept . . . . There is, however, no one-size-fits-all answer to the question what of constitutes the "basic fairness" that a student is due. The case law appears to indicate, and common sense and experience would likewise suggest, that the answer may vary depending upon the competing interests at stake, include such factors as the magnitude of the alleged violation, the likely sanctions and other consequences of a finding of guilt, and the university's experience and aptitude in resolving disputes of that nature.

*Id.* A violation of basic fairness occurs, for example, when a school fails to provide procedural protections to an accused student that, in the criminal context, are among the basic and fundamental components of due process of law. *See id.* at 603.

---

[8] *See also Cloud v. Trs. of Boston Univ.*, 720 F.2d 721, 725 (1st Cir. 1983) (citing *Coveney v. President & Trs. of Coll. of Holy Cross*, 445 N.E.2d 136, 139 (Mass. 1983)) (examining hearing to ensure it was conducted with basic fairness); *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 594 (D. Mass. 2016) ("[T]he Court must 'examine the hearing' afforded to the student 'to ensure that it was conducted with basic fairness.'") (quoting *Cloud*, 720 F.2d at 725; *Schaer v. Brandeis Univ.*, 735 N.E.2d 373, 380 (Mass. 2000)).

8

The procedural flaws stated above also constitute violations of the implied covenant of good faith and fair dealing and the duty of basic fairness.  Most notably, Andrew was denied the rights of fair notice, confrontation, and a fair hearing when Bard College withheld the accuser's allegations from Andrew, presented the J.G. committee with propensity evidence from the L.F. proceeding, and prejudged Andrew as guilty before he had presented any written defense or testimony.  These egregious procedural flaws, among others to be shown through evidence at trial, constituted violations of the most basic and fundamental components of the due process of law.

## IV. Categories of Damages Available to Plaintiff

### A. Title IX

Plaintiff is entitled to economic and non-economic damages arising from Bard's violations of Title IX, breach of contract, and breach of the implied covenant of good faith and fair dealing and duty of basic fairness.  To prove these damages at trial, Andrew and his parents will testify about the severe emotional distress, stigma, and reputational damage Bard's actions have inflicted on him.  Andrew will also present expert testimony from a psychiatrist, Robert L. Goldstein, M.D., who will opine on Andrew's emotional distress and inability to have a normal working life following his expulsion from Simon's Rock.  Plaintiff will also tender an economist, Kristin K. Kucsma, M.A., who will provide expert testimony on Andrew's lost future income reduced to present value.

A Title IX plaintiff "can obtain the full range of remedies," including compensatory damages.  *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 255 (2009) (citing *Franklin v. Gwinnett Cty. Pub. Sch.*, 503 U.S. 60, 76 (1992)).  *See also Cohen v. Brown Univ.*, 991 F.2d 888, 901 (1st Cir. 1993) ("It is . . . established beyond peradventure that, where no contrary legislative directive appears, the federal judiciary possesses the power to grant any appropriate relief on a cause of action appropriately brought pursuant to a federal statute.").  "[C]ompensatory damages

9

may include not only out-of-pocket loss and other monetary harms, but also such injuries as 'impairment of reputation, personal humiliation, and mental anguish and suffering.'" *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986) (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350 (1974)).

Lost income and diminished earning capacity are among the types of economic damages that are recoverable for Title IX violations. *See Rullo v. Univ. of Pittsburgh - of Commonwealth Sys. of Higher Educ.*, 2021 WL 640117, at *6 (W.D. Pa. 2021) (permitting expert testimony on lost past and future income in Title IX action); *Tanyi v. Appalachian State Univ.*, 2015 WL 4478853, at *10 (W.D.N.C. 2015) (permitting recovery for potential lost career opportunities). Damages for emotional distress and stigma associated with the Title IX violation are recoverable because "emotional distress is ... a 'foreseeable consequence' of a [Title IX] recipient's violation of the terms under which it accepted federal funds." *Dawn L. v. Greater Johnstown School Dist.*, 586 F. Supp. 2d 332, 384 (W.D. Pa. 2008). *See also Chatragadda v. Duquesne Univ.*, 2017 WL 11485589, at *1 n.2 (W.D. Pa. 2017) (citing *Dawn L.*, 586 F. Supp. 2d at 384).[9] The stigma and reputational injury associated with violations of Title IX in the school discipline setting are also self-evident. As the court explained in *Brandeis*, a "student who is found responsible for sexual misconduct will likely face substantial social and personal repercussions . . . ," as "[c]ertainly

---

[9] *See also Kirk v. Sch. Bd. City of Monroe*, 2020 WL 7931377, at *5 nn.2-3 (W.D. La. 2020) (acknowledging foreseeability of emotional distress for discrimination under Title IX); *Lopez v. Regents of Univ. of California*, 5 F. Supp. 3d 1106, 1115 n.5 (N.D. Cal. 2013) ("[E]motional distress damages are generally recoverable under Title VI and Title IX.") (citing *Sheely v. MRI Radiology Network, P.A.,* 505 F.3d 1173, 1204 (11th Cir.2007); *Scarlett v. School of Ozarks, Inc.,* 780 F. Supp. 2d 924, 934 (W.D. Mo. 2011)); *Mansourian v. Bd. of Regents of Univ. of Cal. at Davis*, 2007 WL 3046034, at *14 (E.D. Cal. 2007), *rev'd in part sub nom. on other grounds by Mansourian v. Regents of Univ. of California*, 594 F.3d 1095 (9th Cir. 2010), op. amended and superseded on denial of reh'g, 602 F.3d 957 (9th Cir. 2010) (denying motion for judgment on the pleadings that emotional distress damages were not recoverable under Title IX).

stigmatization as a sex offender can be a harsh consequence for an individual who has not been convicted of any crime, and who was not afforded the procedural protections of criminal proceedings." 177 F. Supp. 3d at 602. *See also Adams v. Sch. Bd. of St. Johns Cty.*, 318 F. Supp. 3d 1293, 1327 (M.D. Fla. 2018), *aff'd* 968 F.3d 1286 (11th Cir. 2020) (awarding Title IX compensatory damages based on evidence that plaintiff suffered emotional damage, stigmatization, and shame resulting from violation of Title IX).

Finally, nominal damages and attorney's fees are also compensable under Title IX. *See Carey v. Piphus*, 435 U.S. 247, 267 (1978); *Farrar v. Hobby*, 506 U.S. 103, 112 (1992); *Mercer v. Duke Univ.*, 401 F.3d 199, 211 (4th Cir. 2005); *Fox v. Pittsburg State Univ.*, 258 F. Supp. 3d 1243, 1252 n.21 (D. Kan. 2017).

### B. Breach of Contract

These same categories of damages are also available for Bard's breach of contract, the implied covenant of good faith and fair dealing, and the duty of basic fairness. In Massachusetts, "'[t]he rule of damages in an action for breach of contract is that the plaintiff is entitled in general to damages sufficient in amount to compensate for the loss actually sustained by [him], and to put [him] in as good position financially as [he] would have been if there had been no breach.'" *Young v. Wells Fargo Bank, N.A.*, 828 F.3d 26, 32 (1st Cir. 2016) (quoting *Pierce v. Clark*, 851 N.E.2d 450, 454 (Mass. 2006)).

In this case, the measure of contractual damages is the cost to Andrew of Bard's disciplinary decision, which includes "lost earnings as a result of the delay in graduation, expenses incurred during the suspension, and the reputational and emotional cost of the suspension." *Benning v. Corp. of Marlboro Coll.*, 2014 WL 3844217, at *3 (D. Vt. 2014). The recoverable damages also include the impact of the responsible finding on a plaintiff's employment prospects (i.e., stigma). *See Doe v. Trustees of Boston College*, 1:15-cv-10790, at Doc. 154 (D. Mass.)

11

(allowing "recovery for additional educational expenses, lost income for delay in receiving BC degree, entering law school and/or entering the legal profession or the impact of the responsible finding on employment prospects").

In Massachusetts, emotional distress damages are "available for breach of contract when the nature of the contract is such that emotional distress is a reasonably foreseeable consequence of a breach." *See, e.g.*, *Sullivan v. O'Connor*, 296 N.E.2d 183, 189 (Mass. 1973). "[W]here a breach 'is of a nature particularly likely to produce emotional distress,'" damages for "mental suffering" may be recovered. *Bargantine v. Mechanics Coop. Bank*, 2013 WL 6211845, at \*6 (D. Mass. 2013) (quoting *St. Charles v. Kender*, 646 N.E.2d 411, 413 (Mass. App. Ct. 1995)). Stated otherwise, emotional distress damages are recoverable if there is something inherent in the contract that would put a defendant on notice that emotional distress would be a foreseeable result of a breach. *See John Hancock Mut. Life Ins. Co. v. Banerji*, 858 N.E.2d 277, 288 (Mass. 2006) (citation omitted).

The contract between a student and school, and especially the sexual misconduct provisions of such a contract, is inherently the kind of contract that would put the university on notice that emotional distress would be a foreseeable result of a breach. *See Brandeis*, 177 F. Supp. 3d at 602 (describing the "substantial social and personal repercussions," and stigmatization of being labeled a sex offender without being provided basic procedural protections). It was, therefore, foreseeable to Bard that its breach of the sexual misconduct provisions of the Student Handbook and Annual Report would cause Mobus—essentially a high-school student at the time—significant emotional distress. The contract itself recognized the potential for such harm and put Bard on notice that

emotional distress was a foreseeable result of its breach.[10] *See, e.g.*, Tr. Ex. 1 (Student Handbook) at 82 (providing that an accused party in a sexual misconduct investigation has "[t]he right to be treated with respect and sensitivity by College officials" and "[t]he right to be advised of and have access to all medical, counseling, legal and support resources available, both on campus and in the community"). As a result, damages for emotional distress are recoverable for the breach of contract and implied covenant of good faith and fair dealing/basic fairness claims, as well as for intentional infliction of emotional distress.[11]

## V. Post-Verdict Equitable Relief

Should plaintiff receive a favorable verdict, he will then request from the Court the equitable relief of expungement of his records at Simon's Rock. This order of procedure is required by the Seventh Amendment's right to a jury trial: "Where legal and equitable issues intertwine, then, a trial judge should normally refrain from making an equitable determination until the jury has decided the legal claims." *Music Suppliers, Inc. v. London Records, Inc.,* 1988 WL 34277, at *3 (D. Mass. 1988). Moreover, the Court is bound, under the Seventh Amendment, by the jury's decision on all issues common to requests for legal and equitable relief. *Wallace Motor*

---

[10] In *Boston College,* Judge Casper held in an unpublished order that emotional distress damages were not recoverable under the particular facts of that case. 1:15-cv-10790, at Doc. 124. The court held the two alleged breaches, which arose from the school's interference with the disciplinary committee's consideration of third-party culprit evidence and its interference with the deliberative process, were not likely to cause emotional distress. It would be inappropriate to construe that ruling as foreclosing emotional distress damages in all student discipline cases. But if the ruling were so construed, plaintiff submits the court in *Boston College* interpreted the Second Restatement rule too narrowly to apply only to "common examples" involving carriers, innkeepers, funeral services, and death notifications. *See id.* (citing Restatement (Second) of Contracts § 353, Comment a). A student's contract with a school may not be a "common example" under the Second Restatement, but common sense dictates that its breach is nevertheless particularly likely to cause serious emotional disturbance.

[11] Nominal damages may also be awarded for breach of contract. *See Flynn v. AK Peters, Ltd.*, 377 F.3d 13, 23 (1st Cir. 2004).

*Sales, Inc. v. American Motors Sales Corp.,* 780 F.2d 1049, 1066 (1st Cir. 1985) ("in deciding whether to grant . . . equitable relief . . ., the judge is required . . . to accept the jury's finding of fact"). This order of proceedings was employed in *Doe v. Trustees of Boston College*, 1:15-cv-10790, at Doc. 200.

The Court has significant discretion in fashioning an equitable remedy: "Once invoked, the scope of a district court's equitable powers is broad, for breadth and flexibility are inherent in equitable remedies." *Brown v. Plata,* 563 U.S. 493, 538 (2011) (citations, internal quotation marks, and ellipsis omitted). The Court "has the ability — indeed, the duty — to weigh all the relevant facts and circumstances to craft appropriate relief on a case-by-case basis." *In re Blinds to Go Share Purchase Litig.,* 443 F.3d 1, 8 (1st Cir. 2006).

Expungement of derogatory information from an entity's records is a familiar civil remedy, both in the employment context and in the area of school discipline. *E.g., Matos v. Clinton School Dist.,* 367 F.3d 68, 72-73 (1st Cir. 2004) (high school); *Doe v. Rector & Visitors of George Mason Univ.,* 179 F. Supp. 3d 583, 587-88 (E.D. Va. 2016) (ordering expungement remedy following challenge to university sexual assault proceeding); *Stevenson v. Amazon.com, Inc.,* 2016 WL 2851316, at *5 (D. Mass. 2016) (Massachusetts statute provides an expungement remedy to aggrieved employees). If the jury returns a favorable verdict, plaintiff will file a motion seeking specific expungement relief for the Court to consider and grant under its equitable power.

Respectfully submitted,

Andrew Mobus

By His Attorneys,

DLA PIPER LLP (US)


/s/ Matthew J. Iverson_____
Matthew J. Iverson (BBO # 653880)
33 Arch Street, 26th Floor
Boston, MA 02110
(617) 406-6000
(617) 406-6100 (fax)
matthew.iverson@dlapiper.com

/s/ Charles B. Wayne_____
Charles B. Wayne (*pro hac vice*)
Brian J. Young (*pro hac vice*)
500 8th Street, N.W.
Washington, D.C. 20004
(202) 799-4000
(202) 799-5000 (fax)
charles.wayne@dlapiper.com
brian.young@dlapiper.com


/s/ Lisa A. Frey_____
Lisa A. Frey (*pro hac vice*)
50 Old Main Road, #1857
Quogue, NY  11959
(917) 565-1066
lisaxfrey@gmail.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 25th day of March, 2021, a copy of the foregoing was served by electronic mail using the CM/ECF system, which will then send notification of such filing to all counsel of record.

/s/Charles B. Wayne
Charles B. Wayne